Sarah Uhlemann (WA Bar No. 41164)*†
Center for Biological Diversity
2400 NW 80th Street, #146
Seattle, WA 98117
Phone:  (206) 327-2344
Facsimile:  (415) 436-9683
Email:  suhlemann@biologicaldiversity.org
†Admitted *pro hac vice*

Brendan Cummings (CA Bar No. 193952)
Center for Biological Diversity
P.O. Box 549
Joshua Tree, CA 92252
Phone:  (760) 366-2232
Facsimile:  (760) 366-2669
Email:  bcummings@biologicaldiversity.org

Miyoko Sakashita (CA Bar No. 239639)
Center for Biological Diversity
351 California Street, Suite 600
San Francisco, CA 94104
Phone:  (415) 436-9682
Facsimile:  (415) 436-9683
Email:  miyoko@biologicaldiversity.org

*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, PACIFIC ENVIRONMENT, and TURTLE ISLAND RESTORATION NETWORK,<br><br>                  Plaintiffs,<br><br>         v.<br><br>EXPORT-IMPORT BANK OF THE UNITED STATES and FRED P. HOCHBERG, in his official capacity as Chairman and President of the Export-Import Bank of the United States,<br><br>                  Defendants. | Case No.: C-12-6325 (SBA)<br><br>**SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

**INTRODUCTION**

1.      This case challenges the Export-Import Bank of the United States' ("Ex-Im Bank") decision to provide nearly $4.8 billion USD in financing for the development and construction of two separate liquefied natural gas ("LNG") projects occurring partially in Australia's Great Barrier Reef World Heritage Area. The projects, the Australia Pacific LNG Project and the Queensland Curtis LNG Project (collectively "the Projects"), will each include gas drilling, pipeline construction, construction of an LNG production facility and shipping terminal, and transport of LNG through the Great Barrier Reef to markets abroad. Ex-Im Bank, a U.S. federal agency, funded these massive fossil fuel projects without properly consulting and considering the Projects' substantial impacts on threatened and endangered species or on the Great Barrier Reef World Heritage Area, as required by the U.S. Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531 *et seq.*, and the National Historic Preservation Act ("NHPA"), 16 U.S.C. §§ 470 *et seq.*

2.      Specifically, the Australia Pacific LNG Project will comprise the entire process of liquefied natural gas production. The Project's proponents will drill up to 10,000 coal-seam gas wells in interior Queensland, install nearly 300 miles of pipeline to transport the gas to the coast, construct and operate a massive LNG facility to condense the gas to liquid and prepare it for transport, dredge the adjacent harbor, and then ship directly through the Great Barrier Reef to export the liquefied gas, mostly to ports in Asia.

3.      Similarly, the Queensland Curtis LNG Project will include drilling up to 6,000 coal-seam gas wells in interior Queensland, installation of over 210 miles of pipeline, construction and operation of an LNG facility that will be located immediately south of the Australia Pacific LNG facility, additional dredging of the adjacent harbor, and shipping of the liquefied gas through the Great Barrier Reef, primarily to ports in Asia.

4.      Both of the Projects' LNG processing facilities and terminals will be located on Curtis Island in Queensland, Australia, partially within the boundaries of the Great Barrier Reef World Heritage Area, an area renowned for its beauty and rare species habitat. Both LNG facilities will also be located within designated habitat for the dugong, a species listed under the U.S. ESA as "endangered,"

and within habitat for U.S. threatened-listed green sea turtles, endangered loggerhead sea turtles, and threatened saltwater crocodiles. The Projects also include shipping of the final LNG product from the LNG facilities to destinations abroad, through high seas habitat for dugongs, sea turtles, and several ESA-listed whales.

5.     Despite the serious impacts that these Ex-Im Bank-funded Projects will have on ESA-listed species, Ex-Im Bank did not initiate or complete consultations with the U.S. wildlife agencies as required by the ESA before funding either Project. 16 U.S.C. § 1536(a)(2). The ESA consultation process is triggered whenever a U.S. federal agency, like Ex-Im Bank, "fund[s] . . . in whole or in part" an activity that "may affect" a listed species. 50 C.F.R. §§ 402.02; 402.14. Consultation may have resulted in mitigation of the Projects' wildlife impacts.

6.     Further, the United States is a party to the World Heritage Convention, under which the Great Barrier Reef World Heritage Area is designated. In 2011, the UNESCO World Heritage Committee expressed "extreme concern" regarding the effects these LNG facilities and other nearby developments will have on the World Heritage Area, including impacts to species and water quality.

7.     Despite these acknowledged impacts, Ex-Im Bank funded the Australia Pacific and the Queensland Curtis LNG Projects but failed to "take into account the effect of the undertaking[s] . . . for purposes of avoiding or mitigating any adverse effects" to the Great Barrier Reef World Heritage Area, as required by the U.S. National Historic Preservation Act, which implements the World Heritage Convention. 16 U.S.C. § 470a-2. The NHPA required Ex-Im Bank to generate and consider information regarding the Projects' impacts on the World Heritage Area, determine whether the effects will be adverse, develop modifications to avoid or mitigate those impacts, and consult with Australia and other interested entities.

8.     Because Ex-Im Bank funded both the Australia Pacific LNG Project and the Queensland Curtis LNG Project without first complying with the ESA or the NHPA, the agency has violated both statutes and the Administrative Procedure Act ("APA"). 16 U.S.C. §§ 1536; 470a-2; 5 U.S.C. § 706.

9.     Moreover, by failing to make a full and timely determination regarding the Center's request for records pertaining to the Projects and by failing to promptly provide all responsive records,

Ex-Im Bank has violated the Freedom of Information Act ("FOIA"), 5 U.S.C. §§ 500 *et seq.*, and the APA, *id.* § 706.

## JURISDICTION

10.     Jurisdiction over this action is conferred by the ESA's citizen suit provision, 16 U.S.C. § 1540(g), FOIA, 5 U.S.C. § 552(a)(4)(B), and 28 U.S.C. §§ 1331 (federal question), 2201 (declaratory relief), and 2202 (injunctive relief). This cause of action arises under the laws of the United States, including the ESA, the NHPA, FOIA, and the APA, and the implementing regulations established pursuant to these federal statutes. An actual, justiciable controversy exists between Plaintiffs and Defendants. The requested relief is proper under 28 U.S.C. §§ 2201 and 2202 and 5 U.S.C. §§ 552, 705, and 706.

11.     Plaintiffs provided Defendants notice of their intent to bring this litigation by certified mail dated August 2, 2012. Plaintiffs sent additional notice letters regarding the Queensland Curtis LNG Project on December 10, 2012 and on January 2, 2013. Defendants have not remedied the violations alleged in those notices.

## VENUE

12.     Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391(e) because Plaintiff organizations reside in this judicial district. Venue is also proper under 5 U.S.C. § 552(a)(4)(B).

## INTRADISTRICT ASSIGNMENT

13.     Pursuant to Local Rules 3-5(b) and 3-2(c) and (d), assignment of this case to the San Francisco or Oakland Division is appropriate. Plaintiffs Center for Biological Diversity and Pacific Environment maintain offices in San Francisco County, and Plaintiff Turtle Island Restoration Network maintains its office in Marin County.

## PARTIES

14.     Plaintiff Center for Biological Diversity ("the Center") is a 501(c)(3) non-profit corporation incorporated in the State of California. The Center maintains offices in San Francisco, Tucson, and other cities in California and across the country. Through science, policy, and

1  environmental law, the Center advocates for the protection of threatened, endangered, and rare species

2  and their habitats throughout the United States and abroad. The Center has programs that focus

3  specifically on ocean protection and combating climate change.

