SAM HIRSCH, Acting Assistant Attorney General
U.S. Department of Justice
Environment & Natural Resources Division

MEREDITH L. FLAX, Senior Trial Attorney (D.C. Bar No. 468016)
Wildlife & Marine Resources Section
Ben Franklin Station, P.O. Box 7611
Washington, D.C. 20044-7611
Telephone: (202) 305-0404
Facsimile: (202) 305-0275
meredith.flax@usdoj.gov

KRISTOFOR SWANSON, Trial Attorney (CO Bar No. 39378)
Natural Resources Section
Ben Franklin Station, P.O. Box 7611
Washington, D.C. 20044-7611
Telephone:  (202) 305-0248
Facsimile:  (202) 305-0506
kristofor.swanson@usdoj.gov

*Attorneys for Defendants*
*[Additional counsel listed under signature block]*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

Oakland Division

| | | |
|---|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, *et al.*, | ) ) ) | 4:12-cv-06325-SBA |
| Plaintiffs, | ) ) | DEFENDANTS' MOTION TO DISMISS THE FIRST CLAIM FOR RELIEF IN THE SECOND AMENDED COMPLAINT AND MEMORANDUM OF LAW IN SUPPORT |
| v. | ) ) ) | |
| EXPORT-IMPORT BANK OF THE UNITED STATES, *et al.*, | ) ) ) | Date:  November 25, 2014 Time:  1:00 p.m. Place:  4th Floor, Courtroom 1 |
| Defendants. | ) ) | Judge:  Hon. Saundra Brown Armstrong |

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

Notice is hereby given, under Local Civil Rule 7, that on November 25, 2014, or as soon as this matter may be heard, in the Courtroom of the Honorable Saundra Brown Armstrong (Courtroom 1), Defendants Export-Import Bank of the United States and Fred P. Hochberg, in his official capacity as Chairman and President of the Export-Import Bank of the United States (collectively "the Bank"), will move this Court to dismiss the First Claim for Relief in the Second Amended Complaint for failure to state a claim upon which relief can be granted, pursuant to Fed. R. Civ. P. 12(b)(6). Plaintiffs' First Claim for Relief fails to state a claim because the documents upon which Plaintiffs rely for their new factual allegations that the Bank's action here includes shipping on the high seas do not actually support that proposition.

**MEMORANDUM OF LAW**

**STATEMENT OF RELIEF REQUESTED**

Defendants request that the Court dismiss the First Claim for Relief in Plaintiffs' Second Amended Complaint with prejudice.

**ISSUE TO BE DECIDED**

Whether Plaintiffs' First Claim for Relief states a claim on which relief can be granted if the documents cited in support of that claim and incorporated by reference into the Second Amended Complaint do not actually show the Bank took an "action" triggering consultation under the Endangered Species Act ("ESA").

**STATEMENT OF MEET AND CONFER**

Counsel for Defendants conferred with counsel for Plaintiffs regarding the filing of this motion on September 10, 2014. Plaintiffs' counsel indicated that Plaintiffs will oppose the motion.

**INTRODUCTION**

In the First Claim for Relief in the Second Amended Complaint, Plaintiffs allege that the Bank's decisions to provide funding to two liquefied natural gas ("LNG") projects in Australia constitute agency "action" under the ESA and its implementing regulations, and therefore Defendants violated the statute by failing to initiate or complete consultation with the U.S. Fish

and Wildlife Service and/or the National Marine Fisheries Service (collectively, "the Services"). The Court dismissed the first claim for relief in Plaintiffs' First Amended Complaint for failure to adequately allege that the Bank took an "action" under the ESA. Although Plaintiffs amended their first claim for relief to add new allegations, this claim continues to fail to state a claim upon which relief can be granted because the new allegations Plaintiffs added do not actually show that the Bank took an agency "action" that triggered ESA consultation. Consequently, as explained more fully below, the Court should dismiss the First Claim for Relief in the Second Amended Complaint with prejudice.

