Sarah Uhlemann (WA Bar No. 41164)*†
Center for Biological Diversity
2400 NW 80th Street, #146
Seattle, WA 98117
Phone:  (206) 327-2344
Facsimile:  (415) 436-9683
Email:  suhlemann@biologicaldiversity.org
†Admitted *pro hac vice*

Brendan Cummings (CA Bar No. 193952)
Center for Biological Diversity
P.O. Box 549
Joshua Tree, CA 92252
Phone:  (760) 366-2232
Facsimile:  (760) 366-2669
Email:  bcummings@biologicaldiversity.org

Miyoko Sakashita (CA Bar No. 239639)
Center for Biological Diversity
351 California Street, Suite 600
San Francisco, CA 94104
Phone:  (415) 436-9682
Facsimile:  (415) 436-9683
Email:  miyoko@biologicaldiversity.org

*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, PACIFIC ENVIRONMENT, and TURTLE ISLAND RESTORATION NETWORK, <br><br>               Plaintiffs, <br>      v. <br><br> EXPORT-IMPORT BANK OF THE UNITED STATES and FRED P. HOCHBERG, in his official capacity as Chairman and President of the Export-Import Bank of the United States, <br><br>               Defendants. | Case No.: 4:12-cv-6325 (SBA) <br><br> **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE FIRST CLAIM FOR RELIEF IN THE SECOND AMENDED COMPLAINT** |

1

**TABLE OF CONTENTS**

2    Table of Contents ....................................................................................................... ii

3    Table of Authorities ................................................................................................... iii

4    Introduction ................................................................................................................ 1

5    Background ................................................................................................................. 1

6         A.   The Endangered Species Act ........................................................................... 1

7         B.   Factual Background ......................................................................................... 2

8         C.   Procedural Background ................................................................................... 3

9    Plaintiffs' Second Amended Complaint ..................................................................... 4

10   Standard of Review .................................................................................................... 4

11   Argument ................................................................................................................... 5

12        A.   The Court Should Deny Defendants' Motion Because It Is Based Solely on
13             Extrinsic Evidence that Does Not Represent the "Whole" Administrative Record ................. 5

14        B.   Plaintiffs' Complaint Sufficiently Alleges the Actions Occur "Upon the High Seas" .............. 8

15             1.   The Queensland Curtis LNG Project ......................................................... 8

16             2.   The Australia Pacific LNG Project .......................................................... 10

17             3.   Defendants' Extrinsic Documents Fail to Demonstrate the Projects Do Not
18                  Include High Seas Shipping .................................................................... 11

19             4.   The "Actions" Triggering ESA Consultation Are the Whole QCLNG and
20                  APLNG Projects, Not Just the Construction of the LNG Facilities .................................. 12

21   Conclusion ............................................................................................................... 15

22

23

24

25

26

27

28

1

## TABLE OF AUTHORITIES

2

**CASES**

3

*Bell Atlantic Corp. v. Twombly*,
4    550 U.S. 544 (2007) ................................................................. *passim*

5    *Citizens to Preserve Overton Park, Inc. v. Volpe*,
      401 U.S. 402 (1971) ................................................................. 6
6

7    *Conner v. Burford*,
      848 F.2d 1441 (9th Cir. 1988) ................................................14, 15
8

9    *Davis v. HSBC Bank*,
      691 F.3d 1152 (9th Cir. 2012) ................................................5

10   *District Hospital Partners, L.P. v. Sebelius*,
11    794 F. Supp. 2d 162 (D.D.C. 2011) ................................................7

12   *Florida Key Deer v. Stickney*,
      864 F. Supp. 1222 (S.D. Fla. 1994) ................................................14
13

14   *Friends of the River v. Army Corps of Engineers*,
      870 F. Supp. 2d 966 (E.D. Cal. 2012) ................................................7
15

16   *Greenpeace v. NMFS*,
      80 F. Supp. 2d 1137 (W.D. Wash. 2000) ................................................15

17   *Karuk Tribe of California v. United States Forest Service*,
18    681 F.3d 1006 (9th Cir. 2012) ................................................1, 8, 13

19   *Pacific Rivers Council v. Thomas*,
      30 F.3d 1050 (9th Cir. 1994) ................................................2, 13
20

21   *National Wildlife Federation v. Coleman*,
      529 F.2d 359 (5th Cir. 1976) ................................................14
22

23   *National Wildlife Federation v. FEMA*,
      345 F. Supp. 2d 1151 (W.D. Wash. 2004) ................................................14

24   *Navarro v. Block*,
      250 F.3d 729 (9th Cir. 2001) ................................................5, 6
25

26   *Pinnacle Armor, Inc. v. United States*,
      648 F.3d 708 (9th Cir. 2011) ................................................7

27

28

*Riverside Irrigation District v. Andrews,*
758 F.2d 508 (10th Cir. 1985) ........................................................................ 14

*Sateriale v. R.J. Reynolds Tobacco Co.,*
697 F.3d 777 (9th Cir. 2012) ............................................................................ 5

*Tennessee Valley Authority v. Hill,*
437 U.S. 153 (1978) ........................................................................................ 13

*Thompson v. United States Department of Labor,*
885 F.2d 551 (9th Cir. 1989) ............................................................................ 6

*United States v. Ritchie,*
342 F.3d 903 (9th Cir. 2003) ......................................................................... 5, 6

*Van Buskirk v. CNN,*
284 F.3d 977 (9th Cir. 2002) ......................................................................... 5, 6

*Western Watersheds Project v. Kraayenbrink,*
632 F.3d 472 (9th Cir. 2011) ............................................................................ 6

