UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, PACIFIC ENVIRONMENT, and TURTLE ISLAND RESTORATION NETWORK,<br><br>Plaintiffs,<br><br>vs.<br><br>EXPORT-IMPORT BANK OF THE UNITED STATES and FRED P. HOCHBERG, in his official capacity as Chairman and President of the Export-Import Bank of the United States,<br><br>Defendants. | Case No: C 12-6325 SBA<br><br>**ORDER DENYING MOTION TO DISMISS**<br><br>Docket 69 |

Plaintiffs Center for Biological Diversity, Pacific Environment, and Turtle Island Restoration Network (collectively, "Plaintiffs") bring the instant environmental action against the Export-Import Bank of the United States ("Ex-Im Bank") and Fred P. Hochberg, in his official capacity as Chairman and President of Ex-Im Bank (collectively, "Defendants"). Plaintiffs allege that Ex-Im Bank provided financing for two natural gas projects in Australia without complying with environmental laws in violation of the Endangered Species Act ("ESA"), 16 U.S.C. § 1531, et seq., the National Historic Preservation Act ("NHPA"), 16 U.S.C. § 470, et seq., and the Administrative Procedure Act ("APA"), 5 U.S.C. § 706.[1] The parties are presently before the Court on Defendants' motion to dismiss. Dkt. 69. Plaintiffs oppose the motion. Dkt. 71. Having read and considered the papers filed in connection with this matter and being fully informed, the

---

[1] Plaintiffs also allege that Defendants violated the Freedom of Information Act ("FOIA").

Court hereby DENIES Defendants' motion, for the reasons stated below. The Court, in its discretion, finds this matter suitable for resolution without oral argument. See Fed.R.Civ.P. 78(b); N.D. Cal. Civ. L.R. 7-1(b).

I.  **BACKGROUND**[2]

In this case, environmental organizations dedicated to protecting wildlife and other environmental causes, challenge Ex-Im Bank's[3] decision to provide nearly $4.8 billion in financing for the development and construction of two liquefied natural gas ("LNG") projects occurring partially in Australia's Great Barrier Reef World Heritage Area. Second Amended Complaint ("SAC") ¶ 1, Dkt. 64. Plaintiffs allege that the projects, the Australia Pacific LNG Project ("APLNG Project") and the Queensland Curtis LNG Project ("QCLNG Project") (collectively, "the Projects"), each include gas drilling, pipeline construction, construction of an LNG production facility and shipping terminal, and transport of LNG through the Great Barrier Reef to markets abroad. Id. According to Plaintiffs, Ex-Im Bank funded these "massive" fossil fuel projects without properly consulting and considering the Projects' substantial impacts on threatened and endangered species on the Great Barrier Reef World Heritage Area, as required by the ESA and the NHPA. Id.

The APLNG Project is located in Queensland, Australia. SAC ¶ 2. The project's proponents[4] will drill up to 10,000 coal-seam gas wells in interior Queensland, install nearly 300 miles of pipeline to transport the gas to the coast, construct and operate a LNG facility to condense the gas to liquid and prepare it for transport, dredge the adjacent harbor, and then ship LNG to destinations abroad through the Great Barrier Reef and high seas habitat for dugongs, sea turtles, and several ESA-listed whales. Id. ¶¶ 2, 4, 84. The

---

[2] The parties are familiar with the facts alleged in the SAC. As such, the Court will only recite those facts necessary to resolve the instant motion.

[3] Ex-Im Bank is a federal agency headquartered in Washington D.C. It is the official export credit agency of the United States. SAC ¶ 30; see 12 U.S.C. § 635(a)(1).

[4] The APLNG Project is a joint venture owned and "sponsored" by Origin Energy, ConocoPhillips, and the China Petrochemical Corporation (Sinopec). SAC ¶ 81.

