Sarah Uhlemann (WA Bar No. 41164)*
Center for Biological Diversity
2400 NW 80th Street, #146
Seattle, WA 98117
Phone:  (206) 327-2344
Facsimile:  (415) 436-9683
Email:  suhlemann@biologicaldiversity.org
*Admitted *pro hac vice*

Brendan Cummings (CA Bar No. 193952)
Center for Biological Diversity
P.O. Box 549
Joshua Tree, CA 92252
Phone:  (760) 366-2232
Facsimile:  (760) 366-2669
Email:  bcummings@biologicaldiversity.org

Miyoko Sakashita (CA Bar No. 239639)
Emily S. Jeffers (CA Bar No. 274222)
Center for Biological Diversity
351 California Street, Suite 600
San Francisco, CA 94104
Phone:  (415) 436-9682
Facsimile:  (415) 436-9683
Email:  miyoko@biologicaldiversity.org
         ejeffers@biologicaldiversity.org

*Attorneys for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, *et al.*,<br><br>     Plaintiffs,<br>  v.<br><br>EXPORT-IMPORT BANK OF THE UNITED STATES, *et al.*,<br><br>     Defendants. | Case No.: C-12-6325 (SBA)<br><br>**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT**<br><br>Hearing on Cross-Motions for Summary Judgment Scheduled for 1:00 p.m. on August 11, 2015 |

## TABLE OF CONTENTS

NOTICE OF MOTION ........................................................................................................1

INTRODUCTION ..............................................................................................................1

LEGAL BACKGROUND ...................................................................................................2

    A.  The Endangered Species Act ..............................................................................2

    B.  The National Historic Preservation Act ............................................................4

FACTUAL AND PROCEDURAL BACKGROUND .........................................................5

    A.  The Export-Import Bank of the United States ....................................................5

    B.  The Great Barrier Reef World Heritage Area and Its Endangered Species .........6

    C.  The APLNG and QCLNG Projects ....................................................................7

STANDARD OF REVIEW .................................................................................................12

ARGUMENT .....................................................................................................................12

    A.  Plaintiffs Have Standing to Bring This Action ..................................................12

    B.  Ex-Im Bank Violated the ESA by Failing to Consult with the Services Regarding the Projects' Impacts to Listed Species ..............................................16

        1.  Ex-Im Bank's Funding of the Projects Constitutes "Agency Action" Under Section 7 of the ESA ...................................................................................16

        2.  Ex-Im Bank's Actions Occur on the High Seas ........................................18

        3.  Ex-Im Bank's Actions "May Affect" Listed Species ..................................19

    C.  Ex-Im Bank Violated the NHPA by Failing to Take Into Account the Projects' Impacts on the Great Barrier Reef World Heritage Site ..............................................19

        1.  The Projects are "Federal Undertakings" as a Result of Ex-Im Bank Funding ...................20

        2.  The Projects Directly and Adversely Affect the Great Barrier Reef ....................................21

        3.  Ex-Im Bank Failed to Take Into Account Adverse Impacts to the Great Barrier Reef .......22

CONCLUSION .................................................................................................................25

# TABLE OF AUTHORITIES

**Cases**

*Cantrell v. City of Long Beach*, 241 F.3d 674 (9th Cir. 2001) ....................................14

*Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961 (9th Cir. 2003)................................14

*Chesapeake Climate Action Network v. Export-Import Bank of the United States*,
No. 13-1820, 2015 U.S. Dist. LEXIS 6596 (D.D.C. 2015) ....................................15

*Ctr. for Biological Diversity v. Hagel*, No. C-02-4350,
2015 U.S. Dist LEXIS 18332 (N.D. Cal. 2015) ....................................15

*Conner v. Burford*, 848 F.2d 1441 (9th Cir. 1998)....................................17, 18

*Dugong v. Rumsfeld*, No. C 03-4350, 2005 U.S. Dist. LEXIS 3123 (N.D. Cal. 2005)....................5, 20

*Dugong v. Gates*, 543 F. Supp. 2d 1082 (N.D. Cal. 2008) ....................5, 12, 15, 23-25

*Friends of the Earth v. Watson*, No. C 02-4106, 2005 U.S. Dist LEXIS 42335 (N.D. Cal. 2005) .....12, 14

*Friends of the Earth v. Laidlaw Envtl. Servs.*, 528 U.S. 167 (2000) ....................................13

*Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006 (9th Cir. 2012)................3, 16, 17, 19

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ....................................13-15

*Morris Cnty. Trust for Historic Preservation v. Pierce*, 714 F.2d 271 (3d Cir. 1983)....................20

*Pac. Rivers Council v. Thomas*, 30 F.3d 1050 (9th Cir. 1994)....................................3, 16

*Public Citizen v. DOT*, 316 F.3d 1002 (9th Cir. 2001)....................................14

*Salmon Spawning & Recovery Alliance v. Guttierez*, 545 F.3d 1012 (9th Cir. 2008)....................15

*Thomas v. Peterson*, 753 F.2d 754 (9th Cir. 1985)....................................4

*Tyler v. Cuomo*, 236 F.3d 1124 (9th Cir. 2000)....................................20

*WATCH v. Harris*, 610 F. 2d 310 (2d Cir. 1979)....................................20

*W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472 (9th Cir. 2011)....................3, 12

*Wild Fish Conserv. v. Salazar*, 628 F.3d 513 (9th Cir. 2010) ....................................17

**Statutes and Regulations**

*Administrative Procedure Act*, 5 U.S.C. §§ 500 *et seq.*:

5 U.S.C. § 706(2)(A)....................................12, 25

*Export-Import Bank Organic Statute*, 12 U.S.C. §§ 635 *et seq.*:

12 U.S.C. § 635i-5 .................................................................................6, 15, 17

*National Historic Preservation Act*, 16 U.S.C. §§ 470 *et seq.*:

16 U.S.C. § 470-1(2) ........................................................................................4

16 U.S.C. § 470a ..............................................................................................5

16 U.S.C. § 470a-2 ....................................................1, 5, 15, 19, 20, 21, 22

16 U.S.C. § 470f ...............................................................................................5

16 U.S.C. § 470w(7) ................................................................................20, 21

36 C.F.R. Part 800 .......................................................................................5, 23

36 C.F.R. § 800.5 ......................................................................................21, 24

36 C.F.R. § 800.11 ..........................................................................................24

*Endangered Species Act*, 16 U.S.C. §§ 1531 *et seq.*:

16 U.S.C. § 1531(b) ..........................................................................................2

16 U.S.C. § 1536 ..............................................1, 3, 4, 16, 18, 19

50 C.F.R. § 17.11 .........................................................................................6, 7

50 C.F.R. § 17.21(c) .........................................................................................3

50 C.F.R. § 402.01 ............................................................................................3

50 C.F.R. § 402.02 ..............................................................................3, 16, 17

50 C.F.R. § 402.12 ............................................................................................4

50 C.F.R. § 402.13 .......................................................................................3, 4

50 C.F.R. § 402.14 ....................................................................................3, 4, 19

50 C.F.R. § 402.15 ............................................................................................4

**Federal Register**

51 Fed. Reg. 19,926 (June 3, 1986) ..............................................................19

63 Fed. Reg. 20,496 (April 24, 1998) .......................................................5, 23

**NOTICE OF MOTION**

PLEASE TAKE NOTICE that at 1 p.m. on August 11, 2015, or as soon thereafter as the matter may be heard in the Honorable Judge Saundra Brown Armstrong's courtroom of the U.S. District Court for the Northern District of California, 1301 Clay St., Oakland, CA, 94102, Plaintiffs Center for Biological Diversity, Pacific Environment and Turtle Island Restoration Network will move this court pursuant to Federal Rule of Civil Procedure 56 and Civil Local Rules 7-2, 7-4 and 56 for summary judgment on their Claims for Relief in their Second Amended Complaint. This motion is based on the Memorandum of Points and Authorities below; the declarations, pleadings, records and files in this action; and other such documentary and oral evidence that may be supplied at the hearing.

For the reasons set forth below, Defendants Export-Import Bank of the United States and Fred P. Hochberg, in his official capacity as Chairman and President of the Export-Import Bank of the United States (collectively "Ex-Im Bank"), violated the clear mandates of the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531 *et seq.*, and the National Historic Preservation Act ("NHPA"), 16 U.S.C. §§ 470 *et seq.*, when approving financing for two liquefied natural gas projects in the Great Barrier Reef of Australia. To remedy these violations of law, Plaintiffs seek declaratory and injunctive relief so as to bring Defendants into compliance with these statutory provisions.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**INTRODUCTION**

This case presents two simple questions for the court to resolve: (1) When a federal agency undertakes an action that unquestionably results in harm to a World Heritage Site, must it comply with the National Historic Preservation Act ("NHPA"), which requires agencies to "take into account" the impacts of their actions on World Heritage areas; and (2) when the same action harms endangered species that inhabit the World Heritage Site, must the agency comply with the Endangered Species Act ("ESA") and "consult" on ESA-listed species? 16 U.S.C. §§ 470a-2 & 1536. As demonstrated below, the answer is clearly "yes." Yet despite these unambiguous statutory directives, Defendants failed to comply with either statute, overlooking their obligations under the NHPA, while denying that the ESA even applies to their actions.