4       15.    The Center has more than 50,000 active members and 775,000 online activists. Center

5  members reside throughout the United States and in many other countries, including Australia. The

6  Center has several members who live in Queensland and in the Gladstone area, near where the Projects'

7  LNG facilities will be located. For example, Center members work in the fishing industry in the

8  Gladstone Harbour/Port Curtis area and rely on these waters for their income. These Center members

9  view Gladstone Harbour each day from their homes and their workplace and attempt to spot sea turtles,

10 dugongs, and other rare wildlife species. These members also regularly recreate on Gladstone Harbour

11 and in the broader Great Barrier Reef World Heritage Area and in marine waters beyond, where they

12 enjoy viewing marine wildlife, including large whales. These members are very concerned that the

13 Australia Pacific LNG Project, the Queensland Curtis LNG Project, and the associated dredging in

14 Gladstone Harbour has harmed and will continue to harm marine life, including the fisheries that

15 support their livelihoods, but also the species they enjoy viewing recreationally. These members have

16 witnessed the water in Gladstone Harbour become visibly muddier and less attractive and now see

17 fewer marine mammals and sea turtles. The members are concerned these aesthetic impacts will worsen

18 as the dredging, construction, and operation associated with the Projects continues. These members

19 have specific plans to continue their regular viewing, visits, and recreation in Gladstone Harbour and

20 the Great Barrier Reef World Heritage Area.

21      16.    Other Center members live in other areas of Queensland, but visit the Gladstone area

22 each year or more frequently to meet with patients, friends, and colleagues and to view the area's

23 aesthetics, wildlife, and environment. For example, one Center member is an avid whale watcher who

24 can view humpbacks migrating from her home and has traveled the world to watch whales and other

25 wildlife. This member works for a wildlife protection organization and visits Gladstone several times

26 each year as part of her advocacy against the various LNG facilities being constructed on Curtis Island.

27 Another member is a doctor who regularly visits patients in Gladstone who are affected by

28

1   contamination in the Harbour. Another member is an aquatic animal veterinarian who regularly

2   samples Gladstone Harbour wildlife to evaluate the effects of the dredging and construction on fish,

3   scallops, and other marine species, including sea turtles. When visiting Gladstone, these members work

4   or recreate in and around the Harbour and the broader Great Barrier Reef World Heritage Area,

5   including camping in the Area, to enjoy the aesthetics and to view or attempt to view dugongs, sea

6   turtles, crocodiles, whales, and other rare wildlife species. These members have specific plans to

7   continue their regular visits and recreation in this area.

8          17.     In addition, other Center members and staff reside in the United States but have specific

9   plans to visit both the Great Barrier Reef World Heritage Area generally and the Gladstone area

10  specifically to recreate and to view and enjoy the scenery. These members particularly plan to attempt

11  to view dugongs, sea turtles, saltwater crocodiles, humpback whales, and other wildlife that are being

12  impacted as the Australia Pacific and Queensland Curtis LNG Projects go forward. For example, one

13  member who has traveled around the world to view dugongs in the past has specific plans to visit

14  northeastern Australia between December 30, 2014 and January 27, 2015. While on this trip, he plans

15  to visit Curtis Island, the Australia Pacific and Queensland Curtis LNG Project sites, and the broader

16  Great Barrier Reef World Heritage Area to view the scenery and waters and attempt to view dugongs

17  and other wildlife.

18         18.     Plaintiff Pacific Environment is a non-profit environmental organization whose mission

19  is to protect the living environment of the Pacific Rim. Based in San Francisco, Pacific Environment

20  achieves its mission by strengthening democracy, supporting grassroots activism, empowering local

21  communities, and redefining international policies. Pacific Environment is particularly dedicated to

22  promoting international efforts to protect biodiversity and to protect rare and endangered species.

23  Pacific Environment has hundreds of supporters in the United States, many of whom live in California.

24  As part of Pacific Environment's broader mission to protect the Pacific Rim, it seeks to hold public

25  finance institutions, particularly Ex-Im Bank, accountable to local communities and the environment

26  through project monitoring to ensure that public money is used to support best environmental

27  protection practices.

28

19.     Further, Pacific Environment members and staff live in the United States and have visited and plan to continue to visit the Gladstone area. For example, one Pacific Environment member visited Gladstone Harbour in October of 2012. He took a boat-based tour of the Australia Pacific and Queensland Curtis LNG Project sites and the habitat surrounding the sites, visited Curtis Island, viewed Gladstone Harbour's muddied waters, and attempted to view wildlife, including dugongs and sea turtles. The member has specific plans to return to Gladstone again in the spring of 2015 to view the area and its wildlife, as he travels to Queensland to conduct site visits of current and potential fossil fuel projects that could harm the Great Barrier Reef. Another member lives in China but visited Gladstone in September 2013 and traveled by boat across Gladstone Harbour, viewing the water and trying to view wildlife. He also visited Heron Island, outside Gladstone. He was particularly disturbed by the Harbour's turbid water and the large number of boats crossing the Reef from the coast. This member has specific plans to return to Gladstone and the portion of the Great Barrier Reef that can be accessed from Gladstone in 2015, when he returns to Australia to attend a semi-annual river conference.

20.     Plaintiff Turtle Island Restoration Network ("Turtle Island") is a non-profit corporation with its principal place of business in Marin County, California. Turtle Island operates the Sea Turtle Restoration Project, which is dedicated to the protection and restoration of endangered and threatened species of sea turtles. Turtle Island has over 7,200 members, including members in Australia, and more than 138,000 online activists and supporters who follow and take action on its campaigns, and each shares a commitment to the study, protection, enhancement, conservation, and preservation of the world's marine ecosystems and the wildlife that inhabits the oceans. Turtle Island has worked extensively to conserve and protect sea turtles in the Pacific from a variety of threats, including efforts to conserve sea turtles and other marine wildlife in Australia.

21.     Turtle Island has members who live in the Gladstone area, as well as staff members who regularly visit Australia, including the Great Barrier Reef World Heritage Area. For example, one Turtle Island member is a sea turtle expert who has studied both green and loggerhead sea turtles that inhabit Australia. This member lives in the United States but regularly visits Australia, including as

recently as September 2012 and July 2013. Each time she visits Australia she observes or attempts to observe sea turtles, including endangered loggerhead sea turtles. She has on several occasions assisted with research at a major loggerhead sea turtle rookery south of Gladstone, and to reach this rookery, the loggerheads migrate through the Great Barrier Reef near Gladstone. This member has also sailed along a large portion of the Great Barrier Reef World Heritage Area, including the area outside of Gladstone, and snorkeled and looked for wildlife, including sea turtles and dugongs. In July 2013, the member visited Gladstone and the Great Barrier Reef World Heritage Area, viewed Gladstone Harbour from the shore, and looked for sea turtles and other wildlife. She also toured Gladstone Harbour and nearby areas by air and boat, viewing the Australia Pacific and Queensland Curtis Project sites. This member has plans to return to Australia to view sea turtles and other wildlife, as she has regularly in the past.

22.     TIRN also has several members who live in or near Gladstone, Australia. One member lives on Curtis Island in Southend, has visited the Australia Pacific and Queensland Curtis LNG Project sites by boat, and has watched Gladstone Harbour degrade visually in recent years. She has seen an increasing number of dead turtles on the beach near her home and is concerned that ongoing dredging associated with the LNG Projects has caused the strandings. Another member is an avid sailor and commercial skipper. She once regularly sailed from her home north of Curtis Island through the Narrows and into Gladstone Harbour on recreational trips to view the wildlife and scenery, but now avoids the area, sailing along the outer coast of Curtis Island due to the LNG facilities' construction.