## **BACKGROUND**

### I.    **Statutory and Regulatory Background**

In 1973, Congress enacted the ESA "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b). Section 4 of the ESA directs the Secretary[1] to determine by regulation whether a given species should be listed as endangered or threatened. 16 U.S.C. § 1532(6); 16 U.S.C. § 1532(20); 16 U.S.C. § 1533. Species native to the United States, as well as foreign species, can be listed as threatened or endangered under the ESA. 16 U.S.C. § 1533(a). Individual members of a foreign species located in the United States or on the high seas receive similar protections as domestic species. 50 C.F.R. § 17.11(e).

However, certain portions of the ESA do not apply to foreign species located outside the United States or on the high seas. For example, no critical habitat is designated for foreign species concurrently with listing as occurs for domestic species pursuant to 16 U.S.C. § 1533(a)(3)(A). 50 C.F.R. § 424.12(h); 49 Fed. Reg. 38,900, 38,904 (Oct. 1, 1984) (explaining to a commenter that the ESA "does not contain authority to designate critical habitat in areas outside U.S. jurisdiction."). Similarly, consultation under ESA Section 7(a)(2) is not required

---

[1] Depending on the species, either the Secretary of Commerce or the Secretary of the Interior classifies a species as endangered or threatened. 16 U.S.C. § 1533(a).  The Secretaries' ESA responsibilities have been delegated to the National Marine Fisheries Service and the U.S. Fish and Wildlife Service, respectively.

where a Federal agency engages in an "action" that occurs beyond U.S. jurisdiction or the high seas. 50 C.F.R. § 402.01(a) (Section 7(a)(2) consultation requirement applies to Federal agency actions "in the United States or upon the high seas"); 50 C.F.R. § 402.02 ("'[a]ction' means all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies in the United States or upon the high seas."). ESA Section 9's "take" prohibition is also limited to the take of species "within the United States or the territorial sea of the United States," and "upon the high seas." 16 U.S.C. § 1538(a)(1)(B), (C).

## II.      Factual Background

The Bank is an independent federal agency, headquartered in Washington, D.C., that is the official export credit agency of the United States. *See* 12 U.S.C. § 635(a)(1). The Bank's mission is to assist in financing the export of United States goods and services to international markets. *Id.* The Bank's objective in authorizing loans is to "contribute to maintaining or increasing employment of United States workers." *Id.*

On May 3, 2012, the Bank authorized a $2.95 billion direct loan to Australia Pacific LNG Processing Pty Limited to support United States exports to the Australia Pacific liquefied natural gas ("APLNG") Project located in Queensland, Australia. Second Am. Compl. ¶ 109 (ECF No. 64) ("SAC").[2] On December 27, 2012, the Bank authorized a $1.8 billion direct loan to support United States exports to the Queensland Curtis liquefied natural gas ("QCLNG") Project located in Queensland, Australia. *Id.* ¶ 114. Plaintiffs allege that the Projects will result in impacts to ESA-listed species. *Id.* ¶¶ 92, 106. The Services' regulations limit the geographic scope of ESA Section 7 and, thus the obligation to consult, to agency actions "in the United States or upon the high seas." *Id.* ¶ 43 (citing 50 C.F.R. §§ 402.01; 402.02; 51 Fed. Reg. 19,926 (June 3, 1986)). Because the Bank's action occurred entirely within a foreign country and its territorial waters, and not "in the United States or upon the high seas," 50 C.F.R. § 402.02, the Bank was not

---

[2] Given the present posture of this case, Federal Defendants cite to the Second Amended Complaint only to provide relevant background information to the Court.  The citations are not intended to constitute an admission to any allegations in the Second Amended Complaint.

1 │ subject to the substantive or procedural requirements of ESA Section 7(a)(2) in carrying out that

2 │ action. *See* SAC ¶¶ 1-5, 126-127.

3 │ **STANDARD OF REVIEW**

4 │     A Rule 12(b)(6) motion to dismiss tests the legal sufficiency of the claims asserted in a

5 │ complaint. The material allegations in the complaint must be taken as true, and reasonable

6 │ inferences must be drawn in the plaintiff's favor. *Pareto v. FDIC*, 139 F.3d 696, 699 (9th Cir.

7 │ 1998). However, the pleading requirements in Rule 8(a)(2) "require[] more than labels and

8 │ conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl.*

9 │ *Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted). Courts need not accept "'naked

10 │ assertion[s]' devoid of 'further factual enhancement,'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678

11 │ (2009) (quoting *Twombly*, 550 U.S. at 557), and "the tenet that a court must accept as true all of

12 │ the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals

13 │ of the elements of a cause of action, supported by mere conclusory statements, do not suffice."