*Wild Fish Conservancy v. Salazar,*
628 F.3d 513 (9th Cir. 2010) ..................................................................... 14, 15

**STATUTES**

5 U.S.C. § 706 ................................................................................................... 6

16 U.S.C. § 1531(b) ........................................................................................... 1

16 U.S.C. § 1533(a) ........................................................................................... 1

16 U.S.C. § 1536(a) ................................................................................. 1, 2, 13

**REGULATORY AUTHORITY**

50 C.F.R. § 17.21(c) ........................................................................................... 2

50 C.F.R. § 402.01 ......................................................................................... 1, 2

50 C.F.R. § 402.02 ................................................................................... *passim*

50 C.F.R. § 402.03 ........................................................................................... 13

**FEDERAL RULES**

FED. R. CIV. PROC. 12(b)(6) ..................................................................... *passim*

**INTRODUCTION**

In this suit, Plaintiffs challenge two decisions by the Export-Import Bank of the United States ("Ex-Im Bank" or "Defendants") to provide nearly $5 billion in loans for two liquefied natural gas projects being constructed in and outside the Great Barrier Reef World Heritage Area in Australia. Second Am. Compl. ("SAC") ¶ 1. Among several claims, Plaintiffs allege that Defendants failed to ensure that these massive industrial projects do not "jeopardize the continued existence" of several Endangered Species Act-listed species, including sea turtles, whales, and dugongs. *Id.* ¶ 127; 16 U.S.C. § 1536(a)(2). Defendants have moved to dismiss Plaintiffs' ESA claim under Rule 12(b)(6), relying exclusively on extrinsic evidence. Defs.' Mot. to Dismiss ("MTD") at 5, Dkt. No. 69. As described below, Defendants' motion is both inappropriate and unfounded and should be denied.

**BACKGROUND**

**A. The Endangered Species Act**

Congress enacted the Endangered Species Act ("ESA" or "the Act") in 1973 "to provide a program for the conservation of . . . endangered species and threatened species." 16 U.S.C. § 1531(b). The Act requires the Secretaries of Interior and Commerce, through the U.S. Fish & Wildlife Service ("FWS") and the National Marine Fisheries Service ("NMFS," collectively, "the Services"), to "determine whether any species is . . . endangered . . . or threatened" with extinction.[1] *Id.* § 1533(a)(1).

Once listed, the ESA grants species certain protections. Most relevant here, ESA Section 7, often called the "heart of the ESA," requires that "[e]ach Federal agency shall . . . insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize" any species' continued existence. 16 U.S.C. § 1536(a)(2); *Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1020 (9th Cir. 2012) (en banc). To meet this substantive obligation, the ESA requires each agency, referred to as the "action agency," to "consult" with the Services "before engaging in any discretionary action" in order to obtain the wildlife agencies' "expert opinion" on species impacts. *Karuk*, 681 F.3d at 1020; 16 U.S.C § 1536(a)(2).

The ESA expressly and broadly requires an agency to comply with Section 7 for "*any* action" it

---

[1] Generally, FWS is responsible for terrestrial species, and NMFS is responsible for marine species. *See* 50 C.F.R. § 402.01(b).

authorizes or funds. 16 U.S.C. § 1536(a)(2) (emphasis added); *Pac. Rivers Council v. Thomas*, 30 F.3d 1050, 1054 (9th Cir. 1994) ("there is little doubt that Congress intended to enact a broad definition of agency action in the ESA"). The ESA does not define "action," but the Services' joint regulations define the term broadly to mean:

> *[A]ll activities* or programs of any kind authorized, *funded*, or carried out, *in whole or in part*, by Federal agencies in the United States or upon the high seas. Examples include, but are not limited to:
> (a) actions intended to conserve listed species or their habitat;
> (b) the promulgation of regulations;
> (c) the granting of licenses, contracts, leases, easements, rights-of-way, permits, or grants-in-aid; or
> (d) *actions directly or indirectly causing modifications to the land, water, or air*.

50 C.F.R. § 402.02 (emphasis added); *see also id.* (defining "[a]ction area" as "all areas to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action").

While the ESA itself contains no limitations on the geographic scope of Section 7, the Services have by regulation limited Section 7 to "action[s] [an agency] authorizes [or] funds . . . in the United States or upon the high seas," thereby purporting to exempt actions occurring wholly in foreign jurisdictions from the consultation requirement.[2] 50 C.F.R. §§ 402.01; 402.02. The "high seas" are "all waters seaward of the territorial sea of the United States, except waters officially recognized by the United States as the territorial sea of another country." *Id.* § 17.21(c).

## B.  Factual Background

In May 2012, Ex-Im Bank, a U.S. federal agency, authorized a $2.95 billion loan to support the Australia Pacific Liquefied Natural Gas ("LNG") Project ("APLNG Project"). SAC ¶ 109. In December 2012, Ex-Im Bank authorized a separate $1.8 billion loan for the Queensland Curtis LNG Project ("QCLNG Project"). *Id.* ¶ 114. Each Project includes the construction and operation of a large LNG processing facility and shipping terminal in Queensland, Australia. *Id.* ¶¶ 82-83; 95-96. Each Project *also* includes transportation of the final LNG product by ship through the Great Barrier Reef and across

---

[2] As the Court is aware, Plaintiffs contest the validity of this regulation, as it contravenes the ESA's plain language. *See* SAC ¶ 44; 16 U.S.C. § 1536(a)(2). However, regardless of the regulation's validity, the agency-funded Projects at issue here occur at least in part "upon the high seas," as described below, thus triggering consultation under the regulation. 50 C.F.R. § 402.02.

the high seas, primarily to destinations in Asia. *Id.* ¶¶ 84, 97. Each Project's construction and operation, including shipping, will harm several ESA-listed species both in Australia's territorial waters and in the high seas, including dugongs, sea turtles, and whales, through habitat destruction, vessel collisions, and water, light, and noise pollution. *Id.* ¶¶ 92, 106.