QCLNG Project will also be located in Queensland, Australia. Id. ¶ 3. The project's proponent[5] will drill up to 6,000 coal-seam gas wells in interior Queensland, install over 210 miles of pipeline, construct and operate a LNG facility that will be located immediately south of the Australia Pacific LNG facility, dredge the adjacent harbor, and then ship LNG to destinations abroad through the Great Barrier Reef and high seas habitat for dugongs, sea turtles, and several ESA-listed whales. Id. ¶¶ 3-4, 97.

Both LNG processing facilities and terminals will be located on Curtis Island, partially within the boundaries of the Great Barrier Reef World Heritage Area. SAC ¶ 4. The LNG facilities and terminals will also be located within designated habitat for the dugong, a species listed under the ESA as "endangered," and within habitat for threatened-listed green sea turtles, endangered loggerhead sea turtles, and threatened saltwater crocodiles. Id.

Plaintiffs allege that, despite the serious impacts that the Projects will have on ESA-listed species, Ex-Im Bank failed to initiate or complete consultation with the United States wildlife agencies as required by the ESA before providing funding for the Projects, and failed to "take into account the effect of the undertaking[s] . . . for purposes of avoiding or mitigating any adverse effects" to the Great Barrier Reef World Heritage Area, as required by NHPA.[6] SAC ¶¶ 5, 7. According to Plaintiffs, the NHPA required Ex-Im Bank to generate and consider information regarding the Projects' impacts on the World Heritage Area, determine whether the effects will be adverse, develop modifications to avoid or mitigate those impacts, and consult with Australia and other interested entities. Id. ¶ 7. Plaintiffs allege that because Ex-Im Bank provided funding for the Projects without first complying with the ESA or the NHPA it has violated both of these statutes as well as the APA. Id. ¶ 8.

---

[5] The QCLNG Project's "proponent/sponsor" is BG Energy Holding Limited, a wholly-owned subsidiary of the United Kingdom-based BG Group. SAC ¶ 94.

[6] NHPA implements the World Heritage Convention. SAC ¶ 7. The United States is a party to the World Heritage Convention, under which the Great Barrier Reef World Heritage Area is designated. Id. ¶ 6.

The SAC alleges three claims for relief: (1) violation of § 7 of the ESA; (2) violation of the NHPA and the APA; and (3) violation of the FOIA and the APA.[7] See id. Defendants now move to dismiss Plaintiffs' ESA claim for failure to state a claim upon which relief can be granted. Dkt. 69.

## II. LEGAL STANDARD

"Dismissal under Rule 12(b)(6) is proper when the complaint either (1) lacks a cognizable legal theory or (2) fails to allege sufficient facts to support a cognizable legal theory." Somers v. Apple, Inc., 729 F.3d 953, 959 (9th Cir. 2013). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " Ashcroft v. Iqbal, 563 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim has facial plausibility when a plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678.

In assessing the sufficiency of the pleadings, "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007). The court is to "accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." Outdoor Media Group, Inc. v. City of Beaumont, 506 F.3d 895, 899-900 (9th Cir. 2007). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 563 U.S. at 678. "While legal conclusions can provide the complaint's framework, they must be

---

[7] Plaintiffs allege that Ex-Im Bank violated the FOIA and the APA by failing to make a full and timely determination regarding the Center for Biological Diversity's request for records pertaining to the Projects, and by failing to promptly provide all responsive records. SAC ¶ 9.

- 4 -

supported by factual allegations." Id. at 679. Those facts must be sufficient to push the claims "across the line from conceivable to plausible." Id. at 683. Ultimately, the allegations must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." Twombly, 550 U.S. at 555 (quotation marks and citation omitted).

Where a complaint or claim is dismissed, "[l]eave to amend should be granted unless the district court determines that the pleading could not possibly be cured by the allegation of other facts." Knappenberger v. City of Phoenix, 566 F.3d 936, 942 (9th Cir. 2009). Leave to amend is not required where permitting further amendment to the pleadings would be futile. See Deveraturda v. Globe Aviation Sec. Servs., 454 F.3d 1043, 1049-1050 (9th Cir. 2006).