Defendants' violations of law have real consequences. The Great Barrier Reef is one of the

great wonders of the natural world. It is the planet's largest coral reef ecosystem, and it supports a diverse array of habitats, as well as thousands of species of corals, fish, and endangered sea turtles and marine mammals. In recognition of its remarkable beauty and diversity, the Reef and adjacent areas have been designated as a World Heritage Site. But the ecological integrity of the area is now threatened as a result of several fossil-fuel development projects proposed or underway within it.

These projects threatening the Reef were sponsored by Defendants, who provided nearly $4.8 billion USD in financing for the development of two separate liquefied natural gas ("LNG") facilities. AR 20167, 23374. The projects, the Australia Pacific LNG Project ("APLNG") and the Queensland Curtis LNG Project ("QCLNG," collectively, "the Projects"), will each include gas drilling, pipeline construction, construction of an LNG production facility and shipping terminal, and transport of LNG through the Great Barrier Reef and the high seas to markets abroad. AR 3119-20, 26313-25.

Projected impacts to the Reef as a result of the Projects include severely reduced water quality; death and displacement of endangered whales, sea turtles and dugongs due to ship strikes; habitat loss and underwater noise; and the general industrialization of a currently relatively pristine area. *See, e.g.*, AR 1016-18. The threats are so great that the international body tasked with overseeing World Heritage Sites recently expressed "extreme concern" regarding these developments, particularly the construction of LNG facilities within the Reef's borders, and requested "the immediate halting" of work on such LNG facilities until the impacts could be better assessed. AR 46286, 18762.

Notwithstanding these concerns, Defendants funded the Projects without properly considering the Projects' substantial impacts on ESA-listed species and the Great Barrier Reef World Heritage Area as required by the ESA and NHPA. Through this action, Plaintiffs seek to compel Defendants to come into compliance with these statutes and carry out the required analyses so as to avoid or minimize harm to the Reef and its endangered inhabitants, thereby protecting Plaintiffs' interests.

## LEGAL BACKGROUND

### A. The Endangered Species Act

Congress enacted the Endangered Species Act ("ESA") in 1973 "to provide a program for the conservation of . . . endangered species and threatened species." 16 U.S.C. § 1531(b). Section 7 of the Act requires that "[e]ach Federal agency shall . . . insure that any action authorized, funded, or carried

out by such agency . . . is not likely to jeopardize" any threatened or endangered species. *Id.* § 1536(a)(2). Specifically, each agency must "consult" with the expert wildlife agencies, the National Marine Fisheries Service or the Fish and Wildlife Service (collectively, "the Services"), "before engaging in any discretionary action" in order to obtain an "expert opinion" on species impacts. *Id.*; *Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1020 (9th Cir. 2012) (en banc). The threshold for triggering consultation is low; an agency has a duty to consult for any discretionary agency action that "may affect" a listed species. 50 C.F.R. § 402.14(a).

The ESA expressly requires an agency to comply with Section 7 for "*any* action" it authorizes or funds. 16 U.S.C. § 1536(a)(2) (emphasis added); *Pac. Rivers Council v. Thomas*, 30 F.3d 1050, 1054 (9th Cir. 1994) ("there is little doubt that Congress intended to enact a broad definition of agency action in the ESA"). "Action" is broadly defined to include "all activities of any kind authorized, *funded*, or carried out, *in whole or in part*, by Federal agencies in the United States or *upon the high seas*." 50 C.F.R. § 402.02 (emphasis added).

While the ESA itself contains no limitations on the geographic scope of Section 7, the regulations limit Section 7 to "action[s] [an agency] authorizes [or] funds . . . in the United States or upon the high seas." *Id.* §§ 402.01, 402.02.[1] The "high seas" are "all waters seaward of the territorial sea of the United States, except waters officially recognized by the United States as the territorial sea of another country." *Id.* § 17.21(c).

The Ninth Circuit has described Section 7 as the "heart of the ESA." *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 495 (9th Cir. 2011). "The purpose of consultation is to obtain the expert opinion of wildlife agencies to determine whether the action is likely to jeopardize a listed species or adversely modify its critical habitat and, if so, to identify reasonable and prudent alternatives that will avoid the action's unfavorable impacts." *Karuk Tribe*, 681 F.3d at 1028. The Services may also "suggest modifications" to the action during the course of consultation to "avoid the likelihood of adverse effects" to the listed species even when not necessary to avoid jeopardy. 50 C.F.R. § 402.13.

---

[1] Plaintiffs' Second Amended Complaint also challenged the legality of these regulations as applied to Defendants' actions as being inconsistent with the statutory language of the ESA. The Court dismissed these claims as time-barred. Dkt. # 62, Order Granting Motion to Dismiss. Upon entry of final judgment in this case, Plaintiffs may appeal said dismissal.

1    The consultation process contains specific procedural requirements applying to both the action
2    agency (Ex-Im Bank in this case) and the Services. 16 U.S.C. § 1536(a)-(d); 50 C.F.R. § 402.12-
3    402.15; *see also Thomas v. Peterson*, 753 F.2d 754, 763 (9th Cir. 1985) (describing consultation
4    process). As emphasized by the Ninth Circuit in *Thomas*, the "ESA's procedural requirements call for a
5    systematic determination of the effects of a federal project on endangered species. If a project is
6    allowed to proceed without substantial compliance with those procedural requirements, there can be no
7    assurance that a violation of the ESA's substantive provisions will not result." 753 F.2d at 764.

8    **B.  The National Historic Preservation Act**

9        Congress enacted the National Historic Preservation Act of 1966 to "provide leadership in the
10   preservation of the prehistoric and historic resources of the U.S. and of the international community of
11   nations." 16 U.S.C. § 470-1(2). The statute contains provisions applying to actions and "properties"
12   both domestic and abroad.

13       The international provisions of the NHPA flow largely from the obligations the United States
14   committed to when it ratified the World Heritage Convention. *See* Convention Concerning the
15   Protection of the World Culture and Natural Heritage, Nov. 16, 1972, 27 U.S.T. 37. The Convention,
16   ratified by the U.S. in 1973, recognizes that "parts of the cultural or natural heritage are of outstanding
17   interest and therefore need to be preserved as part of the world heritage of mankind," and that "in view
18   of the magnitude and gravity of the new dangers threatening them, it is incumbent on the international
19   community as a whole to participate in the protection of" this heritage. *Id.*

20       Under the Convention, Parties nominate and the UNESCO World Heritage Committee selects
21   cultural and natural heritage properties that have "outstanding universal value" for the World Heritage
22   List. *Id.* Art. 11(1), (2). Parties then commit "to set up . . . services for the protection [and]
23   conservation" of cultural and natural heritage within their borders. *Id.* Art. 5. Further, "[e]ach State
24   Party . . . undertakes not to take any deliberate measures which might damage directly or indirectly the
25   cultural and natural heritage . . . situated on the territory of other States Parties." *Id.* Art. 6.

26       In 1980, Congress amended the NHPA to implement the United States' World Heritage
27   Convention obligations. Section 402 of the NHPA requires that, "[p]rior to the approval of any Federal
28   undertaking outside the United States which may directly and adversely affect a property which is on

the World Heritage List," each agency "shall take into account the effect of the undertaking on such property for purposes of avoiding or mitigating any adverse effects." 16 U.S.C. § 470a-2. This provision closely mirrors the domestic obligations of the NHPA. *Compare id*. with § 470f.

Domestically, the NHPA directs the Secretary of the Interior to maintain a National Register "composed of districts, sites, buildings, structures, and objects significant in American history, architecture, archeology, engineering, and culture." 16 U.S.C. § 470a(a)(1)(A). Federal agencies are required, when undertaking any federally assisted action within the United States, to "take into account the effect of the undertaking on any district, site, building, structure, or object that is included or eligible for inclusion in the National Register." *Id.* § 470f. The Secretary promulgated regulations in 1974 setting forth the process and standards for agencies to "take into account" the effects of their undertakings. *See* 36 C.F.R. Part 800.