23.     The Center, Pacific Environment, and Turtle Island and their members have and will continue to advocate against the Projects and Ex-Im Bank's funding, seek to discuss the Projects with agency managers to encourage additional mitigation, and provide information to the public and the media regarding the Projects and their impacts on wildlife, the Great Barrier Reef, and the greater environment.

24.     In May of 2012, Ex-Im Bank authorized a $2.95 billion USD loan to the proponents of the Australia Pacific LNG Project. In December of 2012, Ex-Im Bank authorized a $1.8 billion USD loan to the proponents of the Queensland Curtis LNG Project. Ex-Im Bank's funding of the Australia Pacific LNG Project has and will cause harm to Plaintiffs' staff and members' recreational, economic,

scientific, and aesthetic interests in the species and habitats of the Gladstone area, as well as on the high seas. Both separately and cumulatively, Ex-Im Bank's funding of the Queensland Curtis LNG Project has and will cause harm to Plaintiffs' staff and members' recreational, economic, scientific, and aesthetic interests in the species and habitats of the Gladstone area and on the high seas.

25.     Construction and operation of the Australia Pacific LNG Project and the Queensland Curtis LNG Project, each facilitated and made possible by Ex-Im Bank's funding, will harm endangered and threatened dugongs, sea turtles, crocodiles, large whales, and other wildlife, as well the species' habitats. Specifically, construction and operation of the Australia Pacific LNG Project and the Queensland Curtis LNG Project, including shipping, will substantially diminish water quality and clarity, increase underwater noise, cause vessel strikes both near the LNG facilities and on the high seas, destroy and degrade habitat including through contamination of the area with dredged toxic heavy metals, and otherwise harm dugongs, sea turtles, large whales, and other wildlife, or cause wildlife to leave the area. The Projects' construction and operation will also alter the aesthetic view of Curtis Island and the habitat in and around the Project sites. Dredging associated with the Projects will increase turbidity, making the water appear muddier and diminishing the Harbour's aesthetics, and also harming some members' economic interests in the fishing industry. The Projects will also alter the Great Barrier Reef World Heritage Area by harming dugong, sea turtles, and other wildlife for which the Area was designated and the species' habitats; by degrading water quality and clarity; and by increasing shipping traffic through the Area.

26.     Plaintiffs' staff and members are concerned that the Australia Pacific LNG Project and the Queensland Curtis LNG Project's impacts will reduce their ability to view and study wildlife in the Gladstone Harbour area and in other areas where the species migrate; diminish the aesthetic view of the area, of the water, and of impacted habitat; harm the wildlife populations that they study; and degrade their recreational experience and enjoyment. Further, these members are concerned that the Australia Pacific LNG Project and the Queensland Curtis LNG Project will degrade their recreational, scientific, and aesthetic enjoyment of the Great Barrier Reef World Heritage Area by decreasing their ability to view species and diminishing the water quality. By causing this harm to species, habitat, and the Great

Barrier Reef World Heritage Area, Ex-Im Bank's funding will injure Plaintiffs' staff and members by negatively impacting their recreational, aesthetic, scientific, and economic interests.

27. Further, Ex-Im Bank has full authority to require mitigation of the Projects' environmental impacts. Were Ex-Im Bank directed to complete the required ESA consultation and NHPA processes, Ex-Im Bank may require additional environmental mitigation of the Projects' impacts as a condition of its funding. Further, in order to conduct the required ESA and NHPA processes without irreversibly committing resources, Ex-Im Bank may delay its provision of financing for the Projects, and thus delay the Projects' construction or operation, or even cause the cancelation of the Projects. Cancelation or delay of the Projects or implementation of additional environmental mitigation measures would lessen and thus redress Plaintiffs' staff and members' injuries associated with the Australia Pacific LNG Project and the Queensland Curtis LNG Project.

28. Additionally, Ex-Im Bank failed to timely determine whether to respond to the Center's August 2012 FOIA request and has failed to promptly provide all responsive documents, injuring Plaintiffs' ability to obtain, utilize, and disseminate information regarding the Projects, the Projects' impacts, and Ex-Im Bank's funding.

29. If Ex-Im Bank had complied with all ESA, NHPA, and FOIA procedures, the process would have generated additional information on the Projects' impacts to ESA-listed species, the Great Barrier Reef World Heritage Area, and Ex-Im Bank's funding. Plaintiffs and their members would have access to this information and be better informed about the Projects and their impacts, improving their ability to participate in decisionmaking and to suggest potential mitigation.

30. Defendant Export-Import Bank of the United States ("Ex-Im Bank") is the official export credit agency of the United States. Ex-Im Bank offers a variety of financial products, including direct loans and loan guarantees, to support U.S. exporters. The Export-Import Bank Act of 1945, 12 U.S.C. §§ 635 *et seq.*, is Ex-Im Bank's charter and governing statute. The agency is responsible for complying with other statutory and regulatory mandates related to its financing decisions, including ESA, NHPA, and FOIA requirements.

31.     Defendant Fred. P. Hochberg is President and Chairman of the Export-Import Bank of the United States. Mr. Hochberg is the federal official with the ultimate authority and responsibility for ensuring Ex-Im Bank's compliance with the law, including ESA, NHPA, and FOIA requirements.

## LEGAL BACKGROUND

**A.      The Endangered Species Act**

32.     Congress enacted the Endangered Species Act ("ESA") in 1973 "to provide a program for the conservation of . . . endangered species and threatened species." 16 U.S.C. § 1531(b).

33.     The ESA requires the U.S. Fish & Wildlife Service ("FWS") and the National Marine Fisheries Service ("NMFS," or collectively, "the Services") to "determine whether any species is an endangered species or threatened species." *Id.* § 1533(a)(1). The Services have listed numerous foreign species as threatened or endangered. 50 C.F.R. § 17.11.

34.     Once listed as an endangered species, the ESA prohibits the "take" or the harassment, harm, hunting, or killing of a member of that species by any person, entity, or agency. 16 U.S.C. §§ 1538(a); 1532(19). The Services have also extended the take prohibitions to all threatened species automatically upon listing, unless the Services issue a species-specific rule providing alternative protections. 50 C.F.R. § 17.31(a).

35.     The ESA also establishes that it is "the policy of Congress that all Federal departments and agencies shall seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance of the purposes" of the ESA. *Id.* § 1531(c)(1).

36.     To implement this policy, Section 7(a) of the ESA requires that "[e]ach Federal agency shall, in consultation with . . . the [Services], insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species." 16 U.S.C. § 1536(a)(2). The Services' joint regulations define an agency "action" to mean "all activities or programs of any kind authorized [or] funded . . ., in whole or in part, by Federal agencies . . . Examples include, but are not limited to . . . actions directly or indirectly causing modifications to the land, water, or air." 50 C.F.R. § 402.02; *see also id.* § 402.03 ("Section 7 . . . appl[ies] to all actions in which there is discretionary Federal involvement or control.").

37.     To implement Section 7's consultation requirements, an "agency shall . . . request" from the Services information regarding whether any listed species "may be present" in a proposed action area, and if so, the "agency shall conduct a biological assessment" to identify the species likely to be affected. 16 U.S.C. § 1536(c); *see also* 50 C.F.R. § 402.12(b) (requiring preparation of a biological assessment for "major construction activities"). The "'[a]ction area' means all areas to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action." 50 C.F.R. § 402.02.