14 │ *Id.* (citing *Twombly*, 550 U.S. at 555). "A claim has facial plausibility when the plaintiff pleads

15 │ factual content that allows the court to draw the reasonable inference that the defendant is liable

16 │ for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).

17 │     In resolving a motion to dismiss under Rule 12(b)(6), the scope of review is limited to the

18 │ allegations in the complaint, materials referenced in the complaint, and matters that are subject to

19 │ judicial notice, including public press releases and filings in prior litigation. *United States v.*

20 │ *Ritchie*, 342 F.3d 903, 907 (9th Cir. 2003). "Even if a document is not attached to a complaint, it

21 │ may be incorporated by reference into a complaint if the plaintiff refers extensively to the

22 │ document or the document forms the basis of the plaintiff's claim." *Id.* at 908.

23 │     Leave to amend is not warranted where, as here, "there is no set of facts that can be

24 │ proved under the amendment that would constitute a valid claim." *Clarke v. Upton*, 703 F. Supp.

25 │ 2d 1037, 1043 (E.D. Cal. 2010) (citing *Miller v. Rykoff-Sexton, Inc.*, 845 F.2d 209, 214 (9th Cir.

26 │ 1988)); *see also Ascon Properties v. Mobile Oil Co.*, 866 F.2d 1149, 1160 (9th Cir. 1989) ("the

27 │ district court's discretion to deny leave to amend is particularly broad where plaintiff has

28 │ previously amended the complaint.") (citations omitted).

**ARGUMENT**

Plaintiffs' First Claim for Relief alleges that the Bank violated ESA Section 7(a)(2) by failing to consult prior to making its decisions to provide funding to two LNG Projects in Australia. SAC ¶¶123-128. The threshold question at this stage is whether Plaintiffs' Second Amended Complaint has adequately alleged that the Bank's funding of the Projects constitutes an agency "action" under ESA Section 7. Although Plaintiffs have added new factual allegations to attempt to show that the Bank took an agency "action," these new allegations mischaracterize the documents they rely on for this proposition. As the Court will see when it reviews these documents, which is appropriate in this circumstance, the documents actually demonstrate that the Bank's action occurs wholly within a foreign country and its territorial waters.[3] Consequently, the Bank could not have violated ESA Section 7(a)(2) because it had no obligation to consult with the Services and Plaintiffs' ESA claim fails to state a claim upon which relief can be granted.

The ESA requires Federal agencies to consult with the Services to "insure that any <u>action</u> authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species . . ." 16 U.S.C. § 1536(a)(2) (emphasis added). The Services' ESA regulations define "action" as "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies <u>in the United States or upon the high seas</u>." 50 C.F.R. § 402.02 (emphasis added).[4] If a Federal agency's proposed activity or program qualifies as an "action" then it must consult with one or both Services if that "action" "may affect" ESA-listed species. *Id.* § 402.14(a). Within that consultation, the Services address the "effects of the action," which include the direct and indirect effects of the "action" under consultation together with interrelated and interdependent activities. *Id.* § 402.02.

---

[3] Although the ESA does not define the meaning of "high seas," there is no dispute that the "high seas" does not include the territorial waters of foreign countries.

[4] In order to be subject to ESA Section 7, the Federal agency must also have sufficient discretionary involvement or control over the activity or program being authorized, funded, or carried out in the United States or on the high seas. 50 C.F.R. § 402.03. *See also Karuk Tribe v. U.S. Forest Serv.*, 681 F.3d 1006, 1021 (9th Cir. 2012).