## C.  Procedural Background

In Plaintiffs' Complaint and First Amended Complaint, Plaintiffs alleged that Ex-Im Bank failed to consult with the Services on its decision to fund the APLNG and QCLNG Projects, even though both Projects "may affect" several ESA-listed species, in violation of ESA Section 7. *See* First Am. Compl. ¶¶ 114-119, Dkt. No. 28. Additionally, Plaintiffs alleged claims under the National Historic Preservation Act ("NHPA") and the Freedom of Information Act ("FOIA"). *Id.* ¶¶ 121-124; 126-127.

In November 2013, Defendants moved to dismiss Plaintiffs' ESA claim. *See* Defs.' MTD, Dkt. No. 41. The briefing addressed two issues: (1) whether Plaintiffs' complaint sufficiently alleged that the "action[s]" funded by Ex-Im Bank occur "upon the high seas," thus triggering ESA consultation under the Services' Section 7 regulation, *see* 50 C.F.R. § 402.02 (ESA Section 7 applies to actions funded by U.S. agencies "upon the high seas"); and (2) assuming the actions occur only in Australia and are thus exempt from ESA consultation under the Services' regulation, whether Plaintiffs' claim regarding the validity of that regulation was barred by statute of limitations.[3] *Id.* The "high seas" issue was raised in Plaintiffs' opposition, and in their reply, Defendants submitted two exhibits for judicial notice containing executive summaries for the Projects. *See* Pls.' MTD Opp'n, Dkt. No. 43; Defs.' MTD Reply, Dkt. No. 44.

In August 2014, the Court granted Defendants' motion to dismiss on both issues. The Court held that Plaintiffs' First Amended Complaint "d[id] not support" Plaintiffs' claim that the action occurs "upon the high seas," as the Complaint did "not allege facts plausibly suggesting that the transportation of LNG is part of the Projects funded by Ex-Im Bank." MTD Order at 8, Dkt. No. 62.

---

[3] Defendants also moved to dismiss Plaintiffs' ESA claim because Plaintiffs did not include the Services as parties to the case, but the Court did not reach the issue. *See* MTD Order at 11 n.8, Dkt. No. 62. Defendants have not raised the issue in the instant motion to dismiss.

1   The Court also held that "to the extent Plaintiffs seek to . . . challeng[e] the validity of the Services'

2   regulation" exempting foreign agency actions from Section 7, that claim is time-barred.[4] *Id.* at 10-13.

3   However, the Court granted Plaintiffs leave to file an amended complaint. *Id.* at 13.

4       While the motion to dismiss was being decided, Defendants filed an administrative record for

5   this case. *See* Defs.' Notice of Filing of Revised & Am. Admin. R., Dkt. No. 54. The Parties have

6   agreed this case can be resolved on cross-motions for summary judgment based upon the administrative

7   record. *See* Jt. Schedule & Stip. at 2, Dkt. No. 59. Following the Court's order granting the motion to

8   dismiss, the Parties also agreed to a schedule for Defendants' second motion to dismiss and a briefing

9   schedule for summary judgment on the remaining claims, to begin March 1, 2015, unless the Court

10  denies Defendants' motion to dismiss. Stip. & Order Setting Briefing Schedule, Dkt. No. 68.

### PLAINTIFFS' SECOND AMENDED COMPLAINT

12      On August 25, 2014, Plaintiffs filed their Second Amended Complaint ("SAC"). In the SAC,

13  Plaintiffs specifically alleged that the Ex-Im Bank-funded "Projects . . . include shipping of the final

14  LNG product from the LNG facilities to destinations abroad, through high seas habitat for dugongs, sea

15  turtles, and several ESA-listed whales." SAC ¶ 4; *see also id.* ¶¶ 84 ("The Australia Pacific LNG

16  Project also includes the shipping of the final LNG product through the Great Barrier Reef World

17  Heritage Area and across the high seas to ports abroad, mostly in Asia."); 97 (same for QCLNG

18  Project); 91, 105 ("The Project occurs partially upon the high seas."). Additionally and as detailed

19  further below, Plaintiffs provided extensive factual detail to support these allegations, citing both the

20  Project proponents' own "Project Description[s]" from their environmental documents *and* Ex-Im

21  Bank's own documents, describing how the Projects include shipping. *Id.* ¶¶ 85-86; 98-99.

### STANDARD OF REVIEW

23      Defendants have moved to dismiss Plaintiffs' ESA claim under Rule 12(b)(6) for failure to state

24  a claim. Defs.' MTD at 4. A 12(b)(6) motion tests the sufficiency of a complaint, and "[d]ismissal is

25  proper only" where the complaint fails to allege a "cognizable legal theory" or "sufficient facts" to

---

27  [4] The Court also held that the *Massey* decision and rationale did not apply. MTD Order at 9-10, citing

28  *Envtl. Def. Fund, Inc. v. Massey*, 986 F.2d 528 (D.C. Cir. 1993). Plaintiffs reserve the right to appeal the issue, as well as the statute of limitations issue, upon final judgment in this case.

support that theory. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). Under this liberal standard, "all material allegations of the complaint are accepted as true," *id.*, and the Court must "[c]onstru[e] the complaint in the light most favorable to the plaintiffs, and draw[ ] all reasonable inferences from the complaint in the plaintiffs' favor," *Sateriale v. R.J. Reynolds Tobacco Co.*, 697 F.3d 777, 787 (9th Cir. 2012). A complaint "does not need detailed factual allegations" but "must [provide] enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Ultimately, the complaint's allegations must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Id.*; *see also* MTD Order at 5 (same).