## III. DISCUSSION

### A. Incorporation by Reference Doctrine

Defendants request the Court to consider the documents referenced in the SAC under the incorporation by reference doctrine. Plaintiffs do not dispute that the doctrine applies to these documents.

The incorporation by reference doctrine permits a court to consider documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the complaint. Knievel v. ESPN, 393 F.3d 1068, 1076 (9th Cir. 2005); see also Sanders v. Brown, 504 F.3d 903, 910 (9th Cir. 2007) ("Review is generally limited to the contents of the complaint, but a court can consider a document on which the complaint relies if the document is central to the plaintiff's claim, and no party questions the authenticity of the document."). "The defendant may offer such a document, and the district court may treat such a document as part of the complaint, and thus may assume that its contents are true for purposes of a motion to dismiss under Rule 12(b)(6)." United States v. Ritchie, 342 F.3d 903, 908 (9th Cir. 2003).

The Court finds that it is appropriate to consider the documents referenced in Paragraphs 85-86 and 98-99 of the SAC under the incorporation by reference doctrine. Accordingly, in resolving the instant motion, the Court will consider, inter alia, the

Australian Pacific LNG Environmental Impact Statement and the Queensland Curtis LNG Draft Environmental Statement. The contents of these documents are alleged in the SAC, and Plaintiffs necessarily rely upon them in asserting that Defendants failed to comply with § 7(a)(2) of the ESA. Moreover, no party questions their authenticity. As such, the Court will treat the documents referenced in Paragraphs 85-86 and 98-99 as part of SAC, and assume that their contents are true for purposes of the instant motion. Ritchie, 342 F.3d at 908.

### B. Judicial Notice

Defendants request the Court take judicial notice of two documents prepared by the Queensland government: (1) the Draft Terms of Reference for an Environmental Impact Statement for the APLNG Project; and (2) the Terms of Reference for an Environmental Impact Statement for the QCLNG Project. Defendants contend that it is appropriate for the Court to take judicial notice of these documents because they are matters of public record posted on a government website. Plaintiffs do not object to the Court taking judicial notice of the documents. Accordingly, because a court may take judicial notice of undisputed matters of public record as well as information posted on government websites, Defendants' request for judicial notice is GRANTED. See Harris v. Cnty. of Orange, 682 F.3d 1126, 1132 (9th Cir. 2012); Sears v. Cnty. of Monterey, 2013 WL 4510672, at *4 (N.D. Cal. 2013).

### C. Endangered Species Act

The ESA was enacted in 1973 to prevent the extinction of various fish, wildlife, and plant species. The Supreme Court has called the ESA the "most comprehensive legislation for the preservation of endangered species ever enacted by any nation." Tennessee Valley Auth. v. Hill, 437 U.S. 153, 180 (1978). The responsibility for the administration and enforcement of the ESA lies with the Secretaries of Commerce and Interior, who have delegated the responsibility to the National Marine Fisheries Service ("NMFS") with respect to marine species, and to the United States Fish and Wildlife Service ("FWS") with respect to terrestrial species. 50 C.F.R. § 402.01.

Section 7(a)(2) of the ESA requires a federal agency to "insure that any action authorized, funded, or carried out" by the agency "is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species." 16 U.S.C. § 1536(a)(2). Section 7(a)(2) of the ESA imposes a procedural duty on federal agencies to consult with the FWS or NMFS for any "agency action" that "may affect" a listed species or its critical habitat. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a). The purpose of the consultation procedure is to allow either the FWS or NMFS to determine whether the federal action is likely to jeopardize the survival of a protected species or adversely modify its critical habitat, and if so, to identify reasonable and prudent alternatives that will avoid the action's unfavorable impacts. See 16 U.S.C. § 1536(b)(3)(A); Karuk Tribe of Cal. v. U.S. Forest Serv., 681 F.3d 1006, 1020 (9th Cir. 2012) (en banc). "The consultation requirement reflects a conscious decision by Congress to give endangered species priority over the primary missions of federal agencies." Karuk Tribe, 681 F.3d at 1020 (quotation marks omitted).