Because these domestic regulations were first adopted in 1974, they were in effect at the time Congress passed Section 402 governing foreign projects. *See* 36 C.F.R. Part 800. While these regulations do not apply expressly to Section 402, no separate implementing regulations have been promulgated for that section. Consequently, these regulations serve, at a minimum, as an "important guide" in interpreting Section 402 obligations. *Dugong v. Rumsfeld*, No. C 03-4350, 2005 U.S. Dist. LEXIS 3123 at *49 (N.D. Cal. 2005); *Dugong v. Gates*, 543 F. Supp. 2d 1082, 1088 (N.D. Cal. 2008).

In addition to the regulations at 36 C.F.R. Part 800, in 1998 the Secretary issued guidelines to govern implementation of the NHPA. 63 Fed. Reg. 20,496 (April 24, 1998). These guidelines explicitly address the foreign provisions of the statute, requiring that federal agencies consult with the host country's historic preservation authorities and other affected groups. *Id*. at 20504. This consultation "should be undertaken early the planning stage of any Federal action that might affect historic properties." *Id.* "Therefore, as with domestic projects . . . federal agencies are obligated under [Section 402] to consider adverse effects, and they are guided by the Secretary of the Interior guidelines to consult with foreign bodies." *Rumsfeld*, 2005 U.S. Dist. LEXIS 3123, at *15-16.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.  The Export-Import Bank of the United States

The Export-Import Bank of the United States is a federal agency that is designed to foster

1  exports of U.S. products by financing international development projects. The agency assumes credit

2  risks that the private sector is unwilling to accept. *The Charter of the Export Import Bank*, § 8(h)

3  (2012).[2] Consideration of the environmental consequences of its actions is explicitly part of Ex-Im

4  Bank's mandate. Ex-Im Bank's organic statute requires the agency to "establish procedures to take into

5  account the potential beneficial and adverse environmental effect of goods and services for which

6  support is requested under its direct lending and guarantee programs." 12 U.S.C. § 635i-5(a)(1). To

7  implement this requirement, in 1995, Ex-Im Bank adopted its Environmental Procedures and

8  Guidelines, requiring all applicants for "large" projects to submit an "Environmental Impact

9  Assessment" or equivalent documentation sufficient for Ex-Im Bank to "evaluate the nature and extent

10  of the environmental effects of a project, and effectiveness of proposed mitigation measures." AR

11  20174-79 (*Envt'l Procedures & Guidelines* §§ II; I(6), (7)). Ex-Im Bank may "withhold financing from

12  a project for environmental reasons." 12 U.S.C. § 635i-5(a)(2). Further, "[i]f a project does not meet the

13  applicable environmental guidelines," the agency may "provide financial support conditioned on the

14  implementation of measures to mitigate the project's adverse environmental impacts." AR 20177

15  (*Envt'l Procedures & Guidelines* § I(15)).

16  **B.  The Great Barrier Reef World Heritage Area and Its Endangered Species**

17      One of world's most valuable natural wonders, the Great Barrier Reef spans the northeastern

18  coast of Australia and includes the planet's largest coral reef ecosystem. AR 13770. Renowned for its

19  beauty and diversity, the Great Barrier Reef sustains an array of corals and wildlife, and provides

20  crucial habitat for many rare, threatened, and endangered species. AR 13776. Much of the Reef is

21  within the territorial waters of Australia, but both the Reef itself and the World Heritage Area extend

22  into the high seas. AR 13974.

23      Several species inhabiting the Great Barrier Reef area are protected under the ESA. These

24  include the dugong, a large, herbivorous marine mammal related to the manatee, as well as green and

25  loggerhead sea turtles. 50 C.F.R. § 17.11. The dugong's diet is primarily restricted to seagrass, and the

26

27  _____

28  [2] Ex-Im Bank charter available at:
http://www.exim.gov/about/whoweare/charterbylaws/upload/Updated_2012_EXIM_Charter_August_2012_Final.pdf (last accessed April 1, 2015).

1   principal threat to the species is destruction of seagrass beds. AR 13780,-98. Sea turtles face numerous

2   threats in Australia, including bycatch in fisheries, habitat degradation at nesting beaches, and

3   degradation of seagrass habitat. AR 13796.

4        In addition to sea turtles and dugongs, several other ESA-listed wildlife species inhabit the

5   Great Barrier Reef area, including endangered humpback whales, sperm whales, sei whales, fin whales

6   and the threatened saltwater crocodile. *See* 50 C.F.R. § 17.11. These species occur both within

7   Australia's territorial waters as well as the adjacent high seas.

8        The Great Barrier Reef was inscribed on the World Heritage List in 1981. AR 13772. To gain

9   protection under the World Heritage Convention, a natural area must have "outstanding universal

10  values" ("OUV"). World Heritage Convention, Art. 11(1), (2). According to the World Heritage

11  Committee, the range of species and habitats in the Great Barrier Reef make it "one of the richest and

12  most complex natural ecosystems on earth. . . . No other World Heritage Area contains such

13  biodiversity." AR 46596.

14  **C.  The APLNG and QCLNG Projects**

15       The Australia Pacific LNG Project and the Queensland Curtis LNG Project are two separate,

16  but adjacent, LNG export projects, with terminals under construction on Curtis Island, near the town of

17  Gladstone, within the Great Barrier Reef World Heritage Area. Both of the Projects include an

18  "upstream" and a "downstream" portion. In the "upstream" portion of each Project, proponents will

19  drill thousands of coal-seam wells in the interior basins west of Brisbane. AR 3119-20, 26313.

20  Underground pipelines (nearly 300 miles for APLNG and 210 miles for QCLNG) will be installed to

21  transport the gas to the coast, including a marine crossing over the Narrows, a channel that separates the

22  shore and Curtis Island. AR 3119-20, 26319. Installation of the marine crossings will include dredging

23  and direct destruction of seagrass beds. AR 4833, 26694.

24       The "downstream" portions of the Projects include the construction of facilities on Curtis Island

25  to process the gas, condense it to liquid, and store it for transport. AR 3119-20, 26322. Both LNG

26  facility sites lie "wholly within the Great Barrier Reef World Heritage Area," AR 1677, and "will be a

27  major industrial complex that would contrast highly with the existing landscapes of Curtis Island." AR

28  8443; *see also* 26899 (describing QCLNG Project). Each Project will also include a marine loading

jetty to transport the LNG to tankers for shipping. AR 3120, 26295. Construction of these LNG facilities requires dredging and destruction of mangrove and seagrass habitat, as well as dredging of Gladstone Harbour to facilitate tanker access. AR 3126, 26325.

Both Projects include shipping LNG through the Great Barrier Reef World Heritage Area and across the high seas to ports abroad. The Draft Environmental Impact Statement ("Draft EIS") prepared by its proponents states that the QCLNG Project involves shipping LNG through the Great Barrier Reef World Heritage Area and beyond. AR 26324. The document identifies five principle components: the gas field, the pipeline, LNG, the Swing Basin and Channel, and shipping operations. AR 29033-34. The Draft EIS states that shipping operations include:

> Regular transit of LNG tankers and, potentially, infrequent transit of ships carrying propane to the LNG Facility for the "spiking" of LNG. Shipping operations will involve three stages: firstly, loading LNG/unloading propane at the marine jetty; secondly, transit of ships through Gladstone Harbour; *and thirdly, transit of ships through the Great Barrier Reef Marine Park to open ocean.*

AR 29033-34 (emphasis added). Additionally, Ex-Im Bank's own Memorandum to the Board, which provides the agency's final recommendation to fund the QCLNG Project, also includes a project description that includes the same five components described above. Critically, the last component includes "Shipping Operations for regular transit of LNG tankers" through Gladstone Harbour and the Great Barrier Reef. AR 23415-17.

Like the QCLNG Project, the APLNG Project also involves shipping LNG through the Great Barrier Reef World Heritage Area and across the high seas to ports abroad. The APLNG EIS states that one the project's objectives is the construction and operation of a LNG facility for the "production and export of . . . LNG." AR 3119. The project's "Operations" include "LNG Shipping," and the EIS states that "LNG will be transported by specially designed ships. . . . [I]t is expected that a LNG vessel will arrive approximately every one to two days for loading and export." AR 5920-26.

The significant impacts of the APLNG and QCLNG projects on endangered species and on the Great Barrier Reef World Heritage Area are largely undisputed as they are documented in EISs prepared by the Project proponents.[3] Adverse effects include habitat destruction and degradation;

---

[3] These environmental documents were submitted to Ex-Im Bank and constitute the Projects' Environmental Impact Assessment or equivalent documentation, pursuant to Ex-Im Bank's Procedures and Guidelines. AR 103, 23418.

impacts to several ESA-listed species both in Australia's territorial waters and in the high seas; water, noise, light and air pollution; vessel traffic and collisions; and loss of scenic values. AR 1016-18 (APLNG); AR 26693-94, 26705-07 (QCLNG).