38.     An agency must initiate formal consultation with the Services if a proposed action "may affect" a listed species. *Id.* § 402.14(a). The "may affect" threshold is extremely low; consultation is triggered by "[a]ny possible effect, whether beneficial, benign, adverse, or of an undetermined character." 51 Fed. Reg. 19,926 (June 3, 1986). Specifically, to initiate formal consultation, the agency must provide the Services with a "written request" that describes the action, the action area, any listed species, and the manner in which the action may affect those species. 50 C.F.R. § 402.14(c).

39.     After formal consultation, FWS or NMFS issues a biological opinion that evaluates "the current status of the listed species," identifies the "effects of the action" including any "cumulative effects," and concludes whether the agency action is likely to "jeopardize" any species' existence. 50 C.F.R. § 402.14(g); 16 U.S.C. § 1536(b). If the Services find jeopardy, the biological opinion may specify reasonable and prudent alternatives to the action that will avoid jeopardy. 16 U.S.C. § 1536(b)(3); 50 C.F.R. § 402.14(h). If the Services conclude jeopardy will not occur, the Services may "suggest modifications" to the action to "avoid the likelihood of adverse effects." 50 C.F.R. § 402.13.

40.     Further, under ESA Section 7(d), once a federal agency initiates consultation on an agency action, the agency "shall not make any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures." 16 U.S.C. § 1536(d). The Section 7(d) prohibition remains in effect until consultation has concluded.

41.     The ESA does not limit the geographical scope of Section 7's applicability. 16 U.S.C. § 1536(a)(2) ("Each Federal agency shall . . . insure that *any* action . . . is not likely to jeopardize . . . any endangered species or threatened species . . .") (emphasis added).

42.     The Services' original Section 7 regulations, promulgated in 1978, expressly required consultation for all agency actions "in the United States, upon the high seas, and in foreign countries." 50 C.F.R. § 402.02 (1978); 43 Fed. Reg. 870 (Jan. 4, 1978).

43.     However, in 1986, the Services amended their regulations and purported to limit Section 7's scope to agency actions "in the United States or upon the high seas." 50 C.F.R. §§ 402.01; 402.02; 51 Fed. Reg. 19,926 (June 3, 1986).

44.     Several groups challenged the agencies' 1986 regulatory amendment as unlawful, and both the district and appeals courts held the agencies' decision to exempt agency actions in foreign countries from Section 7 consultation violated the ESA's plain language. *Defenders of Wildlife v. Hodel*, 707 F. Supp. 1082 (D. Minn. 1989), *aff'd Defenders of Wildlife v. Lujan*, 911 F.2d 117 (8th Cir. 1990). However, the Supreme Court granted review and found the plaintiffs had failed to establish standing, and without reaching the merits, reversed the lower court decisions. *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992). The Services have not amended their unlawful 1986 regulations.

**B.     The National Historic Preservation Act**

45.     In 1973, the United States ratified the World Heritage Convention. *See* Convention Concerning the Protection of the World Cultural and Natural Heritage, Nov. 16, 1972, 27 U.S.T. 37. The Convention recognizes that "parts of the cultural or natural heritage are of outstanding interest and therefore need to be preserved as part of the world heritage of mankind," and that "in view of the magnitude and gravity of the new dangers threatening them, it is incumbent on the international community as a whole to participate in the protection of" this heritage. *Id.*

46.     Under the Convention, Parties nominate and the UNESCO World Heritage Committee selects cultural and natural heritage properties that have "outstanding universal value" for the World Heritage List. *Id.* Art. 11(1), (2). Parties then commit "to set up . . . services for the protection [and] conservation" of cultural and natural heritage within their borders. *Id.* Art. 5. Further, "[e]ach State

Party . . . undertakes not to take any deliberate measures which might damage directly or indirectly the cultural and natural heritage . . . situated on the territory of other States Parties." *Id.* Art. 6.

47.     In 1980, Congress amended the National Historic Preservation Act of 1966 ("NHPA") to implement the United States' World Heritage Convention obligations. The NHPA requires that, "[p]rior to the approval of any Federal undertaking outside the United States which may directly and adversely affect a property which is on the World Heritage List," each agency "shall take into account the effect of the undertaking . . . for purposes of avoiding or mitigating any adverse effects." 16 U.S.C. § 470a-2.

48.     The NHPA defines an "undertaking" as "a project, activity, or program funded in whole or in part under the direct or indirect jurisdiction of a Federal agency, including . . . those carried out with Federal financial assistance." 16 U.S.C. § 470w(7). Further, an undertaking may affect a World Heritage site if it alters the property's characteristics, including destroying or damaging part of the property. *See* 36 C.F.R. § 800.5(a).

49.     Further, to properly "take into account" the effects of an undertaking on a World Heritage site, an agency must: (1) generate, collect, consider, and weigh information on how the undertaking will affect the listed property, (2) determine whether the effects will be adverse, (3) if necessary, develop and evaluate alternatives or modifications to avoid or mitigate adverse effects, and (4) consult with the host nation and other entities regarding the effects. *See* 36 C.F.R. Part 800.

**C.     The Export-Import Bank Act of 1945**

50.     Ex-Im Bank was created pursuant to the Export-Import Bank Act of 1945. 12 U.S.C. §§ 635 *et seq*. The statute authorizes Ex-Im Bank to provide loans, loan guarantees, insurance, and credits to facilitate the export of U.S. goods and services. *Id.* § 635(a)(1).

51.     Ex-Im Bank provides export financing products that fill gaps in trade financing. The agency assumes credit and country risks that the private sector is unable or unwilling to accept.

52.     Ex-Im Bank's organic statute requires the agency to "establish procedures to take into account the potential beneficial and adverse environmental effects of goods and services for which support is requested under its direct lending and guarantee programs." *Id.* § 635i-5(a)(1).

53.     To implement this requirement, in 1992, Ex-Im Bank adopted its Environmental

Procedures and Guidelines. Under the Environmental Procedures applicable at the time the Australia

Pacific and Queensland Curtis LNG Projects were approved, Ex-Im Bank was required to "screen and

categorize" all applications that "ha[ve] the potential for adverse environmental effects" and for which

Ex-Im Bank's financial exposure exceeds $10 million. *Envt'l Procedures & Guidelines* § I(2) (2012).

All applicants for "[l]arge" projects were required to submit an "Environmental Impact Assessment" or

equivalent documentation sufficient for Ex-Im Bank "to evaluate the nature and extent of the

environmental effects of a project, and effectiveness of proposed mitigation measures." *Id.* §§ II; I(6),

(7).

54.     Further, Annex A of the Procedures & Guidelines provided "the scope of the

environmental guidelines applicable to projects." *Id.* § I(8). These "Performance Standards" require an

applicant to "[p]rotect and conserve biodiversity." *Id.* Annex A, Performance Std. No. 6. Specifically,

in areas of natural habitat, the project "will not significantly convert or degrade" natural habitats unless

there are no viable alternatives. *Id.* Further, "[i]n areas of critical habitat," a project may not cause

"measurable adverse impacts" to the habitat. *Id.* The Performance Standards also require pollution

mitigation and the protection of "cultural heritage." *Id.* Annex A, Performance Std. Nos. 3 and 8.

55.     An applicant must also submit an "Environmental and Social Management Plan" and an

"Action Plan" to Ex-Im Bank, setting out "specific mitigation measures and actions . . . required for the

project to comply with application laws, regulations and the requirements of the[ ] Performance

Standards." *Id.* Annex A, Performance Std. No. 1.