1    Conversely, if no "action" has been taken, there is no obligation to consult and thus no obligation

2    to address the "effects of the action" even if such effects occur in the United States or on the high

3    seas.[5]

4          Here, the Bank provided partial funding for two LNG Projects that will occur entirely

5    within Australia and its territorial waters. Plaintiffs have added allegations to their complaint

6    citing three documents to attempt to demonstrate that shipping on the high seas is a component

7    of each of the two Projects and, thus, that the Bank's funding constitutes an "action" under the

8    ESA: (1) the Environmental Impact Statements ("EIS") prepared by the Project proponents;[6] (2)

9    the Bank's Board Memoranda; and (3) for the APLNG Project, an Information Memorandum

10   prepared by the Project proponents. SAC ¶¶ 85-86, 98-99. By citing and relying on these

11   documents in their SAC, these documents have been incorporated by reference into the

12   complaint and are appropriate for the Court to review on a motion to dismiss. *Richie*, 342 F.3d at

13   907-8. Plaintiffs' new allegations fail, however, because Plaintiffs mischaracterize even the

14   selective portions of the documents on which they attempt to rely. A review of these and other

15

16

17   _____

18   [5] Likewise, the regulatory definition of "action area" indicates that it applies only if the duty to
     consult has been triggered, *e.g.*, if a Federal agency is conducting an "action" within the meaning
19   of 50 C.F.R. § 402.02. *See* 50 C.F.R. § 402.02 (defining "action area" to include all "areas to be
     affected directly or indirectly by the <u>Federal action</u> and not merely the immediate area involved
20   in the action.") (emphasis added).

21   [6] Defendants previously submitted the EISs' Project Descriptions and asked the Court to take
22   judicial notice of them, which the Court granted. Order Granting Motion to Dismiss (ECF No.
     62) ("Order") at 8 n.6. It should be noted that the Project proponents, not the Bank, prepared the
23   EISs, and the "project," from the perspective of the proponents and the Australian government is
     different and far more expansive than the "Project" funded by the Bank. The Bank reviewed the
24   EISs as part of its due diligence and according to its internal guidelines. And those documents
25   consider indirect shipping impacts that may result from the construction and operation of the two
     export facilities. However, the fact that the Project proponents may have considered the potential
26   environmental impacts of shipping in the EISs or that the Bank voluntarily looked at such
     impacts pursuant to its internal guidelines does not expand the scope of the agency "action"
27   under the ESA. As previously explained, the trigger for consultation is an "action" that occurs in
     the United States or on the high seas, not the effects of an "action" that may occur in these
28   geographic areas. ECF No. 44 at 1, 2, 4.

_____

portions of the documents shows that the Projects do not include shipping on the high seas, let alone that the Bank funded any such shipping.[7]

For the APLNG Project, the EIS lists three elements or objectives: development of gas fields in south central Queensland; a high pressure gas pipeline from the gas fields to Gladstone in central Queensland; and an LNG facility on Curtis Island at Gladstone. ECF No. 45 at 9 (of 22) (APLNG EIS Executive Summary at 1); *see also* APLNG EIS Vol. 1, Ch. 1 at 10-12 (attached hereto as Exhibit 1). The Court has already reviewed this part of the EIS and concluded that it "do[es] not identify transportation of LNG as a component of [the] project." Order at 8.

Nonetheless, Plaintiffs cite to the EIS in new allegations in the SAC to attempt to show that shipping on the high seas is a component of the APLNG Project. SAC ¶ 85. Plaintiffs selectively cite to a later chapter of the APLNG EIS in which the Project proponents "note that LNG facility 'Operations' include 'LNG Shipping,'" and discuss the frequency of expected vessel traffic. *Id.* (quoting APLNG EIS Vol. 4, Ch. 3 at 42, 48 (attached hereto as Exhibit 2)). However, a closer examination of this portion of the EIS shows that the Project proponents were evaluating potential environmental impacts of shipping activities at the LNG terminal and in Gladstone Harbor, all within Australia's territorial waters, not shipping activities on the high seas.[8] Such a reading is supported by the Queensland Government's Terms of Reference for the EIS, which were "prepared by the Coordinator-General for comment by various advisory agencies and the public." APLNG Draft terms of reference for an environmental impact statement (attached hereto as Exhibit 4) at 6. The Terms of Reference section on "Shipping" describes Project shipping activities to be assessed as those "in the Commonwealth Marine area" and requires documentation of changes to "access to and from the port, shipping routes to be

---

[7] Defendants have attached the documents or portions thereof cited in paragraphs 85-86 and 98-99 in the SAC as Exhibits with the addition of contextual pages as appropriate. Defendants have also attached additional portions of the EISs and other documents cited herein. Defendants did not provide full versions of the EISs given their size, but can provide them at the Court's request.