"Ordinarily, a court may look only at the face of the complaint to decide a motion to dismiss." *Van Buskirk v. CNN*, 284 F.3d 977, 980 (9th Cir. 2002). However, a court may consider certain, narrow categories of evidence from outside the pleadings, including "documents incorporated by reference in the complaint" or "matters of judicial notice," without converting the motion to dismiss to summary judgment. *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003). A court's decision to consider extrinsic evidence is entirely within the court's discretion; the court "is not required to incorporate documents by reference." *Davis v. HSBC Bank*, 691 F.3d 1152, 1159 (9th Cir. 2012).

**ARGUMENT**

**A.  The Court Should Deny Defendants' Motion Because It Is Based Solely on Extrinsic Evidence that Does Not Represent the "Whole" Administrative Record.**

Defendants move to dismiss Plaintiffs' ESA claim under Rule 12(b)(6), arguing Plaintiffs have failed to demonstrate the Ex-Im Bank-funded Projects actually occur "upon the high seas," and thus Defendants argue the agency's funding does not trigger ESA Section 7 consultation. *See* Defs.' MTD at 1. However, Defendants do not claim Plaintiffs' complaint *on its face* is insufficient – nor could they, given the clear allegations and substantial detail provided showing the actions occur on the high seas. SAC ¶¶ 4, 84-86, 97-99. Instead, Defendants implore the Court to look *beyond* the complaint itself and rely on numerous extrinsic documents that Defendants wrongly claim dispute Plaintiffs' allegations. *See* Defs.' MTD at 1 (asserting that Plaintiffs "fail[ ] to state a claim because the documents upon which Plaintiffs rely for their new factual allegations . . . do not actually support that proposition"), 6-7; *see infra* pp. 8-12 (responding to Defendants' records). But under the most basic rule governing a Rule

12(b)(6) motion, dismissal is *not* appropriate if a complaint alleges "sufficient facts" to support a cognizable legal theory. *Navarro v. Block*, 250 F.3d at 732; *see also* MTD Order at 5 ("Ultimately, the allegations must 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests,'" citing *Twombly*, 550 U.S. at 555).

Plaintiffs acknowledge that in a 12(b)(6) motion, the Court may, in its discretion, review documents outside the complaint, if the documents are properly incorporated by reference or are subject to judicial notice.[5] *Ritchie*, 342 F.3d at 908. However, by submitting eight exhibits containing over 130 pages of extrinsic evidence, Defendants use this narrow exception to swallow the rule that a motion to dismiss must "[o]rdinarily" be evaluated only on the "face of the complaint." *Van Buskirk*, 284 F.3d at 980. Defendants ask this Court to ignore the complaint entirely and instead conduct a full summary judgment-style merits review of Plaintiffs' claim, digging through pages of extrinsic evidence.

Such a review is particularly premature here, where the merits of Plaintiffs' ESA claim must be reviewed on the basis of the agency's "whole" administrative record, which must contain all documents that were before the agency in making its decision. Specifically, "[b]ecause the ESA contains no internal standard of review," ESA cases are governed by the standards provided in Section 706 of the Administrative Procedure Act ("APA"). *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 496 (9th Cir. 2011). The APA requires that agency actions be reviewed on the basis of the "*whole record*." 5 U.S.C. § 706 (emphasis added); *see also Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 419 (1971) (rejecting district court decision because the limited evidence before the court "clearly d[id] not constitute the 'whole record' compiled by the agency: the basis for review required by § 706 of the [APA]"); *Thompson v. U.S. Dep't of Labor*, 885 F.2d 551, 555 (9th Cir. 1989) ("The 'whole' administrative record . . . consists of all documents and materials directly or indirectly considered by

---

[5] Six of the eight exhibits submitted by Defendants were cited in Plaintiffs' SAC. *See* Exs. 1-3 (containing portions of APLNG's Environmental Impact Statement ("EIS")); 6 (portions of QCLNG's Draft EIS); 7-8 (portions of Ex-Im Bank's Board Memoranda on the Projects). However, Exhibits 4 and 5 contain APLNG and QCLNG's "Terms of Reference" documents, which were not cited in Plaintiffs' SAC and thus were not "incorporated by reference." *Ritchie*, 342 F.3d at 908. Nor do Defendants claim Exhibits 4 and 5 are appropriate for judicial notice. *Id.* Because Defendants provide no reason why the Court should consider these extrinsic documents, Exhibits 4 and 5 should be excluded.

agency decision-makers and includes evidence contrary to the agency's position.").

Several courts have rejected similar efforts to use extrinsic evidence in APA cases on a motion to dismiss because the evidence did not constitute the "whole record." In *District Hospital Partners, L.P. v. Sebelius*, a plaintiff sued the Department of Health and Human Services alleging the Department's hospital payment scheme was arbitrary and capricious. 794 F. Supp. 2d 162, 164 (D.D.C. 2011). While the court considered the Federal Register notices attached to the defendants' motion to dismiss as "public records," the court refused to dismiss the case based on those records, as they did not constitute the entire administrative record. The court explained: "to review an agency's action fairly, [the court] should have before it neither more nor less information than did the agency when it made its decision" because "the APA requires review of 'the whole record.'" *Id*. at 171 (emphasis removed); *see Friends of the River v. Army Corps of Eng'rs*, 870 F. Supp. 2d 966, 973-74 (E.D. Cal. 2012) (on a Rule 12(b)(1) motion, refusing to consider some extrinsic documents because they "d[id] not constitute the complete administrative record" and "the Court must consider the entire administrative record"); *Pinnacle Armor, Inc. v. United States*, 648 F.3d 708, 721 (9th Cir. 2011) (in an APA case, reversing district court's dismissal and finding that, without resort to the full administrative record, plaintiff's "claims [we]re certainly sufficient to survive a Rule 12(b)(6) motion to dismiss").