In 1978, the Services promulgated a joint regulation stating that the obligations imposed by § 7(a)(2) extend to actions taken in foreign nations. See 43 Fed. Reg. 870,874 (1978). However, in 1986, the Services promulgated a revised joint regulation, reinterpreting § 7(a)(2) to require consultation only for actions taken in the United States or upon the high seas.[8] See 51 Fed. Reg. 19,926, 19,929-19,930 (1986) (The scope of § 7(a)(2) does not extend to federal actions taken in foreign countries. It only covers federal actions taken (e.g., activities occurring) on the high seas or in the United States, its territorial seas, and the outer continental shelf "because of the apparent domestic orientation of the consultation and exemption processes resulting from the Amendments, and because of the potential for interference with the sovereignty of foreign nations."); 50 C.F.R. 402.01; see also Lujan v. Defenders of Wildlife, 504 U.S. 555, 557-559 (1992) (the

---

[8] The "high seas" are "all waters seaward of the territorial sea of the United States, except waters officially recognized by the United States as the territorial sea of another country, under international law." 50 C.F.R. § 17.21(c).

revised joint regulation limits § 7(a)(2)'s geographic scope to actions taken in the United States or upon the high seas); Defenders of Wildlife, Friends of Animals and Their Environment v. Hodel, 851 F.2d 1035, 1037 (8th Cir. 1988) (the revised joint regulation "limits the scope of consultation" to agency action "in the United States or upon the high seas"; noting that, "[p]reviously, consultation on federal agency actions in foreign countries was required").[9]

The Services' revised joint regulation defines an "action" as "all activities or programs of any kind authorized, funded, or carried out, in whole or in part by Federal agencies in the United States or upon the high seas." 50 C.F.R. § 402.02. Examples of "actions" given in the regulation include "the granting of licenses, contracts, leases, easements, rights-of-way, permits or grants-in-aid," or "actions directly or indirectly causing modifications to the land, water, or air." 50 C.F.R. § 402.02(c)-(d). The ESA's regulations do not explicitly define the scope of an "agency action." However, the term "agency action" is interpreted broadly. Wild Fish Conservancy v. Salazar, 628 F.3d 513, 521 (9th Cir. 2010) (quotation marks omitted); Pacific Rivers Council v. Thomas, 30 F.3d 1050, 1054 (9th Cir. 1994).

### D. Motion to Dismiss

In support of their ESA claim, Plaintiffs allege that Ex-Im Bank's decisions to provide funding for the Projects constitute "agency actions" within the meaning of the ESA that may affect ESA-listed species "in Australian territorial waters and on the high seas."[10] SAC ¶¶ 123-124. According to Plaintiffs, Ex-Im Bank's conduct amounts to agency action subject to the ESA's consultation requirement because the Projects "occur partially upon

---

[9] In Hodel, the Eighth Circuit interpreted the revised joint regulation as "provid[ing] that United States agencies funding projects in foreign countries have no duty to consult with the Secretary about the projects' impact on endangered species of wildlife or plants." Hodel, 851 F.2d at 1036.

[10] According to Plaintiffs, construction and operation of the Projects, including shipping operations, will, among other things, substantially diminish water quality and clarity, increase underwater noise, cause vessel strikes both near the LNG facilities and on the high seas, destroy and degrade habitat and otherwise harm dugongs, sea turtles, large whales, and other wildlife, or cause wildlife to leave the area. See SAC ¶¶ 25, 78, 92, 106.

the high seas" as they include shipping operations across the high seas, primarily to ports in Asia. See id. ¶¶ 2-4, 84, 86, 91, 97, 99, 105. Plaintiffs assert that Ex-Im Bank violated § 7(a)(2) of the ESA by failing to consult with the FWS and/or NMFS (collectively, "the Services") regarding the impacts of its actions on ESA-listed species. Id. ¶¶ 126-128.