The construction of the Projects will destroy mangrove and seagrass habitat, and cause a permanent loss of habitat within the World Heritage Area. AR 6855, AR 26349, 26694. The Project areas include significant seagrass habitat, including the Rodds Bay Dugong Protection Area, and the seagrass meadows nearest the port expansion for QCLNG are among those most heavily used by dugongs. AR 26918-19, 26933. Not only will the project directly destroy large seagrass meadows, but "suspected sediment may smother the seagrass or reduce light availability in the water column." AR 26976.

The Projects will also destroy sea turtle habitat and interfere with nesting, and artificial lighting from the LNG facilities is expected to disorient sea turtles and seabirds, as well as disrupt nesting near rookeries for green and flatback turtles. AR 6883, 6885-86; AR 5672, -74, -75; AR 26997-99. Artificial lighting disorients nesting and hatchling sea turtles and can interfere with their success and survival. AR 27000-01 (QCLNG lighting has "the potential to result in both misorientation and disorientation of hatchlings.").

During construction of the Projects, there is a high potential for erosion of soils that can release contaminants into the water. AR 6268. The disturbance of acid sulfate soils that occur in the area during construction may result in sulfuric acid discharges into the marine habitat that can cause fish kills. AR 1785.

Dredging for the Projects comprises "one of the largest dredging campaigns ever proposed for Queensland and Australia." AR 6903 (describing the APLNG Project). Dredging for the construction and shipping channel will significantly affect marine fauna and water quality. AR 270380 (QCLNG EIS - "The most significant impacts anticipated to occur during the construction phase arise from dredging and reclamation and disposal of dredge material."). Not only will dredging destroy subtidal habitat and harm and smother benthic animals, it also creates a plume preventing light from reaching seagrass. AR 10339. Dredging for the shipping channel and the marine facilities will adversely affect "significant areas of subtidal habitats, including seagrass meadows, intertidal mudflats and benthic

1    macro-intervebrate communities." AR 27691. Dredging can also kill sea turtles and dugong that

2    become entrained in the suction head. AR 26983.

3          The Projects will significantly affect dugongs because the area around Curtis Island is critical

4    for dugong protection. AR 6219. Dugongs forage on seagrass, and the construction and dredging

5    activities will destroy seagrass habitat and displace foraging dugongs. AR 6229. Vessels necessary for

6    the construction and operation of the facilities will risk strikes that can cause significant injury or

7    mortality of dugongs, as well as "displace dugong and cetaceans from critical habitat and interrupt

8    critical behaviors." AR 6230-31. Underwater noise from dredging, pile driving, vessels and

9    construction threaten to interfere with critical dugong behaviors such as foraging, breeding and

10    communication. AR 10405. "Overall the inherent risk to cetaceans and dugong from underwater noise

11    is considered severe." *Id.*

12          Both Projects require construction of a pipeline across The Narrows — an inland waterway

13    between Curtis Island and the coast that is a "high value marine environment located within the

14    Commonwealth Great Barrier Reef World Heritage Area." AR 765. Dredging for the pipeline will

15    create sediment, harming water quality, and result in the loss of seagrass and soft coral. AR 2409.

16    Construction vessels may interact with sea turtles and dugongs, and "[i]mpacts from accidental spills of

17    hydrocarbons or chemicals from construction activities have the potential to be high." AR 2409, 2314.

18          Finally, the Projects will significantly increase vessel traffic in the World Heritage Area and the

19    high seas beyond. The APLNG Project alone anticipates adding 400 LNG ships per year that will

20    transit through the World Heritage Area, while the QCLNG Project will add 180 LNG vessel trips per

21    year. AR 6905; AR 26350. Shipping traffic from the Projects is expected to injure and kill wildlife

22    through collisions as well as damaging habitat and impairing water quality. AR 26962-63. "The World

23    Heritage Committee fears these expansions will mean more shipping through the reef, increasing the

24    likelihood of groundings and oil spills." AR 460-61; AR 26982-83, 27723. The increase in vessel

25    traffic will contribute to injuries and mortality of sea turtles and dugongs, accidental groundings, oil

26    spills, the introduction of invasive species, and increased air and water pollution. AR 12474; AR 27709

27    ("vessel movements can disturb animals such as dugong, marine turtles, and cetaceans from their

28    habitat, interfere with behavior or result in injury or death as a result of boat strikes"). According to the

1  QCLNG EIS, "[i]t is recognized that shipping within the [Great Barrier Reef Marine Park] presents

2  particular and significant hazards to its wellbeing and continued survival." AR 26955.

3      Given these major impacts, it is no surprise that the World Heritage Committee has repeatedly

4  expressed concern about the Projects' harms to the Great Barrier Reef World Heritage Area. In June

5  2011, the World Heritage Committee urged Australia to halt the LNG projects on Curtis Island:

6      The World Heritage Centre and IUCN recall th[e] World Heritage Committee's clear
   position in relation to oil and gas exploration and exploitation, that these activities are

7      incompatible with World Heritage status. They consider that the Liquefied Natural Gas
   facility approved on Curtis Island within the property could represent *a clear potential*

8      *danger to the property's OUV and integrity*, as defined in paragraph 180(b)(ii) of the
   Operational Guidelines. Therefore, they *strongly recommend the immediate halting of the*

9      *development of the LNG plant* until the World Heritage Committee considers this issue at
   its 36th session.

10  AR 18762 (emphasis added). Later that year, the World Heritage Committee issued an official

11  statement of "extreme concern" about the LNG processing and port facilities on Curtis Island within

12  the World Heritage Area. AR 46286. It chastised Australia for failing to inform the Committee of its

13  intention to approve a "new development that may affect the Outstanding Universal Value of the

14  property before making decisions that would be difficult to reverse," and proceeded with steps to

15  conduct a strategic assessment of the projects in the Great Barrier Reef. AR 26286-87.

16      In March 2012, a monitoring mission prompted by the World Heritage Committee visited the

17  Great Barrier Reef to assess the conservation status of the area in light of the LNG developments on

18  Curtis Island. AR 46516. The mission found the Great Barrier Reef at a "crossroads," and expressed

19  "high concern" for its potential to lose the outstanding universal values that qualify it as a World

20  Heritage Area. *Id.* It noted the adverse impact of the LNG projects on Curtis Island and Gladstone

21  Harbor on those values, and called for an independent review of environmental concerns, noting "that

22  developments on Curtis Island are not consistent with the leading industry commitment to not develop

23  oil and gas resources in natural World Heritage properties." AR 46517.

24      On June 14, 2012, the World Heritage Committee announced that unless Australia made

25  substantial progress to conserve the Great Barrier Reef World Heritage Area it would declare the site

26  "in danger" in part because of these LNG projects. AR 46517. The Committee requested that Australia

27  undertake a strategic assessment, address the monitoring mission's recommendations, and not permit

28  any new port development or infrastructure that could affect the outstanding universal values. AR

1  46518-21.[4]

2     On May 2, 2012, Ex-Im Bank authorized $2.95 billion in direct loans for the APLNG project,

3  the second largest loan in the bank's 60 year history. AR 20167. Later that year, Ex-Im Bank approved

4  a $1.8 billion loan for the QCLNG project. AR 23374.

5                                    **STANDARD OF REVIEW**

6     Plaintiffs' claims are reviewable under the Administrative Procedure Act ("APA"). *W.*

7  *Watersheds*, 632 F.3d at 496 ("Because ESA contains no internal standard of review, section 706 of the

8  Administrative Procedure Act, 5 U.S.C. § 706, governs review" of agency actions) (internal citations

9  omitted); *Dugong v. Gates*, 543 F. Supp. 2d at 1089 ("Because the NHPA does not provide an

10 independent basis for judicial review of agency actions, an aggrieved party must pursue its remedy

11 under the Administrative Procedure Act."). An agency's decisions will be set aside if they are

12 "'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law' or if the action

13 failed to meet statutory, procedural, or constitutional requirements." *Citizens to Preserve Overton Park,*

14 *Inc. v. Volpe*, 401 U.S. 402, 413-14 (1971); *see also* 5 U.S.C. § 706(2)(A)-(D).

15                                       **ARGUMENT**

16 **A.    Plaintiffs Have Standing to Bring This Action**

17    Plaintiffs easily meet and exceed the thresholds set by the courts for establishing standing.[5] In

18 assessing Plaintiffs' standing, this court need scarcely look beyond two directly on-point cases from

19 this District where the court found plaintiffs to have standing. *See Gates*, 543 F. Supp. 2d 1082, 1093-

20 96 (Judge Patel finding standing for challenge to agency's failure to comply with NHPA for overseas

21 project); *Friends of the Earth v. Watson*, No. C 02-4106, 2005 U.S. Dist. LEXIS 42335, at *7-16 (N.D.