56.     Ex-Im Bank's Board of Directors may "withhold financing from a project for

environmental reasons." 12 U.S.C. § 635i-5(a)(2). Further, "[i]f a project does not meet the applicable

environmental guidelines," the Board of Directors may "provide financial support conditioned on the

implementation of measures to mitigate the project's adverse environmental effects." *Envt'l Procedures

& Guidelines* § I(15).

57.     Finally, Ex-Im Bank must "monitor the environmental performance of . . . projects . . .,

particularly those aspects of projects subject to any Ex-Im Bank financing conditions pertaining to the

1  implementation of measures to mitigate a project's environmental impacts." *Id.* § V. The agency "shall

2  provide for the public disclosure of environmental assessments and supplemental environmental reports

3  required to be submitted to the Bank, including remediation or mitigation plans and procedures, and

4  related monitoring reports." 12 U.S.C. § 635i-5(a)(1); *see also Envt'l Procedures & Guidelines* §

5  I(7)(c) (requiring Ex-Im Bank to provide "a comprehensive summary of the material environmental

6  requirements associated with its financial support" on its website and all environmental reports that

7  demonstrate compliance with Ex-Im Bank's environmental guidelines and required mitigation

8  measures).

9  **D.    The Freedom of Information Act**

10       58.    The Freedom of Information Act ("FOIA") requires that agencies "shall" upon request

11  "make [agency] records promptly available to any person." 5 U.S.C. § 552(a)(3)(A).

12       59.    Specifically, after receiving a FOIA request, an agency must, within twenty working

13  days "determine . . . whether to comply with such request and shall immediately notify the person

14  making such request of such determination and the reasons therefor, and of the right of such person to

15  appeal to the head of the agency any adverse determination." *Id.* § 552(a)(6)(A)(i). In "unusual

16  circumstances" and only after "written notice" to the requester, an agency may take ten additional

17  working days to make a determination. *Id.* § 552(a)(6)(B)(i).

18       60.    Accordingly, within the twenty working days, or in thirty working days under unusual

19  circumstances, the agency must: (1) gather and review responsive documents, (2) determine and

20  communicate the scope of the documents it intends to produce and withhold and the reasons for

21  withholding any documents, and (3) inform the requester that it can appeal whatever portion of the

22  determination is adverse.

23       61.    Upon a determination to comply with a FOIA request, "records shall be made promptly

24  available" to the requester. *Id.* § 552(a)(6)(C)(i).

25       62.    FOIA states that a requester "shall be deemed to have exhausted his administrative

26  remedies . . . if the agency fails to comply with the applicable time limit provisions" provided under the

27  statute. *Id.*

28

**FACTUAL BACKGROUND**

A.     **The Great Barrier Reef and Its Endangered Species**

63.     Stretching more than 1600 miles along the northeastern Australian coast, the Great Barrier Reef is the world's largest coral reef ecosystem. Renowned for its spectacular natural beauty, the Great Barrier Reef also supports a diverse array of habitats, accounting for a tremendous range in biodiversity, including numerous rare, threatened, and endangered species.

64.     The dugong (*Dugong dugon*) is a large, herbivorous marine mammal related to the manatee. Dugongs can grow up to 10 feet long and weigh over 550 lbs. The dugong diet is largely restricted to seagrass, and dugongs are typically found in wide, shallow, and protected bays, mangrove channels, or on the lee shore of islands containing seagrass meadows. 68 Fed. Reg. 70,185 (Dec. 17, 2003).

65.     The dugong was first listed as endangered in 1970 under the ESA's precursor statute and was subsequently included on the endangered list following the ESA's enactment. 35 Fed. Reg. 18,319 (Dec. 2, 1970); 39 Fed. Reg. 1171 (Jan. 4, 1974). The species is listed as endangered throughout its range. 68 Fed. Reg. 70,185 (Dec. 17, 2003). The dugong is also considered "Vulnerable" by the International Union for Conservation of Nature and Natural Resources ("IUCN"). The species' primary threats include hunting and habitat destruction, as seagrass is extremely sensitive to human influence. Seagrass beds can be destroyed from dredging and inland and coastal clearing, as these actions cause turbidity and sedimentation. Underwater noise and vessel strikes are also threaten the dugong.

66.     A large portion of the world's dugongs inhabit Australia, including the Great Barrier Reef. Dugongs occur in Port Curtis and Gladstone Harbour and near Curtis Island. In recent years, the number of dugong strandings along the Queensland coast has increased, and the Gladstone area is considered a hot spot for these strandings. Between January 2011 and September 2012, the Queensland Department of Environment and Heritage Protection documented 17 dugong strandings in the Gladstone area alone and a total of 41 dugong strandings throughout the state.

67.     In 1997, Australia designated the Rodds Bay Dugong Protection Area B, which includes the entire Port Curtis area, to protect dugong habitat.

68.     The green sea turtle (*Chelonia mydas*) derives its common name from the green fat underneath the turtles' shells. Green sea turtles, like other sea turtles, can live up to 80 years and migrate long distances between their foraging grounds and nesting beaches.

69.     While green sea turtles are found in tropical and subtropical seas worldwide, one breeding population nests in the southern Great Barrier Reef, including a major nesting area on the islands of the Capricorn Bunker Groups, located immediately east of Gladstone. These islands include Heron, Northwest, Wreck, Tryon, Masthead, Erskine, Fairfax, North Reef, and Wilson Islands. Minor breeding aggregations also occur at Bushy Island, the Percy Islands, Bell Cay, and Lady Elliott Island, on the mainland coast from Bustard Head to Bundaberg, and the northern part of Fraser Island. Very low-density nesting can occur on almost any other beach within this area. Adult and juvenile green sea turtles may occur in Port Curtis/Gladstone Harbour and near Curtis Island

70.     Green sea turtle breeding colony populations in Florida and on the Pacific coast of Mexico are listed as endangered under the ESA, while all other populations of green sea turtle, including those in Australia, are listed as threatened. 43 Fed. Reg. 32,800 (July 28, 1978). The IUCN has also deemed the entire species "endangered" and to have a "decreasing" population trend.

71.     The loggerhead sea turtle (*Caretta caretta*) reaches up to 3 feet in length and has a reddish-brown, slightly heart-shaped top shell.

72.     While the loggerhead sea turtle is found in subtropical and tropical areas around the world, loggerhead nesting aggregations in Oman, the United States, and Australia account for about 88 percent of nesting worldwide. Major loggerhead rookeries are found in the Great Barrier Reef, including major nesting concentrations in the thirteen islands of the Capricorn Bunker Groups (especially Wreck, Tryon, and Erskine Islands) immediately east of Gladstone. Loggerhead sea turtles may occur in Port Curtis/Gladstone Harbour and near Curtis Island.

73.     Listed as "endangered" by the IUCN, nine Distinct Population Segments ("DPS") of loggerhead sea turtles are listed under the ESA, including the South Pacific Ocean DPS in eastern Australia, which is listed as endangered. 76 Fed. Reg. 58,868 (Sept. 22, 2011). Based on nest count

data from the mid-1970s through the early to mid-2000s, the South Pacific Ocean DPS is at risk and thus likely to decline in the future.

74.     Sea turtles in Australia, including both green and loggerhead sea turtles, face numerous threats. In addition to bycatch in fisheries and vessel strikes, habitat degradation at nesting beaches and feeding areas plays a significant role in the species' declines. Habitat-related harm includes the presence of lights in nesting areas, beach erosion, increased effluent and water contamination, and increased underwater noise. Further, green sea turtles use seagrass habitats for foraging, and the degradation or destruction of seagrass habitat may harm sea turtles.