[8] Plaintiffs' other cite to the EIS for this Project similarly discusses the Project proponents' work with the Gladstone Port regarding navigational requirements. SAC ¶ 85 (citing APLNG EIS Vol. 4, Ch. 3 at 31 (attached hereto as Exhibit 3)). Gladstone Port is within the territorial waters of Australia, not on the high seas.

used by vessels beyond the port <u>in Commonwealth marine waters</u>." *Id.* at 78-79 (emphasis added). The Terms of Reference for the QCLNG Project similarly has a section on "Shipping" which asks for "details of the number of ships utilising Gladstone Ports Corporation (GPC) port facilities and travelling beyond <u>in Australian waters</u> . . ." and for a description of changes to "access to and from the port, shipping routes to be used by vessels beyond the port <u>in Commonwealth marine waters</u>." QCLNG Terms of Reference for an Environmental Impact Statement (attached hereto as Exhibit 5) at 33 (emphasis added).

Moreover, this portion of the EIS discusses the operational phase of the Project, as opposed to the Project itself. The fact that the Project proponent examined potential indirect environmental impacts from shipping that will occur during the operational phase does not make shipping part of the Project. As the Court has already recognized, such allegations do not suggest that the transportation of LNG is part of the Projects funded by the Bank, but rather "demonstrate that transportation of LNG will occur after the Projects are completed." Order at 8.

For the QCLNG Project, the EIS lists the following four components: expansion of QGC's existing coal seam Gas Fields in the Surat basin of southern Queensland; 700 km of underground pipelines, including about 3401 km underground gas transmission pipeline to take gas to Curtis Island near Gladstone; a natural gas liquefaction facility and marine facilities at Curtis Island; and shipping operations to load the liquefied natural gas for export.[9] ECF No. 45 at 19 (of 22) (QCLNG Supplemental EIS Executive Summary at 8). Plaintiffs cite to a similar list in the QCLNG Draft EISs' Summary of Project Components. SAC ¶ 98 (citing QCLNG DEIS Vol. 2, Ch. 3 at 1-2 (attached hereto as Exhibit 6)).[10] As with the APLNG Project, the Court has

_____

[9] The list Plaintiffs cite includes five components instead of four because it separates out the "natural gas liquefaction facility and marine facilities at Curtis Island" into two components – "LNG Component" and "Swing Basin and Channel." Whether there are four or five components is of no moment, in any case, because all components occur within a foreign country and the Bank did not provide any funding for shipping on the high seas.

[10] Plaintiffs also cite to the Memorandum to the Bank's Board of Directors as "describing the Project's 'five principal Components' to include 'Shipping Operations for regular transit of LNG tankers' through Gladstone Harbor and the Great Barrier Reef." SAC ¶ 98 (quoting Ex-Im Bank Memorandum to the Board of Directors for Queensland Curtis LNG (Nov. 9, 2012) (attached

already reviewed this list of components and concluded that it "do[es] not identify transportation of LNG as a component of [the QCLNG] project." Order at 8. Plaintiffs may argue that the inclusion of shipping as a project component in the EIS for the QCLNG Project distinguishes it from the APLNG Project, which does not include shipping in the list of Project elements or objectives. However, this is a distinction without a difference. As explained above, to the extent the Project proponents for either Project evaluated potential environmental impacts from shipping in the EISs, the consideration was limited in scope to the territorial waters of Australia, *i.e.*, shipping activity within the Harbor and within the portions of the Great Barrier Reef in Australian waters.