In fact, the documents submitted by Defendants as exhibits to its motion to dismiss *are part of the existing administrative record*, which has already been filed with the Court.[6] Defs.' Notice of Filing of Admin. R., Dkt. No. 54. Consistent with the caselaw cited above, the Northern District of California Local Rules clearly contemplate that, in an administrative record review case, Defendants will file the record and then parties will proceed to summary judgment *based on that record*. *See* Civil L.R. 16-5. But instead of accepting Plaintiffs' more-than-adequately pled allegations at this stage and raising these factual issues on summary judgment when the whole record is squarely before the Court, Defendants insert unnecessary delay by filing an inappropriate motion to dismiss, asking the Court to make a merits

---

[6] Because all of the documents referenced in Plaintiffs' complaint, cited by Defendants in their motion to dismiss, and cited in this Opposition are available *in full* in the Administrative Record ("AR") currently lodged before the Court at Dkt. No. 54, Plaintiffs will cite directly to the AR, instead of Defendants' Exhibits, which only contain record excerpts.

decision based on some, but not all, of the administrative record. This wastes both Plaintiffs' and the Court's time. Plaintiffs request that this Court confine its review to Plaintiffs' SAC, exclude the extrinsic evidence submitted by Defendants, and deny Defendants' inappropriate motion so this case may go forward on summary judgment on all claims.

**B. Plaintiffs' Complaint Sufficiently Alleges the Actions Occur "Upon the High Seas."**

As detailed above, ESA Section 7 requires Ex-Im Bank to consult with the Services on "any action . . . funded . . . by [the] agency" to ensure the action does not jeopardize any listed species. 16 U.S.C. § 1536(a)(2); *Karuk Tribe*, 681 F.3d at 1020. An "action" is any "activit[y] . . . funded . . . *in whole or in part*, by" Ex-Im Bank "in the United States or *upon the high seas*," including any "actions directly *or indirectly* causing modifications to the land, water, or air." 50 C.F.R. § 402.02 (emphasis added).

As Plaintiffs' SAC clearly and sufficiently alleges, Ex-Im Bank has "funded" the Australia Pacific LNG Project and the Queensland Curtis LNG Project. *Id.*; SAC ¶¶ 109, 114. Both Projects, or "actions," include both the construction of an LNG production and shipping terminal in Queensland, Australia *and* the shipping of the LNG from Australia across the high seas to destinations abroad, primarily to Asia. *Id.* ¶¶ 4 (the "Projects . . . include shipping of the final LNG product from the LNG facilities to destinations abroad, through high seas habitat"), 84, 97. Accordingly, Plaintiffs allege that the Projects or "actions" funded by Ex-Im Bank "occur on the high seas," thus triggering ESA Section 7 consultation. 50 C.F.R. § 402.02; SAC ¶¶ 91, 105.

In addition to these clear assertions, Plaintiffs provide more specific allegations, walking through statements by the Project proponents and Ex-Im Bank's own documents, which describe how the funded Projects include shipping. *Id.* ¶¶ 85-86, 98-99. These "detailed factual allegations," as described further below, were not required for the complaint to survive a Rule 12(b)(6) motion, but they certainly provide more than "enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

**1. The Queensland Curtis LNG Project**

In their SAC, Plaintiffs describe the QCLNG Project funded by Ex-Im Bank in detail, clearly alleging the Project includes high seas shipping. Specifically, Plaintiffs allege that the Project's

proponent/sponsor is BG Energy Holding Limited, a subsidiary of the U.K.-based BG Group. SAC ¶ 94. The Project includes drilling up to 6,000 coal-seam gas wells in central Queensland, installing a 210-mile pipeline to transport the gas to the coast, and constructing and operating a massive LNG production facility on Curtis Island to process the gas and condense it to liquid, as well as a marine loading jetty to allow shipping access. *Id.* ¶¶ 95, 96, 3.

Plaintiffs then detail how the QCLNG Project "also includes the shipping of the final LNG product through the Great Barrier Reef World Heritage Area and across the high seas to ports abroad," describing and quoting the Project proponent's Draft Environmental Impact Statement ("DEIS"). *Id.* ¶ 97. Particularly, in a chapter entitled "Project Description," where the proponent "describes in detail the principal Components of the Queensland Curtis LNG (QCLNG) Project," the proponent identifies "five principal Components." These include: (1) the "Gas Field Component," (2) the "Pipeline Component," (3) the "LNG Component," which includes the LNG processing plant and jetty facilities, (4) the "Swing Basin and Channel," and (5) critically, "*Shipping Operations*." *Id.* ¶ 98 (emphasis added), quoting QCLNG DEIS, Vol. 2, Chap. 3 at 1-2 (July 2009) (AR 29033-34). Both the DEIS and Plaintiffs' SAC state that "Shipping Operations" include:

> regular transit of LNG tankers and, potentially, infrequent transit of ships carrying propane to the LNG Facility for the 'spiking' of LNG. Shipping operations will involve three stages: firstly, loading LNG/unloading propane at the marine jetty; secondly, transit of ships through Gladstone Harbour; and thirdly, *transit of ships* through the Great Barrier Reef Marine Park *to open ocean*.[7]

*Id.* (emphasis added) (AR 29039). Additionally, Plaintiffs explain that the QCLNG Project proponent included shipping as part of the Project description because "[t]ypically shipping of LNG out of the Port of Gladstone *will be undertaken by BG Group [i.e., the proponent]*, with LNG ships being a combination of vessels owned by BG Group and vessels contracted by BG Group to carry cargo." *Id.* ¶ 99 (emphasis added), quoting QCLNG DEIS, Vol. 2, Chap. 9 at 22 (AR 29150).