In the instant motion, Defendants contend that dismissal of Plaintiffs' ESA claim is appropriate because Plaintiffs have failed to allege sufficient facts to allow the Court to draw the reasonable inference that Ex-Im Bank violated § 7(a)(2) by failing to consult with the Services prior to approving loans for the Projects. Specifically, Defendants contend that the allegations in the SAC do not plausibly show that Ex-Im Bank took an "agency action" that triggers § 7(a)(2)'s consultation requirement. According to Defendants, because the documents referenced in the SAC show that the Projects occur entirely within a foreign country and its territorial waters, Ex-Im Bank did not have an obligation to consult with the Services. In other words, Defendants contend that dismissal of Plaintiffs' ESA claim is appropriate because the Projects are outside the geographic scope of § 7(a)(2).[11] In support of its position, Defendants argue that the documents referenced in the SAC demonstrate that shipping on the high seas is not a component of either project. Defendants further argue that even if the documents supported Plaintiffs' allegations that shipping on the high seas is a component of the Projects, Plaintiffs have not and cannot allege that Ex-Im Bank provided funding for shipping. Defendants maintain that "[b]ecause there can be no allegation that the Bank authorized, funded, or carried out shipping of LNG on the high seas, it did not take agency 'action' within the meaning of the ESA and Plaintiffs' SAC fails to state a claim upon which relief can be granted."

In response, Plaintiffs contend that Defendants' motion should be denied because it is based solely on extrinsic evidence that does not represent the "whole" administrative record. While Plaintiffs acknowledge that the Court may consider documents that are

---

[11] Defendants do not contend that dismissal is appropriate on the ground that the SAC fails to allege sufficient facts to allow the Court to infer that the shipping activities associated with the Projects "may affect" a listed species or its critical habitat.

- 9 -

properly incorporated by reference into the SAC as well as documents subject to judicial notice, they nonetheless argue that the Court should not consider documents outside the SAC in resolving the instant motion because the SAC alleges sufficient facts to survive Defendants' motion to dismiss. The Court disagrees. As discussed above, the documents referenced in Paragraphs 85-86 and 98-99 of the SAC are properly considered under the incorporation by reference doctrine. Plaintiffs do not dispute that the doctrine applies to these documents. Indeed, Plaintiffs rely on the contents of the documents to establish a factual basis for their assertion that the Projects occur "partially" upon the high seas to trigger the ESA's consultation requirement. Further, Plaintiffs have not offered any authority or argument showing that it is improper for the Court to consider the documents subject to judicial notice in determining whether the SAC states a cognizable ESA claim. Accordingly, the Court will consider the documents incorporated into the SAC by reference and the documents that are properly subject to judicial notice in resolving the instant motion.

As for the merits, Plaintiffs contend that Defendants' motion should be denied because the SAC contains sufficient facts to support an inference that the Projects funded by Ex-Im Bank occur partially upon the high seas to trigger the ESA's consultation requirement, including facts taken from the Project proponents' environmental documents and Ex-Im Bank's documents describing how the Projects include shipping of LNG across the high seas to ports abroad. Because federal actions taken in foreign countries are outside the geographical scope of the ESA, Plaintiffs' ESA claim is subject to dismissal if the SAC does not contain facts plausibly showing that the scope of Ex-Im Bank's actions not only include construction-related activities occurring in Australia and its territorial seas but also post-construction shipping activities occurring on the high seas. Viewing the allegations in the SAC in the light most favorable to Plaintiffs, the Court finds that Plaintiffs have alleged sufficient facts to withstand dismissal. The facts alleged in the SAC plausibly show that the scope of Ex-Im Bank's actions include shipping activities occurring upon the high seas.