22 Cal. 2005) (Judge White finding standing in environmental case challenging Ex-Im Bank's funding of

23 overseas fossil-fuels projects). In both of these cases, dealing with similar facts and violations of law,

24 defendants challenged plaintiffs' standing. And in both cases the court applied relevant Supreme Court

25 _____

26 [4] At this time, the final decision of the World Heritage Committee is still pending.

27 [5] Plaintiffs include 13 declarations to demonstrate their standing. *See* Declarations of Cheryl Watson, Matthew Landos, Andrew Jeremijenko, Peter Neilsen, Toni Seeney, Jane Arnold, Bernadette George, Teri Shore, Richard Whittingham, Evgeny Simonov, Virginia Gerlach, Doug Norlen and Peter Galvin filed concurrently.

28

and Circuit precedent, rejected defendants' arguments, found standing, and allowed the case to proceed to the merits. This court should do the same.

In determining Plaintiffs' standing in those cases, the courts followed the familiar analysis set out by the Supreme Court, which requires a plaintiff to show:

> (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Friends of the Earth v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 180-81 (2000) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). However, for allegations of harms tied to procedural violations, such as in this case, the causation and redressability elements are relaxed. *Lujan*, 504 U.S. at 572 n.7 (A plaintiff deprived of a procedural right suffering injury has standing to challenge an agency action "even though he cannot establish with any certainty that the [environmental review] will cause the license to be withheld or altered").[6]

In *Lujan*, the majority found Plaintiffs failed to demonstrate "injury in fact" because their members' declarations failed to specify their interests and injury in a manner that was "concrete and particularized" since they had no specific plans to visit the areas subject to the challenge. 504 U.S. at 563-64. In contrast, Plaintiffs here have provided overwhelming evidence showing their concrete aesthetic and recreational interests in the species and areas affected by the Projects,[7] the harm to their

---

[6] In addition to constitutional standing, a plaintiff claiming an injury under statutes such as the ESA and the NHPA must demonstrate that "the injury he complains of . . . falls within the 'zone of interests' sought to be protected by the statutory provision whose violation forms the legal basis for his complaint." *Lujan*, 497 U.S., at 883. Here, there can be no dispute that Plaintiffs' claims meet the prudential requirements of the ESA and the NHPA as they seek to protect ESA-listed species and a world heritage site protected by the NHPA, interests clearly within the "zone of interests" of the NHPA and the ESA. *See Gates*, 543 F. Supp. 2d at 1094 (overseas property is within the zone of interests protected by the NHPA).

[7] *See, e.g.,* Landos Decl. ¶¶ 5-15 (wildlife veterinarian with interest in sea turtles and marine mammals);  Watson Decl. ¶¶ 4-11 (Curtis Island resident with interest in marine life); Whittingham Decl. ¶¶ 11-15 (Gladstone fishmarket owner with interest in marine life); Gerlach Decl. ¶¶ 5-13 (skipper who lives near Gladstone and leads dolphin research trips in area); George Decl. ¶¶ 4-13 (50-year resident of area who boats, swims and snorkels in impact zone). *See also* Jeremijenko Decl. ¶¶ 10-18; Neilsen Decl. ¶¶ 5-8; Seeney Decl. ¶¶ 6-15; Arnold Decl. ¶¶ 4, 10; Shore Decl. ¶¶ 7-16; Simonov Decl. ¶¶ 7-12; Norlen Decl. ¶¶ 7-10; Galvin Decl. ¶¶ 18-19, 21 (residents or visitors to Gladstone area all describing recreational and aesthetic interests in species and area impacted by Projects).

1   interests from the Projects[8] and concrete plans to continue to visit the project sites.[9] Several of these

2   declarants live in or work in the Gladstone area in the immediate vicinity of the Projects and describe

3   the harms from dredging and other activities related to the Projects in vivid and disturbing detail.[10]

4   Plaintiffs here have met the "injury-in-fact" element of standing. *Lujan*, 504 U.S. at 560.

5   "Once a plaintiff has established an injury in fact under [a procedural statute], the causation and

6   redressability requirements are relaxed." *Cantrell v. City of Long Beach*, 241 F.3d 674, 682 (9th Cir.

7   2001). A plaintiff asserting a procedural injury need only establish "the reasonable probability of the

8   challenged action's threat to his concrete interest." *Citizens for Better Forestry v. U.S. Dep't of Agric.*,

9   341 F.3d 961, 969, 972 (9th Cir. 2003). As the Ninth Circuit has noted, causation and redressability

10  should remain relaxed even where, as here, there are third party actors because "procedural injury cases

11  . . . often involve third parties whose independent actions are necessary for constitutional injury to

12  occur." *Public Citizen v. DOT,* 316 F.3d 1002, 1016 (9th Cir. 2001), *rev'd on other grounds, DOT v.*

13  *Public Citizen*, 541 U.S. 752 (2004).

14  Plaintiffs expect Defendants to argue, as they have before, that because the Projects themselves

15  will be built and operated by third parties, their decision to fund the Projects is not the "cause" of

16  Plaintiffs' injuries. This argument was explicitly rejected by Judge White in *Friends of the Earth v.*

17  *Watson*, 2005 U.S. Dist. LEXIS 42335, at *4. It that case, plaintiffs challenged Ex-Im Bank's failure to

18  conduct an environmental review in relation to its loans to third parties, resulting in projects being

19  constructed and operated in a manner that harmed plaintiffs' members. *Id*. at *4-5. Ex-Im Bank asserted

20

21  [8] *See, e.g.,* Landos Decl. ¶¶ 5-14 (describing observed and projected impacts of Projects on marine
    life); Watson Decl. ¶¶ 4-14 (describing finding dead dugongs and other animals near Project site);

22  George Decl. ¶ 10, 13 (observed dead sea turtles); Gerlach Decl. ¶¶ 8-12 (describing dredging impacts
    to water quality and disappearance of wildlife); Whittingham Decl. ¶¶ 5-15 (describing disappearance

23  of animals and collapse of his seafood business resulting from Projects).

24  [9] *See, e.g.,* Jeremijenko Decl. ¶¶ 3-12 (doctor with patients in Gladstone who regularly visits area);

25  Neilsen Decl. ¶ 5 (resident who visits area twice a week); Landos Decl. ¶¶ 4, 5, 14 (research and
    conference will bring him back to area this year); George Decl. ¶ 4 (resident); Whittingham Decl. ¶ 3

26  (business owner in area who regularly visits); Simonov Decl. ¶¶ 3, 6 (plans return visit this year with
    subsequent permanent move to area); Gerlach Decl. ¶¶ 5-7 (plans to continue regular sailing trips to

27  area); Norlen Decl. ¶ 14 (plans to visit Gladstone this spring); Gavlin Decl. ¶ 20 (plans made and
    tickets purchased for trip to Gladstone area this winter).

28  [10] *See, e.g.,* Landos Decl.; Gerlach Decl.; Watson Decl.; Whittingham Decl.; Jeremijenko Decl.

1    that, even without Ex-Im loans, these large projects "would proceed without their support." *Id*. at *14.

2    Plaintiffs pointed to the Bank's mission statement that it "supports export sales that otherwise would

3    not have gone forward." *Id*. Judge White held that the "[d]efendants ha[d] not submitted *any authority*

4    demonstrating, *in light of the reduced standard for procedural injuries*, that [p]laintiffs have not met

5    their burden regarding causation." *Id*. at *15 (emphasis added). This case is no different.[11]

6        Lastly, to establish redressability, Plaintiffs need only show "that the relief requested—that the

7    agency follow the correct procedures—*may* influence the agency's ultimate decision of whether to take

8    or refrain from taking a certain action." *Salmon Spawning & Recovery Alliance v. Gutierrez*, 545 F.3d

9    1012, 1227-28 (9th Cir. 2008) (emphasis added); *Lujan*, 504 U.S. at 572 n.7 (A plaintiff has standing to

10   challenge an agency action "even though he cannot establish with any certainty that the [environmental

11   review] will cause the license to be withheld or altered"). Where a plaintiff's injury is caused by an

12   agency's failure to comply with statutory procedures, the plaintiff's procedural injury can be redressed

13   by a court rendering a decision requiring the agency to comply with the relevant procedure. *Gates,* 543

14   F. Supp. 2d at 1095-96 ("Plaintiffs' injury [was] caused by the failure of DOD to comply with

15   procedures under NHPA section[s] [470a-2 and] 402 and can be redressed by a favorable decision

16   requiring DOD to so comply.").[12]

17       Ex-Im cannot dispute that it has failed to follow NHPA procedures requiring it to "take into

18   account" the effect of its loans to APLNG and QCLNG on the World Heritage Site. 16 U.S.C. § 470a-

19

20   [11] *Chesapeake Climate Action Network v. Export-Import Bank of the United States*, No. 13-1820, 2015
     U.S. Dist. LEXIS 6596, at *1-2 (D.D.C. 2015) is both factually and legally distinguishable. There the
21   district court did not consider Ex-Im Bank's statutory directive to only fund projects that would not
     otherwise be funded. *Id*.; 12 U.S.C. § 635(b)(1)(B)(ii). More importantly, the court's analysis conflicts
22   with Ninth Circuit precedent, which has found that plaintiffs have standing under similar
     circumstances. *See Friends of the Earth*, 2005 U.S. Dist. LEXIS 42335, at *4 (citing multiple Ninth
23   Circuit cases and finding standing in identical circumstances).