75.     Like the dugong, sea turtles in Queensland have experienced high levels of mortality recently. The Queensland Department of Environment and Heritage Protection documented 296 sea turtle strandings in the Gladstone area alone between January 2011 and September 2012.

76.     The saltwater crocodile in Australia is listed as a threatened species under the ESA. 61 Fed. Reg. 32,356 (June 24, 1996). The species inhabits estuaries, mangrove swamps, and tidal reaches of rivers. The saltwater crocodile reaches lengths well over 20 feet, making it the largest crocodilian species. Exploitation for hides significantly reduced the species' wild population. Although saltwater crocodiles are not common in the area, the species may be found near Port Curtis/Gladstone Harbour.

77.     Several other ESA-listed wildlife species inhabit the Great Barrier Reef, including endangered humpback whales and endangered sperm whales. *See* 35 Fed. Reg. 18,319 (Dec. 2, 1970) (listing humpback and sperm whales). Humpback whales have also been sited within Gladstone Harbour.

78.     Additionally, numerous ESA-listed species inhabit the high seas, including the high seas outside Australia's territorial waters. These species include dugongs, loggerhead sea turtles, green sea turtles, humpback whales, sperm whales, sei whales, and fin whales. *See id.* (listing sei and fin whales as endangered). These high seas species are vulnerable to vessel strike and ship noise.

79.     The Great Barrier Reef World Heritage Area was added to the World Heritage List in 1981 due to its remarkable beauty and biodiversity, including rare fauna like dugong and several

species of sea turtles. In recommending the site for listing, the Advisory Body to the World Heritage Committee specifically noted: "[t]he site includes major feeding grounds for the endangered dugong (Sirenia: *Dugong dugon*) and nesting grounds of world significance for two endangered species of marine turtle, the green (*Chelonia mydas*) and the loggerhead (*Caretta caretta*), . . . [and] given the severe pressures being placed on these species elsewhere, the Great Barrier Reef may be their last secure stronghold." World Heritage Nomination, IUCN Technical Review (July 1981).

80.     Although the Great Barrier Reef World Heritage Area largely coincides with the Great Barrier Reef Marine Park, it extends beyond the Park's boundaries in some areas. The waters to the west of Curtis Island are included in the Great Barrier Reef World Heritage Area. The Great Barrier Reef World Heritage Area includes not only reef habitats, but also seagrass beds, sandy or muddy sea beds, continental slope, and deep oceanic water habitats.

**B.     The Australia Pacific LNG Project**

81.     The Australia Pacific LNG Project is a joint venture owned and sponsored by Origin Energy, ConocoPhillips, and the China Petrochemical Corporation (Sinopec).

82.     The Project includes several components. In the "upstream" portion of the Project, proponents will drill up to 10,000 coal-seam wells in the interior Surat and Bowen Basins west of Brisbane. A nearly 300-mile underground pipeline will be installed to transport the gas to the coast, including a marine crossing over the Narrows, a channel that separates the coast and Curtis Island. The marine crossing will include dredging and direct destruction of seagrass beds.

83.     The "downstream" portion of the Project includes the construction of an 18-million metric tons per year-capacity LNG facility on Curtis Island to process gas, condense it to liquid, and store it for transport. The LNG facility will also include a marine loading jetty to transport the liquefied gas to tankers for shipping. The LNG facility will occupy 740 acres of land and over 800 acres of seabed. Construction will require dredging and destruction of mangrove and seagrass habitat. The Project also requires dredging of Gladstone Harbour to facilitate tanker access.

84.     The Australia Pacific LNG Project also includes the shipping of the final LNG product through the Great Barrier Reef World Heritage Area and across the high seas to ports abroad, mostly in

1    Asia. At maximum capacity, the Project may increase shipping through the Great Barrier Reef Marine

2    Park by 13 percent.

3         85.    Particularly, in their 2010 EIS in a Chapter entitled "Project Description," the Australia

4    Pacific LNG Project proponents note that LNG facility "Operations" include "LNG Shipping," stating

5    that "LNG will be transported by specially designed ships. At the LNG facility's nominal capacity of

6    approximately 18Mtpa, it is expected that a LNG vessel will arrive approximately every one to two

7    days for loading and export." Australia Pacific LNG EIS, Vol. 4, Chap. 3, at 42, 48 (March 2010). The

8    EIS also describes how the Project proponents were "working in conjunction" with the Gladstone port

9    to set certain navigational requirements that apply to ships accessing the LNG facility. *Id.* at 31.

10        86.    Additionally, after the EIS was completed, Sinopec joined the two original proponents,

11   Origin Energy and ConocoPhillips, as a Project proponent in April 2011. Sinopec subscribed to a 15%

12   ownership interest in the Project and also signed a Sale and Purchase Agreement to buy up to 4.3 mtpa

13   of LNG, or about 90% of Project's base case production. While Ex-Im Bank states that the Sinopec

14   contract "places responsibility for the transportation of LNG . . . with the buyer[ ]," *see* Ex-Im Bank

15   Memorandum to the Board of Directors, at 74 (Apr. 25, 2012),  the "buyer" of almost all the LNG

16   produced by the Project is Sinopec – one of the Project's owners and sponsors for the Ex-Im Bank loan.

17   At the time of the loan decision, "Sinopec ha[d] ordered LNG Tankers to meet its transportation

18   obligations under the" proponents' contractual agreement. *Id.* at 75. Further, the proponents also note

19   that, for LNG sold to buyers other than Sinopec, sales may be through "delivered ex-ship" ("DES")

20   contracts, "thus requiring the Borrower [i.e., the Project proponents] to secure ships for a portion of

21   LNG deliveries to market," and "[t]he Borrower will maintain sufficient shipping capacity under long

22   term charter arrangements to enable it to meet its delivery obligations under any sales contracts that may

23   be arranged on a DES basis." APLNG Information Memorandum (Nov. 2011), at 84, 193. Accordingly,

24   regardless of how the proponents' EIS defines the Project, the Project's proponents will both produce

25   and ship the LNG, and the Project includes shipping. Because the agency action includes shipping, the

26   agency action occurs on the high seas.

27

28

87.     Construction and operation of the Australia Pacific LNG Project will emit substantial amounts of greenhouse gases. The Australia Pacific LNG Project will emit over 11 million tons of carbon dioxide equivalents ("$CO_2e$") per year at maximum capacity.

88.     The Project's proponents' 2010 EIS documents some likely impacts from the Project's construction and operation. This EIS was submitted to Ex-Im Bank and constitutes the Project's Environmental Impact Assessment or equivalent documentation, pursuant to Ex-Im Bank's Procedures and Guidelines. However, this EIS was not issued by Ex-Im Bank in conformance with National Environmental Policy Act ("NEPA") procedures, and thus does not constitute compliance with that statute.

89.     The Australia Pacific LNG Project will adversely impact the environment, including both marine and terrestrial habitat and wildlife species.

90.     The Project is located partially within the Great Barrier Reef World Heritage Area. The Project is also located partially within the Rodds Bay Dugong Protection Area.

91.     The Project occurs partially upon the high seas.

92.     The Project may impact marine wildlife in the Port Curtis/Gladstone Harbour area and on the high seas through the destruction or degradation of habitat from dredging, construction, or reclamation, diminished water quality, vessel strikes, lighting impacts, or underwater noise. Dugongs, green sea turtles, loggerhead sea turtles, saltwater crocodiles, or humpback, sperm, sei, or fin whales may be affected by the Australia Pacific LNG Project.

93.      The construction and operation of the Australia Pacific LNG Project may directly and adversely affect the Great Barrier Reef World Heritage Area.