Even if the Project proponents' EISs supported Plaintiffs' allegations that shipping on the high seas is a component of the Projects, the SAC does not and cannot allege that the Bank provided funding for shipping. As the Board Memoranda show, the Bank's funding was limited to providing support for the construction of the LNG plant located at Curtis Island. APLNG Board Memorandum (attached hereto as Exhibit 8) at 2 (loan will "finance a two-train liquefied natural gas [ ] project and related Shared Facilities on Curtis Island in Queensland Australia."); *id.* at 43 ("U.S. Exports/local costs: As loan/guarantee support is being requested just for the downstream LNG facilities, U.S. exports within this project have only been identified for that portion . . ."); QCLNG Board Memorandum, Ex. 7 at 1 (loan is "to support the export of eligible goods and services related to the engineering, procurement and construction and installation of a natural gas liquefaction [ ] facility"); *id.* at 30 ("BG Energy Holdings Ltd.'s request is for support of the U.S. goods and services, and maximum eligible local costs, related to the construction of only the initial two-train LNG Plant."); *id.* at 31 ("U.S. exports/local costs: Requested support is based upon an identified $1.534 billion of U.S. exports, including $1.284 billion under the Bechtel EPC contract consisting predominantly of engineering services, plus various equipment items (compressors, chillers, instrumentation and controls)."). Because there can be no allegation

---

hereto as Exhibit 7) at 36-37.) However, the Board Memo simply repeats the EIS's list of Project Components verbatim. By including this in the Memo, the Board was not endorsing this list as its own.

1   that the Bank authorized, funded, or carried out shipping of LNG on the high seas, it did not take
2   an agency "action" within the meaning of the ESA and Plaintiffs' SAC fails to state a claim upon
3   which relief can be granted.

4           Finally, Plaintiffs allege an alternate theory that the Projects include shipping on the high
5   seas because one of each Project's proponents is also a company that will be shipping some of
6   the LNG. SAC ¶¶ 86, 99. Specifically, Plaintiffs allege that in April 2011, Sinopec joined as a
7   proponent of the APLNG Project and also signed a Sale and Purchase Agreement to buy
8   approximately 90% of the LNG produced by the Project. *Id.* ¶ 86. For the QCLNG Project,
9   Plaintiffs similarly allege that BG Group is both a proponent of the Project and one of the
10  companies owning vessels that are contracted to carry cargo and LNG. *Id.* ¶ 99. Contrary to
11  Plaintiffs' conclusory allegations, the fact that these companies happen to be Project proponents
12  and also buyers/shippers of LNG does not show that the Projects include shipping on the high
13  seas or that the Bank is funding the purchase and shipping of LNG on the high seas. By
14  Plaintiffs' logic, if these companies were not buying and shipping the LNG then the Projects
15  would not include shipping on the high seas. As the documents demonstrate, shipping on the
16  high seas is neither a component of the Projects nor a component of the Bank's funding of the
17  Projects. Thus, the Bank did not take an agency "action" within the meaning of the ESA.

18                                    **CONCLUSION**

19          Plaintiffs' First Claim for Relief in the Second Amended Complaint fails to state a claim
20  upon which relief can be granted. Their claim hinges on documents incorporated by reference
21  into their Second Amended Complaint. However, those documents do not actually support
22  Plaintiffs' allegations that shipping is a component of the two Projects the Bank funded or that
23  the Projects occur on the "high seas." Moreover, Plaintiffs have not alleged and cannot allege
24  that the Bank funded any shipping on the "high seas" or otherwise. Plaintiffs' First Claim for
25  Relief therefore should be dismissed with prejudice.

26  Dated:  October 10, 2014                    Respectfully submitted,

27                                              SAM HIRSCH, Acting Assistant Attorney General

28

U.S. Department of Justice
Environment & Natural Resources Division


  /s/ *Meredith L. Flax*
MEREDITH L. FLAX, Senior Trial Attorney
D.C. Bar No. 468016
Wildlife & Marine Resources Section
Ben Franklin Station, P.O. Box 7611
Washington, D.C. 20044-7611
Telephone: (202) 305-0404
Facsimile: (202) 305-0275
meredith.flax@usdoj.gov
KRISTOFOR SWANSON, Trial Attorney
Colo. Bar No. 39378
Natural Resources Section
Ben Franklin Station, P.O. Box 7611
Washington, D.C. 20044-7611
Telephone:  (202) 305-0248
Facsimile:  (202) 305-0506
kristofor.swanson@usdoj.gov


MELINDA HAAG
UNITED STATES ATTORNEY
MICHAEL T. PYLE
Assistant U.S. Attorney
150 Almaden Boulevard, Suite 900
San Jose, CA 95113
Telephone: (408) 535-5087
Facsimile: (408) 535-5081
michael.t.pyle@usdoj.gov

***Attorneys for Defendants***