If that were not enough to demonstrate the QCLNG Project includes shipping, Plaintiffs also cite Ex-Im Bank's own Memorandum to the Board, which provides the agency's final recommendation

---

[7] As Plaintiffs note in their SAC, in its Supplemental EIS, QCLNG eliminated the "spiking" component of the Project but retains all other shipping operations. SAC ¶ 98.

that the QCLNG Project be funded. *Id.* ¶ 98, quoting Ex-Im Bank QCLNG Board Memo at 35-37 (Nov. 9, 2012) (AR 23415-17). This document contains a "Description of the Project," also detailing the QCLNG Project's "five principal Components," which – according to the Bank – include "Shipping Operations for regular transit of LNG tankers" through Gladstone Harbour and the Great Barrier Reef. *Id.* Accordingly, Plaintiffs allege in sufficient detail that the QCLNG Project includes shipping of the LNG product, and thus the Ex-Im Bank funded "action" includes shipping occurring "upon the high seas," triggering Section 7 consultation. *Id.*; 50 C.F.R. § 402.02; *Twombly*, 550 U.S. at 555.

### 2.   The Australia Pacific LNG Project

Plaintiffs' SAC also describes in detail the APLNG Project funded by Ex-Im Bank. As with QCLNG, this action occurs, at least in part, upon the high seas. Specifically, Plaintiffs allege that the APLNG Project is a joint venture owned and sponsored by Origin Energy, ConocoPhillips, and the China Petrochemical Corporation (Sinopec). SAC ¶ 81. The Project includes drilling 10,000 coal-seam gas wells in interior Queensland, laying 300 miles of pipeline, and constructing and operating a massive LNG facility on Curtis Island to process the gas, as well as a jetty to allow shipping access. *Id.* ¶¶ 82, 83, 2.

Plaintiffs then detail how the APLNG Project "also includes the shipping of the final LNG product through the Great Barrier Reef World Heritage Area and across the high seas to ports abroad, mostly in Asia," describing and quoting the APLNG Project proponents' EIS.  *Id.* ¶ 84. Particularly, Plaintiffs cite the "Project description" chapter, *id.* ¶ 85, where the proponents "describe[ ] the construction [and] operational . . . phases in developing the LNG facility element of the Australia Pacific LNG Project (the Project)." APLNG EIS, Vol. 4, Chap. 3 at 1 (March 2010) (AR 5879); *see also id.* Vol. 1, Chap. 1 at 10 (abbreviated/summary "Project description" stating that the Project includes "Construction and operation" of the LNG facility) (AR 3119). Plaintiffs' SAC and the proponents' EIS both state that APLNG facility "Operations" include "LNG Shipping," explaining that "LNG will be transported by specially designed ships. . . . [I]t is expected that a LNG vessel will arrive approximately every one to two days for loading and export." SAC ¶ 85, quoting APLNG EIS, Vol. 4, Chap. 3 at 42, 48 (AR 5920-26).

Further, Plaintiffs' SAC explains how, *after* the original proponents' EIS was completed, in

2011, Sinopec joined Origin Energy and ConocoPhillips as a Project proponent. *Id.* ¶ 86. Sinopec gained a 15% ownership interest in the Project and agreed to buy 90% of the Project's LNG production. *Id.*; *see* Ex-Im Bank APLNG Board Memo at 2, 13 (Apr. 25, 2012) (AR 056, 067). Plaintiffs note that, according to Ex-Im Bank, the Sinopec contract "places responsibility for the transportation of LNG . . . with the buyer[ ]," i.e., Sinopec – who is also a Project proponent and recipient of Ex-Im Bank's loan. SAC ¶ 86, citing APLNG Board Memo at 74 (AR 127); *see also id.* (noting "Sinopec ha[d] ordered LNG Tankers to meet its transportation obligations under the" proponents' contractual agreement). Accordingly, even if the EIS itself did not demonstrate that the Project includes shipping – which it does – the Project necessarily includes "transportation," i.e., shipping, because one of Project/loan sponsors is transporting *almost all the LNG produced*, and thus shipping is under the control of the Project proponents.[8]

In all, Plaintiffs allege in sufficient detail that the APLNG Project's proponents will both produce *and ship* the LNG, and thus the Project funded by Ex-Im Bank includes shipping, and the agency action occurs "upon the high seas," triggering Section 7 consultation. *Id.*; 50 C.F.R. § 402.02; *Twombly*, 550 U.S. at 555.