Both of the Projects include an "upstream" and "downstream" portion. SAC ¶¶ 82-83, 95-96. The upstream portion includes the development of coal seam gas fields and the construction of gas transmission pipelines, while the downstream portion includes the construction of LNG facilities and related infrastructure that will be used to process natural gas, condense it to liquid, and store it for transport. Id. ¶¶ 2-3, 82-83, 95-96; see also Dkt. 69-1, 69-4, 69-5, 69-6. Ex-Im Bank provided funding for the "downstream" portion of the Projects; specifically, financing for the construction of two LNG facilities and related infrastructure, including the construction of two marine jetties and loading berths to transfer LNG to tankers for shipping. SAC ¶¶ 83, 96; Dkt. 69-1; Dkt. 69-7; Dkt. 69-8. The LNG facilities will be constructed and operated by the proponents of the Projects for the purpose of producing, storing, and exporting LNG. See SAC ¶¶ 2-4, 84-86, 96-99; Dkt. 69-1; Dkt. 69-2; 69-6. During the operational phase of the Projects, the proponents of the Projects and others will ship LNG to destinations abroad, primarily to ports in Asia, through high seas habitat of endangered and threatened species. See SAC ¶¶ 2-4, 78, 84-86, 97-99.

While it is undisputed that all construction-related activities associated with the Projects will occur entirely within Australia and its territorial seas and that Ex-Im Bank did not specifically provide financing for any post-construction shipping activities associated with the Projects, Defendants have not pointed to any facts in the documents properly before the Court or cited any authority supporting the conclusion that the scope of Ex-Im Bank's actions is limited to construction-related activities occurring within Australia and its territorial seas. Because it is reasonable to infer that exporting LNG to destinations abroad is one of the primary objectives/components of the Projects,[12] and because the term "agency action" is interpreted broadly, Plaintiffs have pled facts plausibly showing that the

---

[12] The APLNG EIS states that one of the objectives of the project is the construction and operation of a LNG facility for the "production and export of . . . LNG." See Dkt. 69-1; see also SAC ¶¶ 2, 4, 84-86. The APLNG EIS also states that the project "will enable the creation of a world-scale export industry in Queensland." Dkt. 69-1. The proponent of the QCLNG Project describes the project as including five principal components, including shipping operations through the Great Barrier Reef Marine Park to open ocean. See Dkt. 69-6; Dkt. 69-7; see also SAC ¶¶ 3-4, 97-99.

scope of Ex-Im Bank's actions entail not only construction-related activities occurring in Australia and its territorial seas but also post-construction shipping activities occurring upon the high seas such that it is plausible Ex-Im Bank violated § 7(a)(2) by failing to consult with the Services. SAC ¶¶ 2-4, 83-86, 95-99; see 50 C.F.R. § 402.02 (defining "[a]ction" broadly to mean "all activities . . . of any kind . . . funded . . . in whole or in part by Federal agencies in the United States or upon the high seas."); Conner v. Burford, 848 F.2d 1441, 1453 (9th Cir. 1988) (interpreting agency action broadly in a case involving leases for oil and gas exploration to entail "not only leasing but leasing and all post-leasing activities through production and abandonment" because pumping oil, not leasing tracts, is the aim of congressional mineral leasing policy); see also Defenders of Wildlife v. U.S. Dept. of Navy, 733 F.3d 1106, 1121-1122 (11th Cir. 2013) (refusing to adopt the rule that a biological opinion must be coextensive in scope with the entire agency action, and concluding that even if that rule applied, the NMFS considered the "entire action" by analyzing the impacts of both installation and operation of an undersea warfare training range). Accordingly, because Plaintiffs have alleged sufficient facts to state a claim for relief under the ESA that is plausible on its face, Defendants' motion to dismiss is DENIED.

## IV. CONCLUSION

For the reasons stated above, IT IS HEREBY ORDERED THAT:

1. Defendants' motion to dismiss is DENIED.
2. This Order terminates Docket 69.

IT IS SO ORDERED.

Dated: February 20, 2015

*Saundra B Armstrong*
SAUNDRA BROWN ARMSTRONG
United States District Judge