24   [12] In a subsequent decision to the *Gates* case, after finding injunctive relief would be precluded by the
     Political Question Doctrine, Judge Chen concluded that plaintiffs lacked standing to seek declaratory
25   relief that defendants were violating the NHPA since treaty obligations *precluded* defendants from
     reaching a different decision even if they were found in violation of the NHPA. *Ctr. for Biological*
26   *Diversity v. Hagel*, No. C-03-4350, 2015 U.S. Dist. LEXIS 18332, at *2 (N.D. Cal. 2015).  Here, Ex-Im
     Bank is under no irreversible treaty obligation. On the contrary, Ex-Im Bank retains the ability to
27   modify its loan agreements and withhold funding for environmental reasons. *See, e.g.*, 12 U.S.C. §
     635i–5(a)(2) (Ex-Im Bank allowed "to withhold financing from a project for environmental reasons").
28

2. Nor can it claim to have complied with Section 7 of the ESA. But Ex-Im can still redress Plaintiffs' injuries, since correctly following ESA and NHPA procedures *may* influence the nature of its loans—for instance, through a loan modification that establishes additional conditions on Project operations that would reduce or avoid impacts to endangered species and the World Heritage Area, and consequently reduce or avoid the injuries to Plaintiffs' members. Plaintiffs need prove no more.

**B.  Ex-Im Bank Violated the ESA by Failing to Consult with the Services Regarding the Projects' Impacts to Listed Species**

The record shows that there is no real dispute that the QCLNG and APLNG Projects will negatively affect ESA-listed species. The only dispute is whether the location of the Projects serves to absolve Ex-Im Bank of any ESA obligations it would otherwise have when authorizing financing for projects that impact ESA-listed species. As demonstrated below, and acknowledged by the court in denying Defendants' motion to dismiss Plaintiffs' ESA claim, because these Projects occur, at least in part, in the "high seas," the Ex-Im Bank should have engaged in consultation under Section 7 of the ESA. 16 U.S.C. § 1536; 50 C.F.R. 402.02 (applying Section 7 to the "high seas"); Dkt. # 75, Order Denying Motion to Dismiss at 10-12. Ex-Im Bank failed to do so, rendering its funding approvals unlawful.

**1.  Ex-Im Bank's Funding of the Projects Constitutes "Agency Action" Under Section 7 of the ESA**

The plain language of the ESA and its implementing regulations requires federal agencies funding projects to undergo Section 7 consultation. 16 U.S.C. § 1536(a)(2) (requiring consultation for any action "funded" by the agency); 50 C.F.R. 402.02 (defining action as "all activities or programs of any kind authorized, *funded*, or carried out, *in whole or in part*, by Federal agencies") (emphasis added). The Ninth Circuit has "repeatedly held" that the ESA's use of the term "agency action" is to be construed broadly, and that there is "'little doubt' that Congress intended agency action to have a broad definition in the ESA." *Karuk Tribe*, 681 F.3d at 1021 (*citing Pac. Rivers Council v. Thomas*, 30 F.3d at 1054-55 (9th Cir. 1994)). As stated by an *en banc* panel of the Ninth Circuit in *Karuk Tribe*, "the 'agency action' inquiry is two-fold. First, has a federal agency affirmatively authorized, funded, or carried out the underlying activity? Second, does the agency have some discretion to influence or change the activity for the benefit of a protected species?" *Id.* at 1021. Both questions can be answered

1   in the affirmative in this case, making the Projects "agency actions" that require Section 7 consultation.

2   First, as detailed above, Ex-Im Bank authorized nearly $3 billion in direct loans to the APLNG

3   Project, and nearly $2 billion in direct loans to the QCLNG Project. AR 20167, 23374. This

4   "affirmative . . . funding" of the Projects undoubtedly satisfies the initial query. *Karuk Tribe*, 681 F.3d

5   at 1021. Second, Ex-Im Bank retains discretionary control over the Projects, which allows it to

6   influence the activities at issue for the benefit of ESA-listed species. Ex-Im Bank has clear authority to

7   "provide financial support conditioned on the implementation of measures to mitigate [a] project's

8   adverse environmental effects." AR 20177 (*Envt'l Procedures & Guidelines* § I(15)); *see also* 12

9   U.S.C. § 635i-5(a)(2) (Ex-Im Bank may "withhold financing from a project for environmental

10  reasons.").

11  Furthermore, as acknowledged by this court in denying Defendants' second motion to dismiss,

12  the "actions" here subject to ESA consultation are the Projects in their entirety, and not merely those

13  portions of the Projects funded by Ex-Im Bank. Dkt. # 75 at 11-12; 50 C.F.R. § 402.02 (defining action

14  as "*all activities* or programs of any kind authorized, *funded*, or carried out, *in whole or in part*, by

15  Federal agencies") (emphasis added). The regulations provide several examples of "actions" that trigger

16  consultation, including "actions directly or indirectly causing modifications to the land, water, or air."

17  *Id.* § 402.02(d). Similarly, the "[a]ction area" over which the agency must consult is defined as "all

18  areas to be affected directly or indirectly by the Federal action and not merely the immediate area

19  involved in the action." *Id.* § 402.02. The plain terms of the regulations require Ex-Im Bank to consult

20  over the *whole* project (i.e., all activities) that Ex-Im Bank "funded . . . in part." *Id.* Therefore, the scope

21  of Ex-Im Bank's actions is not limited to construction-related activities occurring within Australia and

22  its territorial seas.

23  Ninth Circuit case law supports this broad interpretation of "agency action," because "caution

24  can only be exercised if the agency takes a look at all the possible ramifications of the agency action."

25  *Wild Fish Conserv. v. Salazar*, 628 F.3d 513, 521 (9th Cir. 2010) (rejecting biological opinion because

26  agency only considered five years of project operation and thus failed to look at entire agency action)

27  (internal quotation marks omitted). In *Connor v. Burford*, the Ninth Circuit also interpreted "agency

28  action" broadly, rejecting a biological opinion that only considered the immediate leasing phase on an

oil drilling project but ignoring the later on-the-ground drilling and production impacts. 848 F.2d 1441, 1453 (9th Cir. 1988). The court held that "section 7 of the ESA on its face requires the [agency] . . . to consider all phases of the agency action, which includes post-leasing activities." *Id.* Ex-Im Bank cannot avoid consultation here by defining the "action" to be only the portion of the much larger project that the agency's funding supports. Instead, it must look at the actual effect of the activities on endangered species, and consult with the Services on its funding of the Projects to ensure that all ramifications are evaluated and properly mitigated.

### 2. Ex-Im Bank's Actions Occur on the High Seas

It is undisputed that federal agency actions upon the high seas trigger consultation, 50 C.F.R. § 402.02, and here Ex-Im's actions occur not only in Australia's territorial sea but also upon the high seas. *See supra* at pp. 8-9 (describing high seas components of the Projects).

In denying Defendants' motion to dismiss this claim, this court has recognized that the very EISs relied upon by Ex-Im Bank describe the Projects as including shipping the final LNG product through the Great Barrier Reef World Heritage Area and across the high seas to ports abroad. Dkt. # 75 at 11, fn. 12; AR 29033-34 (QCLNG - stating that "Shipping Operations" include the "transit of ships through the Great Barrier Reef Marine Park to open ocean"), 5920 (APLNG – stating that "Facility Operations" include "LNG Shipping"). Moreover, Defendants can point to no document or authority to argue otherwise. According to this court:

> Defendants have not pointed to any facts in the documents properly before the Court or cited any authority supporting the conclusion that the scope of Ex-Im Bank's actions is limited to construction-related activities occurring within Australia and its territorial seas. Because it is reasonable to infer that exporting LNG to destinations abroad is one of the primary objectives/components of the Projects, and because the term "agency action" is interpreted broadly, Plaintiffs have pled facts plausibly showing that the scope of Ex-Im Bank's actions entail not only construction-related activities occurring in Australia and its territorial seas but also post-construction shipping activities occurring upon the high seas such that it is plausible Ex-Im Bank violated § 7(a)(2) by failing to consult with the Services.