**C.      The Queensland Curtis LNG Project**

94.     The Queensland Curtis LNG Project's proponent/sponsor is BG Energy Holding Limited, a wholly-owned subsidiary of the United Kingdom-based BG Group.

95.     The Project includes several components. In the "upstream" portion of the Project, proponents will drill up to 6,000 coal-seam wells in the interior Surat Basin west of Brisbane. A 210-

mile underground pipeline will be installed to transport the gas to the coast, including a marine crossing over the Narrows.

96.     The "downstream" portion of the Queensland Curtis LNG Project includes the construction of a 12-million metric tons per year-capacity LNG facility on Curtis Island to process gas, condense it to liquid, and store it for transport. The Queensland Curtis LNG facility will be located just south of the Australia Pacific LNG facility. The LNG facility will also include a marine loading jetty to transport the liquefied gas to tankers for shipping. Construction and dredging for the Project will destroy mangroves and may smother seagrass habitat.

97.     The Queensland Curtis LNG Project also includes the shipping of the final LNG product through the Great Barrier Reef World Heritage Area and across the high seas to ports abroad, mostly in Asia. At maximum capacity, the Project may increase current large vessel movements within the Great Barrier Reef by 6 percent.

98.     Particularly, in the "Project Description" volume in the Draft Environmental Impact Statement ("DEIS"), the Project proponent stated it "will develop five principal Components as part of the Queensland Curtis LNG (QCLNG) Project," including: (1) the "Gas Field Component," (2) the "Pipeline Component," (3) the "LNG Component," which includes the LNG processing plant, storage, and jetty and docking facilities to facilitate loading of LNG carriers, (4) the "Swing Basin and Channel," and (5) "Shipping Operations." *See* Queensland Curtis LNG DEIS, Vol. 2, Chap. 3, at 1-2 (July 2009). "Shipping Operations" are described to include:

> regular transit of LNG tankers and, potentially, infrequent transit of ships carrying propane to the LNG Facility for the 'spiking' of LNG. Shipping operations will involve three stages: firstly, loading LNG/unloading propane at the marine jetty; secondly, transit of ships through Gladstone Harbour; and thirdly, transit of ships through the Great Barrier Reef Marine Park to open ocean.

*Id.* In its Supplemental EIS, the proponent noted some changes to the Project, including the Swing Basin component, but the only change to the Project Description for "Shipping Operations" was that "[t]he Project no longer proposes 'spiking' of LNG with propane," so shipping associated with that spiking will not occur. Queensland Curtis LNG SEIS, Vol. 2, Chap. 3, at 5 (Jan. 2010); *see also* Ex-Im Bank Memorandum to the Board of Directors for Queensland Curtis LNG (Nov. 9, 2012), at 36-37 (similarly

describing the Project's "five principal Components" to include "Shipping Operations for regular transit of LNG tankers" through Gladstone Harbour and the Great Barrier Reef).

99.     The proponent included shipping as part of its Queensland Curtis LNG Project because "[t]ypically shipping of LNG out of the Port of Gladstone will be undertaken by BG Group [i.e., the proponent], with LNG ships being a combination of vessels owned by BG Group and vessels contracted by BG Group to carry cargo . . . BG Group has a core fleet of nine LNG tanker ships," with four additional BG Group ships under construction. QCLNG DEIS, Vol. 2, Chap. 9, at 22; QCLNG SEIS, Vol. 2, Chap. 9, at 7 (noting no changes to this description in the SEIS). Because the agency action includes shipping, the agency action occurs on the high seas.

100.     The Project also requires dredging of Gladstone Harbour to facilitate tanker access. The Queensland Curtis LNG Project will include dredging of a new shipping channel and swing basin.

101.     Construction and operation of the Queensland Curtis Pacific LNG Project will emit substantial amounts of greenhouse gases. The Queensland Curtis LNG Project will emit over 108 million tons $CO_2e$ over the Project's lifetime.

102.     The Project's proponents 2009 DEIS documents some likely impacts from the Project's construction and operation. The DEIS was later supplemented in 2010, and the DEIS and supplement together constitute the Project's Final EIS. This EIS was submitted to Ex-Im Bank and constitutes the Project's Environmental Impact Assessment or equivalent documentation, pursuant to Ex-Im Bank's Procedures and Guidelines. However, this EIS was not issued by Ex-Im Bank in conformance with National Environmental Policy Act ("NEPA") procedures, and thus does not constitute compliance with that statute.

103.     The Queensland Curtis LNG Project will adversely impact the environment, including both marine and terrestrial habitat and wildlife species.

104.     The Project is located partially within the Great Barrier Reef World Heritage Area. The Project is also located partially in the Rodds Bay Dugong Protection Area.

105.     The Project occurs partially upon the high seas.

24

106.    The Project may impact marine wildlife in the Port Curtis/Gladstone Harbour area and on the high seas through the destruction or degradation of habitat from dredging, construction, or reclamation, diminished water quality, vessel strikes, lighting impacts, or underwater noise. Dugongs, green sea turtles, loggerhead sea turtles, saltwater crocodiles, or humpback, sperm, sei, or fin whales may be affected by the Queensland Curtis LNG Project.

107.    The construction and operation of the Queensland Curtis LNG Project may directly and adversely affect the Great Barrier Reef World Heritage Area.

**D.    UNESCO's  Response**

108.    In 2011, the UNESCO World Heritage Committee expressed "extreme concern" regarding Australia's approval of liquefied natural gas facilities on Curtis Island and requested an official monitoring mission to assess the impacts. The resulting report, issued in June 2012, found that "the developments in Gladstone Harbour and on Curtis Island," including the various LNG facilities and associated dredging, "do have a negative impact on the OUV [Outstanding Universal Value] of the property." World Heritage Committee Mission Report, Reactive Monitoring to Great Barrier Reef: WHC-12/36.COM/7B (June 2012). In response, the World Heritage Committee requested that Australia formally report on the status of the Great Barrier Reef World Heritage Area, "with a view to considering, in the absence of substantial process, the possible inscription of the property on the List of World Heritage in Danger."

**E.    Ex-Im Bank's Funding of the Australia Pacific LNG Project**

109.    On May 3, 2012, Ex-Im Bank's Board of Directors authorized $2.95 billion in direct loans for the Australia Pacific LNG Project.

110.    The Australia Pacific LNG transaction was Ex-Im Bank's second largest single-project financing in its history.

111.    The Australia Pacific LNG Project is a Category A project.

112.    Upon information and belief, Ex-Im Bank's support of the Australia Pacific LNG Project is structured as limited recourse project finance.

113.    Upon information and belief, the funding provided by Ex-Im Bank for the Australia Pacific LNG Project was critical to the Project's financing. The Australia Pacific LNG Project would not likely proceed without Ex-Im Bank's financial support.

**F.      Ex-Im Bank's Funding of the Queensland Curtis LNG Project**

114.    On December 27, 2012, Ex-Im Bank's Board of Directors authorized $1.8 billion in direct loans for the Queensland Curtis LNG Project.

115.    The Queensland Curtis LNG Project is a Category A project.

116.    Upon information and belief, Ex-Im Bank's support of the Queensland Curtis LNG Project is structured as limited recourse project finance.

117.    Upon information and belief, the funding provided by Ex-Im Bank for the Queensland Curtis LNG Project was critical to the Project's financing. The Queensland Curtis LNG Project would not likely proceed without Ex-Im Bank's financial support.