### 3. Defendants' Extrinsic Documents Fail to Demonstrate the Projects Do Not Include High Seas Shipping.

Instead of critiquing Plaintiffs' actual complaint allegations, Defendants instead rely on extrinsic evidence to contest Plaintiffs' claims. However, none of the cited documents demonstrate the Projects end at Australia's boundaries. First, Defendants implore the Court to look only at the "Executive Summary" excerpts from the Projects' EISs that Defendants submitted as exhibits to their original motion to dismiss reply, which briefly describe the Projects. Defs.' Br. at 7, 8-9; Defs.' MTD Reply, Exs. 1, 2, Dkt. No. 45 (AR 39858 (for QCLNG); AR 973 (for APLNG)). However, these "summary" documents repeatedly refer the reader to the subsequent, several-thousand-page *actual* EISs

---

[8] In fact, in 2011, the Australian government approved the APLNG Project and EIS subject to certain conditions, including requiring preparation of "a Shipping Activity Management Plan . . . for shipping undertaken *by or under the control of the proponent*." Australian Gov. EBPC LNG Approval at 10 (AR 19351). The Plan was required to address both shipping associated with plant construction *and* "LNG tanker operation and LNG tanker activities." *Id.* at 11 (AR 19352).

for more detail. For example, the QCLNG Executive Summary Preface notes that "[f]or a complete understanding of the QCLNG Project," both the SEIS and DEIS "should be read." AR 39862. Looking to those actual EIS documents, the Projects are described to include shipping through the high seas, as detailed above. *See, e.g.*, AR 29039 (QCLNG DEIS describing "transit of ships . . . to open ocean" as part of Project); AR 39932 (QCLNG SEIS describing Project components to include "LNG shipping operations to load the LNG and ship cargoes to global export markets").

Second, Defendants claim the Projects' "Terms of Reference" documents dictate the Projects' scope. *See* Defs.' Br. at 7-8, citing Exs. 4, 5 (AR 505, 25650). These documents, which were developed by the Queensland government prior to preparation of the EIS, direct what the EIS must contain pursuant to Queensland law. *See* AR 25659, 25664. It is unclear why Defendants believe these documents' description of the Projects trump the actual EISs' description. And while Queensland law may not require an Australian EIS to evaluate high seas impacts, that does not mean the Project only occurs within Australian waters, or that no high seas impacts exist.

### 4. The "Actions" Triggering ESA Consultation Are the Whole QCLNG and APLNG Projects, Not Just the Construction of the LNG Facilities.

As demonstrated above and clearly pled in Plaintiffs' complaint, both the QCLNG and APLNG Projects include shipping, which occurs upon, and affects ESA-listed species in, the high seas. Nevertheless, Defendants argue that, even if the Projects *do* include shipping, Ex-Im Bank did not fund the shipping portion of the Projects, and thus no consultation is required. Defs.' Br. at 9-10 (arguing Ex-Im Bank only funded "goods and services related to the engineering, . . . construction and installation of a natural gas liquefaction facility," citing QCLNG Board Memo (AR 23381); APLNG Board Memo (AR 056)). However, Defendants' argument that Ex-Im Bank may look only at the portion of the Projects funded by the Bank (i.e., construction of the LNG facilities) in determining whether to consult, as opposed to considering the LNG Projects as a whole, clearly contravenes the ESA.[9]

---

[9] Defendants' argument also contravenes its previous position in this case. In the last round of briefing, Defendants *specifically* relied on the Projects' EISs as the definitive "demonstrat[ion]" of what the "action[s]" include. Defs.' MTD Reply at 3 (stating that "[a]s publicly available [EIS] documents demonstrate, shipping is not a component of either project").

As noted above, the ESA expansively requires Ex-Im Bank to consult over "any action . . . funded" by the Bank. 16 U.S.C. § 1536(a)(2); *see also* 50 C.F.R. § 402.03 ("Section 7 . . . appl[ies] to *all actions* in which there is discretionary Federal involvement or control") (emphasis added). "Action" is defined broadly to mean "*all activities* or programs of any kind authorized, *funded*, or carried out, *in whole or in part*" by the agency. 50 C.F.R. § 402.02 (emphasis added). Thus under the governing regulation's plain terms, Ex-Im Bank was required to consult over the *whole* Project (i.e., "all activities") that Ex-Im Bank "funded . . . in part." *Id.*

Moreover, the regulations provide several examples of "actions" that trigger consultation, including "actions directly *or indirectly* causing modifications to the land, water, or air." *Id.* § 402.02(d) (emphasis added). Similarly, the "[a]ction area" over which the agency must consult is defined as "all areas to be affected directly or indirectly by the Federal action and *not merely the immediate area involved in the action*." *Id.* § 402.02 (emphasis added). Thus Ex-Im Bank's funding, at a minimum, "indirectly" affects the high seas, as the Bank is funding portions of the QCLNG and APLNG Projects – Projects that indisputably result in shipping upon the high seas. *Id.* Consultation is therefore required.[10]

Caselaw directs the same result. As the Ninth Circuit has repeatedly held, "Congress intended to enact a broad definition of agency action in the ESA." *Pac. Rivers Council*, 30 F.3d at 1054-55 (citing *Tenn. Valley Auth. v. Hill*, 437 U.S. 153 (1978)); *Karuk Tribe*, 681 F.3d at 1020-21 (same).[11] Courts "interpret the term 'agency action' broadly, because caution *can only be exercised* if the agency takes a

---

[10] In a footnote, Defendants bizarrely suggest that Ex-Im Bank may *entirely ignore* all "effects of an action" in deciding whether to consult because *only* the Services are required to "address the 'effects of the action,'" including "direct and indirect effects," once consultation is triggered. Defs.' Br. at 6 n.6, 5. Such a construction would render Section 7 a nullity, as it would require the Services to fully weigh all effects of an agency action *if* consultation is initiated, but simultaneously allow the action agency to avoid consultation in the first place for the very same project.