Dkt. # 75 at 11.

What was true for purposes of the motion to dismiss is still true now. The Projects include shipping through the high seas and consequently are "actions" triggering the consultation obligations of the ESA. Ex-Im Bank should have engaged in consultation with the Services. 16 U.S.C. § 1536.

1

### 3. Ex-Im Bank's Actions "May Affect" Listed Species

An agency must initiate consultation with the Services if a proposed action "may affect" a listed species. 50 C.F.R. § 402.14(a). The "may affect" threshold is extremely low; consultation is triggered by "[a]ny possible effect, whether beneficial, benign, adverse, or of an undetermined character." 51 Fed. Reg. 19,926 (June 3, 1986); *Karuk Tribe*, 681 F.3d at 1028. Ex-Im Bank cannot reasonably dispute that the Projects "may affect" listed species, given the warnings in the EISs that the Projects would have direct and adverse impacts on endangered and threatened species. *See, e.g.,* AR 6230 (Vessel traffic will "displace dugong and cetaceans from critical habitat and interrupt critical behaviors"), AR 27709 ("vessel movements can disturb animals such as dugong, marine turtles, and cetaceans from their habitat, interfere with behavior or result in injury or death as a result of boat strikes"); *see also, supra* at pp. 9-12 (describing litany of risks and harms to endangered species from various aspects of the Projects, including high seas shipping). Given the Projects constitute "actions," and those actions "may affect" listed species, Ex-Im Bank was required to consult. Its failure to do so renders its actions unlawful, in violation of the ESA. *Karuk Tribe*, 681 F.3d at 1028; 16 U.S.C. § 1536.

### C. Ex-Im Bank Violated the NHPA by Failing to Take Into Account the Projects' Impacts on the Great Barrier Reef World Heritage Site

In contrast to the ESA claim, where Ex-Im Bank denies the law even applies to its actions, the agency appears to have simply ignored its obligations under the NHPA. The NHPA requires that "[p]rior to the approval of any Federal undertaking outside the United States which may directly and adversely affect a property which is on the World Heritage List," federal agencies "shall take into account the effect of the undertaking on such property for purposes of avoiding or mitigating any adverse effects." 16 U.S.C. § 470a-2.

The court need not look beyond the plain language of the statute to find a violation here, as it is clear that (1) Ex-Im Bank's financing of each Project constitutes a "Federal undertaking outside the United States," and (2) these undertakings will directly and adversely affect the Great Barrier Reef, a "property" on the World Heritage List. The Project proponents' own EISs are rife with references to significant harms to the Great Barrier Reef, and the UNESCO World Heritage Committee stated its "extreme concern" with the Projects' impacts. AR 46286; AR 16226-44 (APLNG impacts); AR 26694-

1   27707 (QCLNG impacts).

2        Because federal funding of a project that will have adverse impacts on a World Heritage Site

3   necessitates compliance with the NHPA, Ex-Im Bank was required to "take into account" the effects of

4   the Projects on the site. Here, the administrative record is devoid of any indication that Ex-Im Bank

5   properly examined the effects of the Projects on the delicate marine ecology and natural history of the

6   Great Barrier Reef, as required by Section 402. 16 U.S.C. § 470a-2. Not only did the agency not follow

7   the required procedures laid forth in the NHPA regulations and guidelines, but Ex-Im Bank failed to

8   undergo *any* consultation process that would ensure avoidance and mitigation of these adverse impacts.

9        **1.  The Projects Are 'Federal Undertakings' as a Result of Ex-Im Bank Funding**

10       The plain language and legislative history of the NHPA are clear that when an agency partially

11  finances a project, that project constitutes an "undertaking" for purposes of the NHPA. 16 U.S.C. §

12  470w(7) (defining an "undertaking" as "a project, activity, or program *funded in whole or in part* . . .

13  including . . . those *carried out with Federal financial assistance*") (emphasis added). Because Ex-Im

14  Bank provided financial support for the Projects, they are "undertakings" subject to the requirements of

15  the NHPA.

16       "Courts have construed the NHPA's broad definition of 'undertakings' to include a wide range

17  of direct and indirect means of federal support, such as financing, licensing, construction, land grants,

18  and project supervision." *Rumsfeld*, 2005 U.S. Dist. LEXIS 3123, at *41-43 (using cases interpreting

19  "undertaking" on U.S. properties to provide guidance for undertakings abroad).[13] Specifically, federal

20  financing of projects triggers NHPA review. *See Tyler v. Cuomo*, 236 F.3d 1124, 1128 (9th Cir. 2000)

21  (finding a development funded in part by federal financing to be reviewable under the NHPA); *WATCH

22  v. Harris*, 610 F.2d 310 (2d Cir. 1979) (Department of Housing and Urban Development ("HUD")

23  funding for an urban renewal project constituted an undertaking); *Morris County Trust for Historic

24  Preservation v. Pierce*, 714 F.2d 271 (3d Cir. 1983) (HUD funding to a municipality for an urban

25  renewal project that would require demolition of a historical landmark constituted an undertaking).

---

[13] Legislative history is clear that Congress intended the meaning of "undertaking" to be identical for both foreign and domestic provisions. House Report No. 96-1457, Oct. 10, 1980, U.S. Code Cong. And Adm. News, 6378, 6408 ("The Committee also notes that the term 'undertaking,' as it is used in other section of the Act, is meant to be used in the same context as described in Section 106.").

In this case, Ex-Im Bank authorized $2.95 billion dollars in direct loans for the APLNG Project, and $1.8 billion in direct loans for the QCLNG Project. AR 20167, 23374. The plain language and legislative history of the statute make clear that Ex-Im Bank's substantial funding of each of the two Projects at issue makes them "undertakings" pursuant to the NHPA. 16 U.S.C. § 470w(7).

### 2. The Projects Directly and Adversely Affect the Great Barrier Reef

Ex-Im's undertakings on the LNG Projects "may directly and adversely affect" the Great Barrier Reef World Heritage Area, and therefore NHPA review was required. 16 U.S.C. § 470a-2. As described in detail above, the adverse impacts to the Great Barrier Reef due to the construction and operation of the Projects are numerous. *See supra* at pp. 9-12. From ship strikes of dugongs, whales and sea turtles, to habitat destruction, declines in water quality, and displacement of dolphins, the Projects will injure the very features that prompted UNESCO to designate the Great Barrier Reef a World Heritage Area in 1981. *See* AR 1016-18, 46539. Ex-Im Bank cannot argue that these impacts are neither "adverse" nor "direct."

To trigger NHPA obligations, Ex-Im's undertaking need not actually result in adverse impacts; all that is required is a showing that the undertaking "may" result in direct and adverse effects.[14] 16 U.S.C. § 470a-2. Here, the record shows this threshold is easily met. An undertaking may adversely affect a World Heritage Site if it alters the property's characteristics, including destroying or damaging part of the property. *See* 36 C.F.R. § 800.5(a)(2)(i). Adverse effects may also include "reasonable foreseeable effects caused by the undertaking that may occur later in time, be farther removed in distance or be cumulative." *Id.* § 800.5(a)(1). Examples of adverse effects include a "change of the character of the property's use or of physical features within the property's setting that contribute to its historic significance," and introduction of "visual, atmospheric or audible elements that diminish the integrity of the property's significant historical features." *Id.* § 800.5(a)(2)(iv)-(v).

---

[14] Because federal funding transforms the entire project into an "undertaking" for purposes of the NHPA, whether or not there are adverse and direct impacts is not dependent on the funding, but on the undertaking itself. 16 U.S.C. 470w(7) (A federal undertaking is a "project, activity, or program funded in whole or in part" by a federal agency). Therefore, in this case, the question is whether the Projects may have direct and adverse impacts on the Great Barrier Reef, and not whether Ex-Im Bank's funding itself directly leads to these impacts. *See Karst Envtl. v. EPA*, 403 F. Supp. 2d 74 (D.D.C. 2005), aff'd 475 F.3d 1291 (D.C. Cir. 2007).