**G.      FOIA Request and Ex-Im Bank's Failure to Respond**

118.    On August 3, 2012, the Center submitted a FOIA request (#201200053F) to Ex-Im Bank, seeking records regarding the agency's decision to fund the Australia Pacific LNG Project and the Queensland Curtis LNG Project.

119.    On August 9, 2012, Ex-Im Bank acknowledged that it had received the Center's request on August 3, 2012.

120.    Ex-Im Bank was required to determine whether to comply with the Center's request, provide its reasons, and notify the Center of its appeal rights by September 4, 2012.

121.    Ex-Im Bank has begun providing some documents in response to the FOIA; however, to date, Ex-Im Bank has not fully notified the Center of which documents the agency will release, which exemptions it will claim, or whether it will grant the Center's request for a fee waiver and has not informed the Center of its appeal rights.

# CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### Violations of Section 7 of the Endangered Species Act

122.    Plaintiffs hereby incorporate by reference the allegations presented in all preceding paragraphs.

123.    Ex-Im Bank's funding of the Australia Pacific LNG Project constitutes an "agency action" under Section 7 of the ESA. 16 U.S.C. § 1536; 50 C.F.R. §§ 402.02; 402.03. Ex-Im Bank's funding of the Queensland Curtis LNG Project constitutes an "agency action" under Section 7 of the ESA. *Id.*

124.    Ex-Im Bank's funding of the Australia Pacific LNG Project "may affect" ESA-listed species present in the action area in Australian territorial waters and on the high seas. 50 C.F.R. § 402.14(a). Ex-Im Bank's funding of the Queensland Curtis LNG Project "may affect" ESA-listed species present in the action area in Australian territorial waters and on the high seas. *Id.*

125.    Ex-Im Bank failed to request from the Services a list of endangered and threatened species present in the action area and failed to prepare a biological assessment describing the impacts of the Australia Pacific and Queensland Curtis LNG Projects on threatened and endangered species, as required by the ESA. 16 U.S.C. § 1536(c); 50 C.F.R. § 402.12(b).

126.    Ex-Im Bank failed to initiate or complete consultation with the Services regarding the impacts of its actions on ESA-listed species, as required by the ESA. 16 U.S.C. § 1536(a)(2).

127.    By failing to comply with the procedural mandates of Section 7 of the ESA, Ex-Im Bank has failed to ensure its actions do not jeopardize any listed species, including dugong, loggerhead and green sea turtles, saltwater crocodiles, and humpback and sperm whales. 16 U.S.C. § 1536(a)(2).

128.    Defendants' failure to comply with Section 7's consultation requirements constitutes a violation of the ESA.

**SECOND CLAIM FOR RELIEF**

**Violations of the National Historic Preservation Act and the Administrative Procedure Act**

129.     Plaintiffs hereby incorporate by reference the allegations presented in all preceding paragraphs.

130.     Ex-Im Bank's funding of the Australia Pacific LNG Project constitutes an "undertaking" that "may directly and adversely affect" the Great Barrier Reef World Heritage Area, pursuant to the NHPA. 16 U.S.C. § 470a-2. Ex-Im Bank's funding of the Queensland Curtis LNG Project constitutes an "undertaking" that "may directly and adversely affect" the Great Barrier Reef World Heritage Area, pursuant to the NHPA. *Id.*

131.     Ex-Im Bank failed to "take into account the effect . . . for purposes of avoiding or mitigating any adverse effects" of the Projects on the Great Barrier Reef World Heritage Area, prior to approving funding for the Projects. *Id.*

132.     Ex-Im Bank failed to generate and collect information regarding the Projects' effects on the Great Barrier Reef World Heritage Area, failed to determine whether the effects will be adverse, failed to consider mitigation to avoid those effects, and failed to properly consult with all parties regarding the effects.

133.     Defendants' failure to properly take into account the Australia Pacific LNG and Queensland Curtis LNG Projects' effects on the Great Barrier Reef World Heritage Area violates the NHPA, is arbitrary, capricious, and otherwise not in accordance with law, and/or constitutes an action unlawfully withheld under the APA. *Id.*; 5 U.S.C. §§ 551; 706.

**THIRD CLAIM FOR RELIEF**

**Violations of the Freedom of Information Act and Administrative Procedure Act**

134.     Plaintiffs hereby incorporate by reference the allegations presented in all preceding paragraphs.

135.     Ex-Im Bank failed to determine whether it would comply with the Center's August 3, 2012 FOIA request; notify the Center of the agency's determination, the scope of responsive documents, and the reasons for withholding any documents; or notify the Center of its appeal rights

within the statutory time period. 5 U.S.C. §§ 552(a)(6)(A)(i). Further, Ex-Im Bank failed to promptly provide all responsive records. *Id.* § 552(a)(6)(B).

136.   Defendants' failure to properly respond to the Center's FOIA request violates FOIA and constitutes an action unlawfully withheld and/or unreasonably delayed under the APA. *Id.* §§ 551; 552; 706.

## RELIEF REQUESTED

For the reasons stated above, Plaintiffs respectfully request that the Court grant the following relief:

1.   Declare that Ex-Im Bank violated Section 7 of the ESA, 16 U.S.C. § 1536, by failing to ensure through consultation that its funding of the Australia Pacific LNG Project and the Queensland Curtis LNG Project did not jeopardize any ESA-listed species;

2.   Declare that Ex-Im Bank violated the NHPA, 16 U.S.C. § 470a, and the APA, 5 U.S.C. § 706, by failing to properly take into account the effects of the Australia Pacific LNG Project and the Queensland Curtis LNG Project on the Great Barrier Reef World Heritage Area;

3.   Declare that Ex-Im Bank violated FOIA, 5 U.S.C. § 552, and the APA, 5 U.S.C. § 706, by failing to timely respond to the Center's FOIA request and promptly provide requested records;

4.   Set aside and remand Ex-Im Bank's decisions to fund the Australia Pacific LNG Project and the Queensland Curtis LNG Project and compel Ex-Im Bank to consult with the Services regarding those decisions, to suspend any actions that might constitute irreversible and irretrievable commitments of resources pending completion of that consultation, and to properly take into account the Projects' effects on the Great Barrier Reef World Heritage Area;

5.   Order Ex-Im Bank to produce records in response to the Center's August 3, 2012 FOIA request;

6.   Award Plaintiffs their costs of litigation, including reasonable attorneys' fees; and

7.   Grant Plaintiffs such other relief as the Court deems just and proper.

Dated:  August 25, 2014                    Respectfully submitted,

                                            _/s/  Sarah Uhlemann_____
                                           Sarah Uhlemann (WA Bar No. 41164)*
                                           Center for Biological Diversity
                                           2400 NW 80th Street, #146
                                           Seattle, WA 98117
                                           Phone:  (206) 327-2344
                                           Facsimile:  (415) 436-9683
                                           Email:  suhlemann@biologicaldiversity.org
                                           *Admitted *pro hac vice*

                                           Brendan Cummings (CA Bar No. 193952)
                                           Center for Biological Diversity
                                           P.O. Box 549
                                           Joshua Tree, CA 92252
                                           Phone:  (760) 366-2232
                                           Facsimile:  (760) 366-2669
                                           Email:  bcummings@biologicaldiversity.org

                                           Miyoko Sakashita (CA Bar No. 239639)
                                           Center for Biological Diversity
                                           351 California Street, Suite 600
                                           San Francisco, CA 94104
                                           Phone:  (415) 436-9682
                                           Facsimile:  (415) 436-9683
                                           Email:  miyoko@biologicaldiversity.org

                                           *Attorneys for Plaintiffs*

Second Amended Complaint                        30                    C-12-6325 (SBA)