[11] *Karuk* held that a court's "'agency action' inquiry is two-fold." 681 F.3d at 1021. First, the court asks "whether a federal agency affirmatively authorized, funded, or carried out the underlying activity." Second, the court "determine[s] whether the agency had some discretion to influence or change the activity" to benefit the species. *Id.* Defendants have not raised either issue, nor could they, as Ex-Im Bank "affirmatively . . . funded" the LNG Projects, and the Bank has clear authority to "provide financial support conditioned on the implementation of measures to mitigate the project's adverse environmental effects." SAC ¶¶ 109, 114, 56, 57.

look at *all the possible ramifications* of the agency action." *Wild Fish Conserv. v. Salazar*, 628 F.3d 513, 521 (9th Cir. 2010) (emphasis added and internal quotation marks omitted).

　　In several cases, courts have rejected agencies' attempts to narrow the scope of their "action" by ignoring indirect effects, in order to avoid consultation. For example, in *National Wildlife Federation v. Coleman*, the Fifth Circuit held that the Federal Highway Administration failed to insure against jeopardy under the ESA when it approved construction of a highway segment without consultation. 529 F.2d 359 (5th Cir. 1976). While the segment would only directly destroy 300 acres of ESA-listed crane habitat, the court held that "[t]he relevant consideration is the *total impact of the highway* on the crane," including private "residential and commercial development that can be expected to result from the construction of the highway." *Id.* at 373 (emphasis added). The court held: "[t]he fact that the private development surrounding the highway . . . does not result from direct federal action does not lessen the [agency's] duty under § 7." *Id.* at 374. *See Nat'l Wildlife Fed'n v. FEMA*, 345 F. Supp. 2d 1151, 1169 (W.D. Wash. 2004) (finding FEMA failed to consult on its flood insurance program, which includes "actions that indirectly cause modifications of the land and water (e.g., FEMA's . . . [Rating System] provides incentives to modify the floodplains)" and thus "falls within the broad definition of 'agency action'"); *Fla. Key Deer v. Stickney*, 864 F. Supp. 1222, 1232-42 (S.D. Fla. 1994) (finding FEMA's flood insurance program triggers consultation because the program indirectly enables development on floodplains), *aff'd*, 522 F.3d 1133 (11th Cir. 2008); *Riverside Irrigation Dist. v. Andrews*, 758 F.2d 508, 512-13 (10th Cir. 1985) (upholding Corps' denial of dredging permit that indirectly depletes water and holding the ESA requires the agency to consider all impacts, even if an impact "does not result 'from direct federal action'").

　　Similarly, the Ninth Circuit has repeatedly held that an "agency action" includes the "entire agency action." In *Conner v. Burford*, the court rejected a biological opinion that only considered the immediate leasing phase of an oil drilling project but ignored the later on-the-ground drilling and production impacts. 848 F.2d 1441, 1453 (9th Cir. 1988). The court held that "section 7 of the ESA *on its face* requires the [agency] . . . to consider all phases of the agency action, which includes post-leasing activities." *Id.* (emphasis added); *see also Wild Fish Conserv.*, 628 F.3d at 522-23 (rejecting biological opinion because agency only considered five years of project operation and thus failed to

"analyze the effect of the entire agency action"); *Greenpeace v. NMFS*, 80 F. Supp. 2d 1137, 1147 (W.D. Wash. 2000) (biological opinion must "address the full scope of the agency action").[12]

Accordingly, Ex-Im Bank cannot avoid consultation by narrowly defining the "action" to be only the portion of the much larger project that the agency's funding supports, thus ignoring entirely the actual effect of its funding on endangered species. 50 C.F.R. § 402.02. As the Ninth Circuit has repeatedly held, the institutionalized "caution" mandated by the ESA to ensure agencies do not jeopardize endangered species "can only be exercised if the agency takes a look at *all the possible ramifications of the agency action*." *Wild Fish Conserv.*, 628 F.3d at 521 (emphasis added); *Conner*, 848 F.2d at 1453 (same). Ex-Im Bank must consult on its funding of the QCLNG and APLNG Projects to ensure all ramifications of the Projects are evaluated and properly mitigated.

## CONCLUSION

For all of the above reasons, Defendants' motion to dismiss must be denied.

Dated:  October 31, 2014                    Respectfully submitted,

                                                  _/s/  Sarah Uhlemann_____
                                                  Sarah Uhlemann (WA Bar No. 41164)*
                                                  Center for Biological Diversity
                                                  2400 NW 80th Street, #146
                                                  Seattle, WA 98117
                                                  Phone:  (206) 327-2344
                                                  Facsimile:  (415) 436-9683
                                                  Email:  suhlemann@biologicaldiversity.org
                                                  *Admitted *pro hac vice*

                                                  Brendan Cummings (CA Bar No. 193952)
                                                  Center for Biological Diversity
                                                  P.O. Box 549
                                                  Joshua Tree, CA 92252
                                                  Phone:  (760) 366-2232
                                                  Facsimile:  (760) 366-2669
                                                  Email:  bcummings@biologicaldiversity.org

---

[12] While these cases arose in the context of determining the proper scope of an FWS or NMFS biological opinion, instead of considering whether the action agency had an obligation to consult in the first place, the same statutory phrase – "agency action" – must be interpreted the same in both contexts.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Miyoko Sakashita (CA Bar No. 239639)
Center for Biological Diversity
351 California Street, Suite 600
San Francisco, CA 94104
Phone:  (415) 436-9682
Facsimile:  (415) 436-9683
Email:  miyoko@biologicaldiversity.org

*Attorneys for Plaintiffs*