1    As demonstrated above, direct and adverse impacts to the Great Barrier Reef World Heritage

2   Area are likely to occur as a result of the Projects. *See supra* at pp. 9-12.; AR 1016-18, 46539 (Project

3   EISs describing impacts on wildlife, vegetation and water quality from dredging, boat strikes, lighting,

4   noise and other project activities).[15]

5    The Projects are so destructive to the Great Barrier Reef World Heritage Area that the World

6   Heritage Committee began voicing concerns in 2011, and has clearly and repeatedly stated that direct

7   and adverse impacts resulting from the Projects could affect the Committee's future assessment of the

8   state of conservation of the Great Barrier Reef. AR 46527. According to the World Heritage

9   Committee, the "LNG plant could represent a clear potential threat to the property's OUV due to its

10   expected direct impacts on coastal and marine habitats and species, as well as the potential direct and

11   indirect impacts from increased maritime traffic." AR 18761. The World Heritage Committee noted

12   with "extreme concern" the approval of the LNG facilities on Curtis Island and recommended that "the

13   development of the LNG plant be halted until the World Heritage Committee has had the opportunity to

14   consider the [Environmental assessments] and inform the State Party [Australia] of its conclusions."

15   AR 46286, 18761.

16    Clearly, Project impacts that may push a World Heritage Site into being officially classified as

17   "in danger" meet the NHPA threshold for impacts that "may directly and adversely affect" the property.

18   AR 46517; 16 U.S.C. § 470a-2.

19    **3.  Ex-Im Bank Failed to Take Into Account Adverse Impacts to the Great Barrier Reef**

20    The NHPA imposes an independent duty on federal agencies to protect World Heritage Areas

21   by "tak[ing] into account the effect of the undertaking on such property for purposes of avoiding or

22   mitigating any adverse effects." 16 U.S.C. § 470a-2. Here, Ex-Im Bank funded the Projects in Australia

23   with the knowledge that they may have direct and adverse effects on the Great Barrier Reef, a World

24   Heritage Area. *See* AR 103, 21321. Nevertheless, Ex-Im Bank failed to perform the "take into account"

25

26   [15] Other expected adverse impacts include loss of mangroves, reduction in fisheries production, reduced
     plankton abundance, and changes of water quality detrimental to marine species. APLNG AR 14388-
27   89. Similar impacts are expected from the QCLNG Project. *See, e.g.*, QCLNG AR 26694, 27707
     ("Impacts include direct impacts on habitat such as seagrasses and mangroves, as well as secondary
28   impacts on water quality and behavioural changes by mobile marine species.").

analysis required by statute. The agency did not follow federal regulations or the Secretary of the Interior's guidelines for engaging in consultation to satisfy the "take into account" process, nor did it follow the strictures laid by this court in *Dugong v. Gates*. 543 F. Supp. 2d 1082. In fact, the administrative record is bereft of any analysis of the NHPA's requirements. Ex-Im Bank therefore failed to comply with the law.

The Secretary of Interior's guidelines to assist agencies in fulfilling their responsibilities under NHPA Section 402 state that "efforts to identify and consider effects on historic properties in other countries should be carried out in consultation with the host country's historic preservation authorities, with affected communities and groups, and with relevant professional organizations." 63 Fed. Reg. at 20,504. In turn, consultation means the "process of seeking, discussing, and considering the views of others, and, where feasible, seeking agreement with them on how historic properties should be identified, considered, and managed. . . . [C]onsultation should always include *all* affected parties. *Id.* (emphasis added).

Additionally, this court has held that to properly "take into account" of the effects of an undertaking on a World Heritage site, an agency must: (1) generate, collect, consider, and weigh information on how the undertaking will affect the listed property; (2) determine whether the effects will be adverse; (3) if necessary, develop and evaluate alternatives or modifications to avoid or mitigate adverse effects; and (4) consult with the host nation and other entities regarding the effects. *Gates*, 543 F. Supp. 2d at 1088; 36 C.F.R. Part 800. "A federal agency does not complete the take into account process on its own, in isolation, but engages the host nation and other relevant private organization and individuals in a cooperative partnership." *Gates*, 543 F. Supp. 2d at 1104.

While it appears from the record for each of the Projects that Ex-Im Bank never actually considered its obligations under the NHPA, the agency did in each case make a single-sentence conclusory statement about the impacts on the Projects on the World Heritage Site, asserting that there would be "no predicted direct impacts on the Great Barrier Reef World Heritage Site/Marine Park as a result of [the] facilities." AR 111 (APLNG); AR 23428 (similar statement regarding QCLNG).  Such cursory statements, unhinged from any record support, and without reference to the NHPA and its procedures, fall far short of satisfying the legal framework established under the NHPA guidelines and

regulations, as well as the relevant caselaw.[16]

First, Ex-Im Bank did not make a formal determination whether or not the effects of the Projects would be "adverse," as dictated by NHPA regulations. 36 C.F.R. § 800.5. If Ex-Im Bank believed the undertaking would have "no adverse effect," it was obliged to make an official finding, notify consulting parties, and provide documentation to enable any reviewing parties to understand its basis. *Id.* at § 800.5(3)(b), 800.11(a),(e). The documentation relating to a finding of no adverse effect must include a description of the undertaking and its area of potential effects, a description of the affected historic properties and the undertaking's effects on the historic property, and an explanation of why the criteria of adverse effect were found applicable or inapplicable, "including any conditions or future actions to avoid, minimize or mitigate adverse effects." 36 C.F.R. § 800.11(e)(5). The agency must also provide copies or summaries of any views provided by consulting parties and the public. *Id.* at § 800.11(3). Ex-Im Bank provided no explanation of why a determination of no adverse effect was appropriate in the face of evidence to the contrary, nor did it address the concerns of affected parties.

Second, Ex-Im Bank failed to consult with affected parties, including the World Heritage Commission. Instead, Ex-Im Bank blindly accepted the determinations by the Australian and Queensland governments that the projects would have minimal effects on the World Heritage Site, despite the vocal criticism of the World Heritage Committee and mountains of statements to the contrary in the EISs. *See* Board Memos, AR 103, 111 (APLNG), AR 23428 (QCLNG). The host nation's determinations cannot relieve Ex-Im Bank of its independent obligation under the NHPA to take adverse effects into account and consult with all affected parties. *See Gates*, 543 F. Supp. 2d at 1108-09 (stating that while a federal agency may examine available information with input and cooperation from the host nation, ultimately the agency "must determine whether there will be adverse effects or no adverse effects" and then consider and evaluate options to mitigate or avoid those effects);

---

[16] Throughout the loan approval process, Ex-Im Bank relied upon the submissions of the Project proponents in order to fulfill the agency's own internal requirements for environmental review. AR 103, 23418. As a result of these environmental assessments, Ex-Im Bank was in full knowledge of the grave effects of the projects. *See, e.g.,* AR 1016-18. It is wholly inconsistent of Ex-Im Bank to rely upon the proponents' EISs for purposes of complying with its obligations under its organic statute, that clearly disclose direct and adverse impacts on the Great Barrier Reef, while simultaneously denying any such harm for purposes of avoiding NHPA obligations. AR 103, 23418.

63 Fed. Reg. at 20504 (guidelines that recommend consultation with the host country's historic preservation authorities). Like the federal defendants in *Dugong v. Gates*, Ex-Im Bank's efforts are inadequate to demonstrate compliance with NHPA section 402. 543 F. Supp. 2d at 1109. Ex-Im Bank's approval of financing for the Projects in light of these failings is arbitrary and capricious and not in accordance with law. 5 U.S.C. § 706(2)(A).

## CONCLUSION

For the foregoing reasons, Plaintiffs request the court grant this motion for summary judgment.[17]

Dated: April 2, 2015                            Respectfully submitted,

                                                /s/ Emily Jeffers
                                                Emily S. Jeffers (CA Bar No. 274222)
                                                Miyoko Sakashita (CA Bar No. 239639)
                                                Center for Biological Diversity
                                                351 California Street, Suite 600
                                                San Francisco, CA 94104
                                                Phone: (415) 436-9682
                                                Facsimile: (415) 436-9683
                                                Email: ejeffers@biologicaldiversity.org
                                                        miyoko@biologicaldiversity.org

                                                Sarah Uhlemann (WA Bar No. 41164)*
                                                Center for Biological Diversity
                                                2400 NW 80th Street, #146
                                                Seattle, WA 98117
                                                Phone: (206) 327-2344
                                                Facsimile: (415) 436-9683
                                                Email: suhlemann@biologicaldiversity.org
                                                *Admitted *pro hac vice*

                                                Brendan Cummings (CA Bar No. 193952)
                                                Center for Biological Diversity
                                                P.O. Box 549
                                                Joshua Tree, CA 92252

[17] Given that is has been two years since Plaintiffs filed their complaint, and that intervening events have affected the Great Barrier Reef World Heritage Area and its endangered species in the interim, in the event that Plaintiffs prevail, we request the Court order the parties to confer in an attempt to reach a resolution as to appropriate remedies, or if no such resolution is possible, to provide a joint proposal for briefing regarding an appropriate remedy.

1

2

Phone:  (760) 366-2232
Facsimile:  (760) 366-2669
Email:  bcummings@biologicaldiversity.org

*Attorneys for Plaintiffs*

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28