Sarah Uhlemann (WA Bar No. 41164)*†
Center for Biological Diversity
2400 NW 80th Street, #146
Seattle, WA 98117
Phone:  (206) 327-2344
Facsimile:  (415) 436-9683
Email:  suhlemann@biologicaldiversity.org
†Admitted *pro hac vice*

Brendan Cummings (CA Bar No. 193952)
Center for Biological Diversity
P.O. Box 549
Joshua Tree, CA 92252
Phone:  (760) 366-2232
Facsimile:  (760) 366-2669
Email: bcummings@biologicaldiversity.org

Emily S. Jeffers (CA Bar No. 274222)
Miyoko Sakashita (CA Bar No. 239639)
Center for Biological Diversity
351 California Street, Suite 600
San Francisco, CA 94104
Phone: (415) 436-9682
Facsimile:  (415) 436-9683
Email:  ejeffers@biologicaldiversity.org
         miyoko@biologicaldiversity.org

*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, PACIFIC ENVIRONMENT, and TURTLE ISLAND RESTORATION NETWORK,<br><br>        Plaintiffs,<br><br>   v.<br><br>EXPORT-IMPORT BANK OF THE UNITED STATES and FRED P. HOCHBERG, in his official capacity as Chairman and President of the Export-Import Bank of the United States,<br><br>        Defendants. | Case No.: 4:12-cv-6325 (SBA)<br><br>**PLAINTIFFS' REPLY AND OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**<br><br><br>Date:  December 9, 2015<br>Time: 1:00 p.m.<br>Place: 4th Floor, Courtroom 1<br>Judge: Hon. Saundra Brown Armstrong |

Pls.' Reply and Opp'n to Summ. J.
4:12-cv-6325 SBA

i

# TABLE OF CONTENTS

Table of Contents ...................................................................................................... ii

Table of Authorities ................................................................................................. iii

A.  Plaintiffs Have Demonstrated Causation and Redressability ................................... 1

   1.  Plaintiffs' Injuries Are Causally Linked to Ex-Im Bank's Funding Decisions
       Because Consultation Could Have Resulted in Additional Project Mitigation ................... 1

   2.  Plaintiffs Demonstrate Redressability ................................................................. 4

   3.  Plaintiffs' Claims Are Not Prudentially Moot ...................................................... 5

B.  The ESA Requires Ex-Im Bank to Consult ......................................................... 6

   1.  The "Action" Funded Includes High Seas Shipping, Triggering Consultation ................... 7

   2.  The Funded Projects Impact the High Seas, Triggering Consultation ............................. 8

   3.  Consultation in No Way Interferes with Australia's Sovereignty ................................. 9

   4.  Ex-Im Bank's Funding Is the "Legal Cause" of the Action ...................................... 10

C.  Defendants Failed To Take Into Account World Heritage Impacts under the NHPA ............. 11

   1.  The Ex-Im Bank-Funded LNG Projects Are Federal "Undertakings" ............................ 11

   2.  Defendants Failed to "Take Into Account" the Projects' Effects on the Great
       Barrier Reef World Heritage Area ...................................................................... 12

# TABLE OF AUTHORITIES

**CASES**

*Animal Legal Defense Fund v. Veneman*,
469 F.3d 826 (9th Cir. 2006) ..............................................................................4

*Bear Valley Mutual Water Co. v. Jewell*,
2015 U.S. App. LEXIS 10755 (9th Cir. June 25, 2015) .....................................5

*Beno v. Shalala*,
30 F.3d 1057 (9th Cir. 1994) ..............................................................................5

*Bragdon v. Abbott*,
524 U.S. 624 (1998) ..........................................................................................12

*Cantrell v. City of Long Beach*,
241 F.3d 674 (9th Cir. 2001) ..............................................................................6

*Center for Biological Diversity v. HUD*,
541 F. Supp. 2d 1091 (D. Ariz. 2008) ..............................................................11

*Chesapeake Climate Action Network v. Export-Import Bank*,
2015 U.S. Dist. LEXIS 6596 (D.D.C. Jan. 21, 2015) .........................................3

*Commissioner v. Lundy*,
516 U.S. 235 (1996) ..........................................................................................13

*Connor v. Burford*,
848 F.2d 1441 (9th Cir. 1988) ............................................................................7

*Conservation Congress v. United States Forest Service*,
720 F.3d 1048 (9th Cir. 2013) ..........................................................................13

*Defenders of Wildlife v. Lujan*,
911 F.2d 117 (8th Cir. 1990) ............................................................................10

*Defenders of Wildlife v. United States EPA*,
420 F.3d 946 (9th Cir. 2005) .......................................................................1, 4

*Department of Transportation v. Public Citizen*,
541 U.S. 752 (2004) ..........................................................................................10

*Department of Treasury v. FLRA*,
837 F.2d 1163 (D.C. Cir. 1988) ........................................................................10

*Dugong v. Rumsfeld,*
2005 U.S. Dist. LEXIS 3123 (N.D. Cal. Mar. 1, 2005) ...................................................11, 12

*Dugong v. Rumsfeld,*
543 F. Supp. 2d 1082 (N.D. Cal. 2008) ..........................................................................13

*Greenpeace v. National Marine Fisheries Service,*
80 F. Supp. 2d 1137 (W.D. Wash. 2000) .........................................................................8

*Hunt v. Imperial Merchant Services, Inc.,*
560 F.3d 1137 (9th Cir. 2009) ......................................................................................5

*In re Nelson,*
391 B.R. 437 (B.A.P. 9th Cir. 2008) ...............................................................................5

*Karuk Tribe of California v. United States Forest Service,*
681 F.3d 1006 (9th Cir. 2012) .....................................................................................11

*Lujan v. Defenders of Wildlife,*
504 U.S. 555 (1992) ............................................................................................3, 4, 5

*Maldonado v. Holder,*
781 F.3d 1107 (9th Cir. 2015) ......................................................................................6

*Massachusetts v. EPA,*
549 U.S. 497 (2007) .......................................................................................1, 3, 4, 5

*Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Insurance Co.,*
463 U.S. 29 (1983) ...................................................................................................15

*National Ass'n of Home Builders v. Defenders of Wildlife,*
551 U.S. 644 (2007) .................................................................................................10

*National Wildlife Federation v. Coleman,*
529 F.2d 359 (5th Cir. 1976) ....................................................................................7, 8

*National Wildlife Federation v. FEMA,*
345 F. Supp. 2d 1151 (W.D. Wash. 2004) .......................................................................8

*Natural Resources Defense Council v. Jewell,*
749 F.3d 776 (9th Cir. 2014) ...............................................................................1, 2, 3, 5

*Neighbors of Cuddy Mountain v. Alexander,*
303 F.3d 1059 (9th Cir. 2002) ......................................................................................6

*Northwest Environmental Defense Center v. Gordon,*
849 F.2d 1241 (9th Cir. 1988) ...................................................................................5, 6

*Padash v. INS*,
358 F.3d 1161 (9th Cir. 2004) ................................................................................12

*Presidio Golf Club v. National Park Service*,
155 F.3d 1153 (9th Cir. 1998) ................................................................................1

*Ratzlaf v. United States*,
510 U.S. 135 (1994) ................................................................................13

*Sierra Club v. United States Department of Energy*,
825 F. Supp. 2d 142 (D.D.C. 2011) ................................................................................3

*Toll Bros., Inc. v. Twp. of Readington*,
555 F.3d 131 (3d Cir. 2009) ................................................................................3

*Wilbur v. Locke*,
423 F.3d 1101 (9th Cir. 2005) ................................................................................1

**STATUTES**

12 U.S.C. § 635i-5(a) ................................................................................2, 5, 9, 11

16 U.S.C. § 470a-2 ................................................................................11, 12, 13

16 U.S.C. § 470f ................................................................................11, 12

**REGULATORY AUTHORITY**

50 C.F.R. § 402.01 ................................................................................6, 7

50 C.F.R. § 402.02 ................................................................................6, 7, 8, 9

18 Fed. Reg. 3366 (Jan. 25, 1974) ................................................................................12

63 Fed. Reg. 20,496 (Apr. 24, 1998) ................................................................................13

**LEGISLATIVE HISTORY**

H. REP. 96-1457 (1980) ................................................................................11, 12

Pub. L. No. 89-665, 80 Stat. 915 (1966) ................................................................................12

Pub. L. 96-515, 94 Stat. 2987 (1980) ................................................................................12

**FEDERAL RULES**

FED. R. CIV. PROC. 56(d) ................................................................................5

As detailed below, Defendants ("Ex-Im Bank") violated the Endangered Species Act ("ESA") and the National Historic Preservation Act ("NHPA") by authorizing nearly $5 billion in loans for the Australia Pacific and Queensland Curtis Liquefied Natural Gas ("LNG") facilities ("the Projects"). Despite Defendants' arguments to the contrary, Plaintiffs clearly have standing to sue, Defendants failed to consult as required by the ESA, and Defendants failed to properly "take into account" the Projects' effects on the Great Barrier Reef World Heritage Area.

## A. Plaintiffs Have Demonstrated Causation and Redressability.

While Defendants do not dispute Plaintiffs have demonstrated an injury, Defendants wrongly argue that Plaintiffs have failed to show causation and redressability.[1] Dkt. No. 84 at 7-12.

### 1. Plaintiffs' Injuries Are Causally Linked to Ex-Im Bank's Funding Decisions Because Consultation Could Have Resulted in Additional Project Mitigation.

As Plaintiffs explained in their opening brief, under the relaxed standard for causation and redressability in procedural injury cases,[2] a "litigant has standing if there is *some possibility* that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant." *Mass. v. EPA*, 549 U.S. 497, 518 (2007) (emphasis added); *Defenders of Wildlife v. United States EPA*, 420 F.3d 946, 957 (9th Cir. 2005) ("members must show only that they have a procedural right that, if exercised, *could* protect their concrete interests") (emphasis in original), *rev'd on other grounds*, 551 U.S. 644 (2007).

In *NRDC v. Jewell*, an en banc panel of the Ninth Circuit recently applied this reduced burden in a similar case challenging an agency's failure to properly consult under the ESA before entering into a

---

[1] Although Defendants do not contest the existence of Plaintiffs' members' injuries, Defendants complain that some of the injuries precede Ex-Im Bank's disbursement of funds. Dkt. No. 84 at 7-8. However, "standing is determined as of the date of the filing of the complaint," not the date of the Bank's disbursement. *Wilbur v. Locke*, 423 F.3d 1101, 1107 (9th Cir. 2005). Plaintiffs' complaint was originally filed in December 2012, and Plaintiffs' members, many of whom have lived in or regularly visited Gladstone for years, vividly describe the harms they suffered on and after that date – harms that could have been mitigated had Ex-Im properly consulted. Dkt. No. 1; *see* Watson Decl. ¶¶ 9, 6 (describing how, "[d]uring and after 2012, the water has been much dirtier"); Neilson Decl. ¶¶ 6-8 (describing change in water quality, aesthetics, and wildlife from before construction until now).

[2] *See NRDC v. Jewell*, 749 F.3d 776, 783 (9th Cir. 2014) (en banc) (violations of Section 7(a)(2)'s consultation requirement constitute a procedural injury); *Presidio Golf Club v. Nat'l Park Serv.*, 155 F.3d 1153, 1159 (9th Cir. 1998) (same for NHPA).

---

contract. 749 F.3d 776 (9th Cir. 2014) (en banc). The court held that, to satisfy causation and redressability, plaintiffs "need only show that, if the [agency] engages in adequate consultation, the [resulting] Contracts *could* better protect Plaintiffs' concrete interest in [affected wildlife] than the contracts do currently." *Id.* at 783 (emphasis in original).

Here, a clear causal relationship exists between Ex-Im Bank's decision to finance the LNG Projects and Plaintiffs' injuries because "there are various . . . ways in which [Ex-Im Bank] could have contracted to benefit" ESA-listed wildlife and the Great Barrier Reef. *Id.* When deciding to finance the Projects, Ex-Im Bank had ample authority to require environmental mitigation. Specifically, consistent with its organic statute, the Bank's Environmental Procedures state that the Bank may "withhold financing or . . . provide financial support conditioned on the implementation of measures to mitigate the project's adverse environmental effects." AR 20177 at I(15); *see also* 12 U.S.C. § 635i-5(a)(1), (2) (providing "[a]uthority to withhold financing . . . from a project for environmental reasons or to approve financing after considering the potential environmental effects of a project").[3]

The Bank's Environmental Procedures further provide that Ex-Im may prepare "recommendations to the Board of Directors with respect to conditions that must be met to obtain financial support" and require the agency to publish "a comprehensive summary of the material environmental requirements associated with its financial support" on its website. AR 20185 at IV(C); AR 20175 at I(7)(c); AR 20187 at V (Ex-Im must "monitor . . . those aspects of projects subject to any Ex-Im Bank financing conditions" regarding environmental mitigation). And it appears that Ex-Im *did*

---

[3] Defendants oddly suggest the Bank has no authority to condition its financing because its Environmental Procedures only apply to "transaction[s] involving a project . . . [f]or which the Bank's support would be critical to its implementation." Dkt. 84 at 22 n.16, citing 12 U.S.C. § 635i-5(a)(1)(B). However, throughout the record and Defendants' own brief, the Bank repeatedly states that it applied and complied with its Environmental Procedures. *See, e.g.*, AR 23418 (QCLNG Board Memo stating "[a]s prescribed by the Ex-Im Bank Procedures and Guidelines, the Project was evaluated…"), 23429; AR 103 (same for APLNG), 112; Dkt. No. 84 at 24 (Defendants' brief claiming that, by complying with its Environmental Procedures, Ex-Im Bank complied with the NHPA). In fact, Ex-Im's application of its Environmental Procedures to the Projects suggests the Bank believed its "support would be critical to [the Projects'] implementation," contravening the Bank's causation argument.

condition the APLNG and QCLNG loans on certain mitigation measures.[4] *See* AR 108 (stating APLNG "has been very cooperative in response to comments in preparation of" mitigation plans, and "compliance gaps . . . identified by the Ex-Im Bank" would be addressed), 20094; AR 36951 (detailed questions regarding QCLNG's mitigation). Accordingly, there is a clear causal relationship between Ex-Im Bank's decision to finance the LNG Projects and Plaintiffs' injuries because "there are various . . . ways in which [Ex-Im Bank] could have contracted to benefit" ESA-listed wildlife and the World Heritage site. *NRDC*, 749 F.3d at 783. Plaintiffs easily meet the relaxed burden of causation.

Defendants respond by suggesting that, in order to establish causation, Plaintiffs must demonstrate the LNG Projects would not have occurred *at all* but for Ex-Im Bank's sizable financial contribution. Dkt. No. 84 at 6-8, citing *Sierra Club v. U.S. Dep't of Energy*, 825 F. Supp. 2d 142 (D.D.C. 2011); *Chesapeake Climate Action Network v. Export-Import Bank*, 2015 U.S. Dist. LEXIS 6596 (D.D.C. Jan. 21, 2015); El-Mohandes Decl. ¶¶ 7-8.

However, neither the Ninth Circuit nor the Supreme Court require Plaintiffs to meet such a heightened burden; instead, Plaintiffs need only demonstrate the Projects may have caused *less* harm to wildlife if Ex-Im Bank had consulted. For example, in *Massachusetts v. EPA*, the Supreme Court found causation when an agency action "contribute[d]" to a plaintiffs' injuries and redress when the agency could "slow or reduce" the injury, even if the injury could not be "reverse[d]." 549 U.S. at 523-26; *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 573 n.7 (1992) (a plaintiff has procedural standing "even though he cannot establish with any certainty that [compliance with procedures] will cause the license . . . to be withheld *or altered*") (emphasis added); *NRDC v. Jewell*, 749 F.3d at 783 (causation sufficient if agency's action "could better protect" wildlife); *Toll Bros., Inc. v. Twp. of Readington*, 555 F.3d 131, 142 (3d Cir. 2009) ("fairly traceable connection" not equivalent to "causation needed to succeed on the merits of a tort claim").

In fact, if Defendants were correct, the Supreme Court could not have found standing in *Massachusetts v. EPA*. In that case, plaintiffs challenged EPA's failure to regulate greenhouse gas

---

[4] Although the Bank is required to identify all "environmental requirements associated with its financial support" on its website, AR 20175 at I(7)(c), Ex-Im failed to do so, and the agency's heavily redacted administrative record does not detail such requirements.

pollution from motor vehicles. 549 U.S. at 505. Regardless of EPA's actions, greenhouse gas emissions were occurring and harming the plaintiffs because there are many emission sources worldwide. Yet the Court found causation because EPA's failure to regulate and proactively reduce *at least some portion* of those emissions "contribute[d]" to the plaintiffs' injuries. *Id.* at 523-24. Similarly, here, even if we assume that, regardless of Ex-Im's actions, harms may occur to Plaintiffs' members, Ex-Im's failure to consult and mitigate at least some portion of the harm "contributes" to the injuries.

This Court should decline Defendants' invitation to dive into a rabbit hole of hypotheticals, wherein the Court must conjecture what *might* have happened *if* Ex-Im had *not* funded the Projects. Ex-Im *did* fund the Projects and had it complied with the law, there is certainly "some possibility" that Ex-Im would have required additional project mitigation, thereby lessening Plaintiffs' injuries. *Mass. v. EPA*, 549 U.S. at 518. Plaintiffs' injuries are "fairly traceable to the defendant's allegedly unlawful conduct." *Lujan*, 504 U.S. at 590. Nothing more is required.[5]

### 2. Plaintiffs Demonstrate Redressability.

As with causation, Plaintiffs easily meet their reduced burden to demonstrate redressability. *Defenders*, 420 F.3d at 957 (for procedural injury, plaintiffs "must show only that they have a procedural right that, if exercised, *could* protect their concrete interests"); *Animal Legal Def. Fund v. Veneman*, 469 F.3d 826, 835 (9th Cir. 2006), *vacated*, 490 F.3d 725 (9th Cir. 2007) (causation and redress "are two sides of the same coin").

Here, Plaintiffs have requested that the Court remand Ex-Im Bank's funding decision and compel the Bank to consult and properly "take into account" the Projects' effects as required by the ESA and NHPA. Dkt. No. 64 at 29. And just as in *NRDC v. Jewell*, upon remand and following proper consultation, Ex-Im Bank "could . . . contract[ ] to benefit" ESA-listed species and the World Heritage area, including by requiring mitigation of the harms caused by the remaining Project construction and

---

[5] Defendants also claim Plaintiffs' injuries stem from activities conducted by non-Project-proponent entities, such as dredging by the Port. Dkt. No. 84 at 8. However, the record clearly demonstrates that both dredging and shipping are part of the Ex-Im Bank-funded Projects and thus could be subject to Ex-Im-required mitigation. AR 5880, 39921 (describing project-related dredging from construction of dock, offloading facility, and pipeline crossing; 29033-34, 5879, 5920-26 (Projects include shipping, as elaborated below); Jeremijenko Decl. ¶ 14 ("dredging directly associated with [the Projects], in addition to the Gladstone Ports Corporation's dredging" will exacerbate problems).

ongoing/future Project operations.[6] 749 F.3d at 783; 12 U.S.C. § 635i-5(a)(2) (providing Ex-Im "[a]uthority to withhold financing . . . from a project for environmental reasons"); AR 20177 at I(15). Mitigation could include: offsets, compensation, or restoration for already completed habitat destruction; vessel speed limits to protect whales, sea turtles, and dugongs; LNG plant lighting modifications to protect sea turtles; restrictions on remaining dredging; and monitoring for wildlife impacts throughout future operations. If the Court remands the decision and directs Ex-Im Bank to comply with proper procedures, there is certainly "some possibility that" Ex-Im Bank will "reconsider the decision that allegedly harmed the litigant." *Mass. v. EPA*, 549 U.S. at 518.

Defendants respond by citing the plurality (not the majority) decision in *Lujan*. Dkt. No. 84 at 10. In *Lujan*, four justices believed the plaintiffs lacked redress because the agencies only supplied 10 percent of a project's funding, and the plaintiffs did not show the project would be "suspended . . . if that fraction is eliminated." 504 U.S. at 571. However, a majority of justices did *not* join this portion of the opinion and as two justices pointed out, "the relevant inquiry is not . . . what will happen if [the agencies] stop funding projects, but what will happen if [the agencies] comply with the consultation requirement." *Id.* at 600. More recent cases concur with this position. *See NRDC v. Jewell*, 749 F.3d at 783; *Mass. v. EPA*, 549 U.S. at 523-26.

### 3. Plaintiffs' Claims Are Not Prudentially Moot.

Plaintiffs' claims are not prudentially moot, as Defendants assert. Dkt. No. 84 at 12. The burden for demonstrating mootness, whether prudential or constitutional, is high – Defendants must show "circumstances [have] changed since the beginning of litigation that forestall *any occasion* for meaningful relief." *Hunt v. Imperial Merch. Servs., Inc.*, 560 F.3d 1137, 1142 (9th Cir. 2009) (emphasis added); *In re Nelson*, 391 B.R. 437, 443 (B.A.P. 9th Cir. 2008) (standard is whether the "court can grant . . . any effective relief"); *see also Nw. Envtl. Def. Ctr. v. Gordon*, 849 F.2d 1241, 1245 (9th Cir. 1988)

---

[6] Defendants have not included the Projects' contracts in the Administrative Record. To the degree Defendants rely on non-record evidence in their reply, including any contract terms, Plaintiffs reserve the right to seek discovery to resolve the issue. FED. R. CIV. P. 56(d); Dkt. 51 at 2 n.1 (reserving right to seek discovery regarding remedy); *see also Bear Valley Mut. Water Co. v. Jewell*, 2015 U.S. App. LEXIS 10755, *33 (9th Cir. June 25, 2015) ("FWS may not relinquish its statutory obligation [under the ESA] . . . by contract with third parties.").

("[a]s long as effective relief may still be available to counteract the effects of the violation, the controversy remains live and present").[7]

As the Ninth Circuit has repeatedly held, "completion of activity is not the hallmark of mootness," particularly in cases involving environmental procedures. *Neighbors of Cuddy Mt. v. Alexander*, 303 F.3d 1059, 1065 (9th Cir. 2002). For example, in *Cantrell v. City of Long Beach*, a case challenging demolition of a naval station was not moot, even though buildings had been razed, trees removed, and habitat dredged. 241 F.3d 674 (9th Cir. 2001). The court explained that, "if [defendants were] required to undertake additional environmental review, the defendants could . . . develop ways to mitigate the damage to the birds' habitat," including "creating new nesting . . . areas on the land" or "utilizing other nearby land for mitigation purposes."*Id.* at 678-79; *see also Neighbors of Cuddy Mt.*, 303 F.3d at 1066 (even though "the logged trees cannot be brought back, the court . . . might order other measures to help mitigate the damage" from a timber sale, including monitoring and mitigation).

Here, meaningful relief remains available. Neither LNG Project is complete, and thus mitigation of still-ongoing construction and subsequent Project operation remains available. And even if the Projects were complete, if Ex-Im Bank were required to consult, the agency "could . . . develop ways to mitigate the damage to [protected species'] habitat" and the Great Barrier Reef World Heritage Area through monitoring, habitat restoration or offsets, and mitigation. *Cantrell*, 241 F.3d at 678. Plaintiffs' claims are not prudentially moot.

**B. The ESA Requires Ex-Im Bank to Consult.**

As Defendants acknowledge, in 2012, Ex-Im Bank committed nearly $5 billion in U.S. taxpayer money to fund the two massive LNG Projects. The sole purpose of both Projects is to produce LNG in Australia for export abroad – export that undeniably requires shipping the LNG across the high seas, thus triggering ESA consultation. Despite pages of excuses in Defendants' opposition brief, it remains clear the Bank "funded . . . in part" an "action" occurring "upon the high seas," and that action will have at least "indirect" impacts on the high seas. 50 C.F.R. §§ 402.02; 402.01(a). Consultation is required.

---

[7] As Defendants note, the Ninth Circuit has never expressly adopted the concept of prudential mootness and has applied it "only the bankruptcy context, when there are no assets left to distribute." *Maldonado v. Holder*, 781 F.3d 1107, 1112 n.5 (9th Cir. 2015).

1    **1.   The "Action" Funded Includes High Seas Shipping, Triggering Consultation.**

2           Under the ESA and its implementing regulations, each agency must consult on "any action it . . .

3    funds . . . upon the high seas." 50 C.F.R. § 402.01(a). An "action" includes "all activities" an agency

4    funds "in whole or in part." *Id.* § 402.02. Because the term "action" is interpreted broadly, courts have

5    repeatedly required agencies to consult over the *whole* action, not just the portion in which the agency is

6    directly involved. *See, e.g.*, *Nat'l Wildlife Fed'n v. Coleman*, 529 F.2d 359, 373 (5th Cir. 1976)

7    (requiring consultation for "the total impact" of highway construction on an ESA-listed crane, not just

8    the agency-approved section); *Connor v. Burford*, 848 F.2d 1441, 1453 (9th Cir. 1988) (requiring

9    consultation on "all phases" of drilling project).

10          As Plaintiffs detailed in their briefing, consultation was triggered because Ex-Im Bank "funded

11   . . . in part" an "action" occurring "upon the high seas." 50 C.F.R. § 402.02. There is no dispute that Ex-

12   Im funded the two Projects, and both the APLNG and QCLNG Projects clearly include shipping across

13   the high seas. *See* Dkt. Nos. 71 at 8-11, 83 at 8; AR 29033-34, 26294-95, 23415-17 (QCLNG EIS and

14   Ex-Im Bank Board Memo identifying "Shipping Operations" as one of five "principal Components" of

15   the Project); AR 3119, 5879, 5920-26 (APLNG EIS identifying "[c]onstruction and operation" of the

16   LNG facility as a Project component and stating that "Operations" include "LNG Shipping").

17          Defendants' response in the face of these clear record statements is unpersuasive. Defendants

18   first argue that the Project EISs only "considered potential environmental impacts of shipping activities

19   . . . within Australia's territorial waters." Dkt. No. 84 at 16. However, the cited documents actually

20   *support* Plaintiffs' claim, as they demonstrate the Project proponents considered shipping to be part of

21   the Projects and thus evaluated the impacts of shipping on the environment. For example, the APLNG

22   EIS states that "[t]he Project will result in significant additional shipping movements within . . . shipping

23   channels to the open sea." AR 1003, 6230 (noting risk of "LNG ships" striking turtles), 7144 (requiring

24   analysis of "shipping routes"), 19352. And while the Queensland government may only require a

25   proponent's EIS to evaluate impacts of LNG shipping up to its territorial boundaries, AR 7144, the

26   Projects' LNG shipping vessels do not stop at that edge but proceed into and across the high seas.

27          Similarly unavailing, Defendants argue that Ex-Im Bank never considered shipping costs in

28   calculating the overall cost of the Projects. Dkt. No. 84 at 17. Defendants' reasoning is circular,

essentially arguing that because Defendants did not consider shipping to be part of the action, then Defendants must be correct that shipping is not part of the action. However, the scope of the agency action "is determined as a matter of law by the Court, not by the agency." *See Greenpeace v. Nat'l Marine Fisheries Serv.*, 80 F. Supp. 2d 1137, 1146 (W.D. Wash. 2000).

Lastly, Defendants argue that shipping is a "separate" action from the APLNG Project, inaccurately claiming that shipping will be undertaken solely by outside entities, not the Project proponents (i.e., the loan recipients).[8] Dkt. No. 84 at 18. To the contrary, Sinopec is one of three APLNG proponents and in 2011, agreed to buy 90% of the APLNG's production. AR 056, 067. According to Ex-Im Bank, the Sinopec contract "places responsibility for the transportation of LNG . . . with the buyer[ ]," i.e., Project proponent Sinopec.[9] AR 127; *see also* AR 128 (noting "Sinopec has ordered LNG Tankers to meet its transportation obligations under the" proponents' contractual agreement), 19351-52. The Project proponents/loan recipients are transporting *almost all the LNG produced*, and thus shipping is under Project proponents' control and part of the APLNG Project. Because ExIm Bank "funded . . . in part" the LNG Projects and those Projects include activities occurring "upon the high seas," Section 7 consultation is required. 50 C.F.R. § 402.02.

### 2.  The Funded Projects Impact the High Seas, Triggering Consultation.

Additionally and independently, even if shipping were not part of the Ex-Im Bank-funded LNG Projects, which it clearly is, consultation would nonetheless be required because the LNG facilities' construction will have "indirect[ ]" impacts on the high seas and its species. Specifically, in defining "action[s]" that require consultation, Section 402.02 provides several examples, including "actions directly *or indirectly* causing modifications to the land, water, or air." 50 C.F.R. § 402.02 (emphasis added); *Nat'l Wildlife Fed'n v. FEMA*, 345 F. Supp. 2d 1151, 1169 (W.D. Wash. 2004) (Section 7 triggered for FEMA's flood insurance program because the program "indirectly cause[d] modifications" to the land by "provid[ing] incentives to modify the floodplains"); *Coleman*, 529 F.2d at 374 (although

---

[8] Defendants admit the QCLNG proponents undertake the Project's shipping, as they do not raise the issue in their brief. Dkt. No. 84 at 18; AR 29150 ("shipping of LNG . . . will be undertaken by BG Group," the Project's proponent).

[9] In support, Defendants cite AR 19391, an undated document with no identified author. As Sinopec did not become an APLNG proponent until 2011, the cited document may have preceded their involvement.

"private development surrounding the highway . . . does not result from direct federal action" that "does not lessen the [agency's] duty under § 7").

Indisputably, the whole purpose of the Ex-Im Bank-funded LNG export facilities is to produce LNG for sale and shipment abroad, primarily to Asian markets. *See* AR 23383 (QCLNG's facility will "liquefy [gas] for export sales"), 26350 (180 LNG shipping vessels anticipated annually, representing a 12.5% increase in shipping from Gladstone); AR 3119 ("objective[ ]" of APLNG is "production and export of approximately 18Mtpa of LNG"), 6906 (anticipating 400 LNG ships annually). And shipping by massive LNG vessels indisputably affects the Great Barrier Reef's wildlife and waters, which extend far into the high seas.[10] *See* Dkt. No. 83 at 10 (citing EIS statements regarding effects from shipping, including injury to wildlife from vessel collisions and ship noise, habitat damage from ships running aground, oil spills, and water quality impairment). Accordingly, even if the Court were to limit "action" to the portion of the Projects funded by Ex-Im (i.e., construction of the LNG facilities), that action "*indirectly* caus[es] modifications to the land, water, or air," including the high seas, thus triggering consultation.[11] 50 C.F.R. § 402.02.

### 3. Consultation in No Way Interferes with Australia's Sovereignty.

Defendants next contend that, for policy reasons, Ex-Im Bank should be allowed to ignore the ESA's clear consultation mandate because consultation would "impose significant burdens" because the "locus of the project is in a foreign country." Dkt. No. 84 at 19. However, Ex-Im Bank already operates in Australia and at least purportedly conducted an assessment of the LNG Projects' impacts pursuant to the agency's Environmental Procedures. AR 103, 23415. Consultation with the Services simply ensures

---

[10] The Great Barrier Reef and its incredible wildlife habitat extend well-into the "high seas." The ESA regulations state that "high seas" begin at the edge of a foreign nation's "territorial sea," which the U.S. has traditionally recognized as 3nm from shore but may extend to 12nm (3.5 or 13.8 miles). The Great Barrier Reef extends well-beyond even the 12nm mark. *See* http://www.gbrmpa.gov.au/about-the-reef/facts-about-the-great-barrier-reef (Great Barrier Reef Marine Park extends over 250 km (130 nm) offshore).

[11] Contrary to Defendants' suggestion, Plaintiffs do not argue that shipping is an "interrelated or independent" activity under Section 402.02's definition of "effects of an action." Dkt. No. 84 at 18. Instead, Plaintiffs argue that the LNG portion of the Projects "indirectly" modifies the high seas and its species because construction and operation of the LNG plants causes ships to cross the high seas that would not otherwise, thus triggering consultation under Section 402.02's definition of "action."

1    that Ex-Im's evaluation of impacts on ESA-listed dugongs, sea turtles, and whales meets the ESA's

2    standards. *See Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 671 (2007) (Section

3    7 "applies to every discretionary agency action – regardless of the expense or burden its application

4    might impose") (emphasis omitted).

5            And despite Defendants' contention otherwise, Ex-Im Bank has full authority to ensure that

6    financed projects avoid jeopardy of listed species, even if portions of the Projects occur in foreign

7    countries. *See* Dkt. No. 84 at 20. As detailed above, Ex-Im must consider environmental impacts before

8    issuing funding and then mitigate excessive harms and monitor implementation. *Supra* at 2. If Ex-Im

9    consults with the Services regarding project impacts – just like every other U.S. federal agency – it can

10   avoid jeopardy by either not funding the project or requiring mitigation as a contract condition. Nothing

11   about this simple act interferes with Australia's wildlife management or treads on Australia's

12   sovereignty.[12]

13           **4.   Ex-Im Bank's Funding Is the "Legal Cause" of the Action.**

14           Finally, recycling its same sorry theme, Ex-Im Bank claims that it is not the "legally relevant

15   cause of the Projects or their resulting environmental effects," citing the *Home Builders* case. Dkt. No.

16   84 at 21. In *Home Builders*, the Court upheld the Service's regulatory requirement that ESA Section 7

17   only applies to "discretionary" agency actions, explaining that an agency cannot be the "legal 'cause' of

18   an action that it has no statutory discretion not to take." 551 U.S. at 668 (emphasis omitted), citing 50

19   C.F.R. § 402.03; *DOT v. Publ. Citizen*, 541 U.S. 752, 770 (2004) (under NEPA, "where an agency has

20   no ability to prevent a certain effect due to its limited statutory authority over relevant actions, the

21   agency cannot be considered a legally relevant 'cause'").

22           Unlike the statutory scheme in *Home Builders*, Ex-Im Bank's organic statute does not mandate

23   that the Bank issue financing regardless of environmental impacts. Instead, Ex-Im Bank's organic

24   statute and its Environmental Procedures give the agency broad authority to consider and mitigate

25

26   [12] As Defendants note, the validity of the Services' Section 7 regulation limiting the foreign applicability
     of the consultation requirement is not presently before the Court. Further, Defendants' arguments that
27   Section 7 was only intended to apply domestically was specifically rejected by the Eighth Circuit in
     *Defenders of Wildlife v. Lujan*, 911 F.2d 117 (8th Cir. 1990), *overruled on other grounds by* 504 U.S.
28   555 (1992).

environmental impacts of financed projects and monitor compliance with any required mitigation, as detailed above. 12 U.S.C. § 635i-5(a)(2); AR 20177 at (I)15, AR 20187 at V. Because Ex-Im Bank can "influence a private activity to benefit a listed species," Ex-Im Bank's loans are "discretionary," and Ex-Im Bank is the legally relevant cause of the Projects' environmental effects. *Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1025 (9th Cir. 2012) (en banc); *cf. Ctr. for Biological Diversity v. HUD*, 541 F. Supp. 2d 1091, 1100 (D. Ariz. 2008) (finding no legal causation when "governing statutes and regulations do not give [an agency] the discretion to consider environmental factors").

## C. Defendants Failed To Take Into Account World Heritage Impacts under the NHPA.

As Plaintiffs described in their opening brief, the NHPA requires that, "[p]rior to the approval of any undertaking outside the United States that may directly and adversely affect a property that is on the World Heritage List," agencies "shall take into account the effect of the undertaking . . . for purposes of avoiding or mitigating any adverse effects." 16 U.S.C. § 470a-2 (now codified at 54 U.S.C. § 307101(e)).[13] Ex-Im Bank failed to meet this mandate, violating the NHPA.

### 1. The Ex-Im Bank-Funded LNG Projects Are Federal "Undertakings."

When Ex-Im Bank committed nearly $5 billion in loans to finance the LNG Projects, the Projects became NHPA "undertaking[s]," triggering NHPA review. The statute broadly defines "undertaking" to mean "a project . . . funded in whole or in part" by an agency. 16 U.S.C. § 470w(7) (now at 54 U.S.C. § 300320). Contrary to Defendants' suggestion, the statutory definition does not distinguish between domestic and international "undertakings," and Congress specifically stated that the term "is meant to be used in the same context" throughout the NHPA. H. REP. 96-1457, at 45 (1980). And while Defendants note that the foreign NHPA "take into account" provision differs from the domestic provision, if anything, the difference suggests a *broader* application for the Act's international provision. *Compare* 16 U.S.C. § 470a-2 (international provision requiring NHPA assessment "[p]rior to the approval of *any* undertaking") (emphasis added) *with* § 470f (§ 306108) (domestic provision applying to a "federally assisted undertaking"); *Dugong v. Rumsfeld*, 2005 U.S. Dist. LEXIS 3123, *42 (N.D. Cal. Mar. 1, 2005)

---

[13] During the recent recodification, Congress made minor amendments to this provision, changing "which" to "that" and deleting "Federal." These amendments do not impact the arguments in this case.

1    ("Congress may have intended a less restrictive definition of undertakings to apply to federal projects

2    abroad"). The Ex-Im Bank-funded LNG Projects are NHPA "undertakings."

3            **2.   Defendants Failed to "Take Into Account" the Projects' Effects on the Great Barrier**

4                **Reef World Heritage Area.**

5          Defendants next insist that, because the NHPA does not define "take into account," the agency

6    has a free hand to interpret the mandate as it wishes – and conveniently, Ex-Im proposes its own

7    Environmental Procedures as the standard. Dkt. No. 84 at 23, 28. However, Defendants ignore the Act's

8    legislative history, statutory structure, and caselaw, all of which clearly dictate a basic procedure

9    Defendants must – but failed to – follow. *See Padash v. INS*, 358 F.3d 1161, 1170 (9th Cir. 2004) (to

10   interpret statute, look to act's "language, structure, . . . context, and history").

11         As Plaintiffs described in their opening brief, when Congress enacted the NHPA in 1966 it

12   included a domestic provision requiring agencies to "take into account the effect of [a federal]

13   undertaking" on sites listed on the National Register. Pub. L. No. 89-665, 80 Stat. 915 (1966) (codified

14   at 16 U.S.C. § 470f; 54 U.S.C. § 306108). In 1974, the Advisory Council on Historic Preservation

15   promulgated detailed regulations to implement the provision, requiring agencies to: identify protected

16   properties; gather information; determine whether the undertaking will have an adverse effect; if so,

17   evaluate mitigation; and engage in in-depth consultation with interested parties. 18 Fed. Reg. 3366 (Jan.

18   25, 1974) (§§ 800.4; 800.5) (codified at 36 C.F.R. Part 800). With this background, Congress amended

19   the NHPA in 1980 to add the international provision and applied *the exact same language*, requiring

20   agencies to "take into account" effects on World Heritage properties. Pub. L. 96-515, § 402, 94 Stat.

21   2987 (1980) (codified at §§ 470a-2; 300320).

22         Applying even the most basic rules of statutory construction, Congress clearly intended the

23   identical "take into account" directives to be interpreted the same. First, "[w]hen administrative and

24   judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same

25   language in a new statute indicates . . . the intent to incorporate" those interpretations. *Bragdon v.*

26   *Abbott*, 524 U.S. 624, 645 (1998). Congress was plainly aware of the existing "take into account"

27   regulations, strongly suggesting Congress intended to adopt the same interpretation. *See* H. REP. NO. 96-

28   1457 (noting with approval regulation's definition of undertaking). Second, "identical words used in

---

different parts of the same act are intended to have the same meaning." *Comm'r v. Lundy*, 516 U.S. 235, 250 (1996); *Ratzlaf v. United States*, 510 U.S. 135, 143 (1994) ("term appearing in several places in a statutory text is generally read the same way each time it appears").

With this context, the court in *Dugong v. Rumsfeld* found "[t]he plain language of section [470a-2], combined with express legislative purpose, reveals clear Congressional intent regarding the basic components of a take into account process." 543 F. Supp. 2d 1082, 1104-05 (N.D. Cal. 2008). Accordingly, the court held the NHPA requires agencies to: (1) identify the protected property, (2) generate and consider information regarding the action's effects, (3) determine whether effects will be adverse, (4) if so, determine whether mitigation could avoid those effects, and (5) engage with the foreign nation and interested individuals through consultation.[14] *Id.*; *see also* 63 Fed. Reg. 20,496, 20,504 (Apr. 24, 1998) (NHPA guidance stating that agencies should consult "with the host country's historic preservation authorities," "affected communities" and "relevant professional organizations").

Despite this clear direction and despite a record that *never references* the NHPA or its requirements, Ex-Im Bank insists that it *did* "take into account" effects of the LNG Project on the Great Barrier Reef World Heritage Area, citing its Environmental Procedures. Dkt. No. 84 at 27-28. However, Ex-Im Bank failed to take several of the basic procedural steps required by the NHPA, and to the degree Ex-Im Bank somehow could be deemed to have complied with the NHPA's procedural requirements, the agency's conclusion is arbitrary, capricious, and contrary to the record.

First, Defendants never identify where Ex-Im Bank made an explicit determination whether the Projects would "adverse[ly] [a]ffect[ ]" the World Heritage Area. 16 U.S.C. § 470a-2; 543 F. Supp. 2d 1103; Dkt. No. 84 at 28 (simply noting Ex-Im concluded the Australia's review is "substantially the same" as its own environmental review procedures). Second, Ex-Im never explicitly considered whether

---

[14] In response, Defendants cite *Conservation Congress*, where the court refused to require an agency to conduct a cumulative effects analysis when "no statutory or regulatory provision, legislative materials, or other relevant authority" suggested such a duty. 720 F.3d 1048, 1056 (9th Cir. 2013). In contrast here, the NHPA, its legislative history, caselaw, and agency guidance all direct the basic components of the take into account process. Further, because the NHPA assigns the Interior Department, not Ex-Im Bank, primary responsibility to implement the NHPA, Ex-Im Bank's lawyers' interpretation of the NHPA deserves no deference. *Dep't of Treasury v. FLRA*, 837 F.2d 1163, 1167 (D.C. Cir. 1988) ("when an agency interprets a statute other than that which it has been entrusted to administer, its interpretation is not entitled to deference").

mitigation could avoid adverse World Heritage impacts. *Id.* While Defendants point to the proponents' discussion of mitigation in their EISs, Dkt. No. 84 at 26, Defendants provide no cites to where Ex-Im Bank itself, or its contractors, fully discussed and evaluated that mitigation. *Wild Fish Conservancy v. Salazar*, 628 F.3d 513, 529 (9th Cir. 2010) ("agency's action must be upheld, if at all, on the basis articulated by the agency itself"). Finally, there is no evidence that Ex-Im engaged in in-depth consultation, as the agency did not consult directly with Australia, affected Australian individuals, or Australia's "historic preservation authorities." 63 Fed. Reg. at 20,504; 543 F. Supp. 2d 1103.

Further, to the degree Defendants *did* make a determination that the LNG Projects had no adverse effects on the World Heritage area, or otherwise "t[ook] into account" World Heritage impacts, Defendants' conclusion is arbitrary, capricious, and contrary to the record. *See* AR 111 (Ex-Im asserting "there are no predicted direct impacts on the Great Barrier Reef World Heritage Site . . . as a result of AP LNG activities"), 23428 (same for QCLNG). Specifically, Defendants rely on the proponents' EIS's conclusion that construction of the massive LNG plants *within the boundaries* of the World Heritage site – which will result in vastly increased shipping across the Great Barrier Reef – had only "minor" direct and indirect impacts on World Heritage area habitat and species, and also on proposed habitat "offsets" for mitigation.[15] Dkt. No. 84 at 25-26, citing AR 6862, 28600. And as Defendants point out, the Australian government approved the Projects' proponents' findings. AR 808, 25742.

However, following Australia's approval, UNESCO's World Heritage Commission strongly condemned these conclusions. At its 2011 meeting, the Commission reviewed Australia's approval of another LNG facility, the Santos LNG facility, located on Curtis Island just south of the QCLNG and APLNG facilities.[16] The Committee criticized the EIS's conclusion – which is nearly identical to the

---

[15] Defendants also rely on the Strategic Assessment conducted by Australia in response to UNESCO's concerns. However, the Assessment is a forward-looking, long term plan for *future* Reef development; it was not intended to evaluate or remedy effects from already-approved actions, like the LNG Projects. AR 13700, 23457.

[16] *See* http://www.dilgp.qld.gov.au/assessments-and-approvals/gladstone-liquefied-natural-gas.html. While UNESCO specifically criticized only the Santos LNG approval, they apparently did not realize that *three* LNG facilities (Santos, QCLNG, and APLNG) had been proposed on Curtis Island. AR 13748 (UNESCO noting that the "Committee had noted with extreme concern the consenting of one LNG development, whereas in point of fact three LNG developments have been approved").

APLNG and QCLNG EIS conclusions – that significant impacts to the Reef's values were not expected despite the EIS's acknowledgement of "direct impacts" to seagrass, mangrove, and intertidal habitats and "direct and indirect impacts on whales, dolphins, turtles and dugong." AR 18761; *cf.* Dkt. No. 83 at 8-9 (citing Projects' EISs findings of direct and indirect impacts to seagrass, mangroves, and wildlife). The Committee concluded that LNG development "could represent a clear potential threat to the property's OUV [Outstanding Universal Values] and integrity" and recommended halting the facility's construction. AR 18762. The Committee also restated its position that oil and gas exploitation activities "are incompatible with World Heritage status." *Id.*

Following that meeting, in March 2012, UNESCO undertook a monitoring mission to the Reef, particularly to evaluate the developments on Curtis Island. AR 13655. UNESCO acknowledged that Australian law required review of the LNG Projects' World Heritage impacts but deemed the process "not . . . transparent, nor effective." AR 13686. UNESCO criticized the offsets proposed in the various LNG projects, finding the offsets "do not appear to compensate for losses resulting from these developments." AR 13698, 13705 (finding compensation "dubious"). UNESCO further evaluated Australia's proposed mitigation for the LNG Projects and concluded "the developments . . . on Curtis Island, and associated dredging activity, *do have a negative impact on the OUV of the property*." AR 13707 (emphasis added).

Each of these documents is readily available in Defendants' administrative record, but Ex-Im Bank failed to acknowledge or address UNESCO's specific findings, which directly contradict its own. Clearly, the Ex-Im Bank-funded Projects have "adverse effects" on the Great Barrier Reef World Heritage site, and Defendants' failure to grapple with clear record evidence demonstrating those impacts violates both the APA and the NHPA. *Beno v. Shalala*, 30 F.3d 1057, 1074-75 (9th Cir. 1994) (rejecting decision where agency "simply did not mention the extensive and uncontradicted evidence" in the record and "where there is no indication that the agency or other proponents refuted the issue"); *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (decision arbitrary when agency "offer[s] an explanation . . . that runs counter to the evidence before the agency").

Dated:  July 17, 2015                    Respectfully submitted,

                                          /s/  Sarah Uhlemann
                                         Sarah Uhlemann (WA Bar No. 41164)*
                                         Center for Biological Diversity
                                         2400 NW 80th Street, #146
                                         Seattle, WA 98117
                                         Phone:  (206) 327-2344
                                         Facsimile:  (415) 436-9683
                                         Email:  suhlemann@biologicaldiversity.org
                                         *Admitted *pro hac vice*

                                         Brendan Cummings (CA Bar No. 193952)
                                         Center for Biological Diversity
                                         P.O. Box 549
                                         Joshua Tree, CA 92252
                                         Phone:  (760) 366-2232
                                         Facsimile:  (760) 366-2669
                                         Email:  bcummings@biologicaldiversity.org

                                         Emily S. Jeffers (CA Bar No. 274222)
                                         Miyoko Sakashita (CA Bar No. 239639)
                                         Center for Biological Diversity
                                         351 California Street, Suite 600
                                         San Francisco, CA 94104
                                         Phone:  (415) 436-9682
                                         Facsimile:  (415) 436-9683
                                         Email:  ejeffers@biologicaldiversity.org
                                         Email:  miyoko@biologicaldiversity.org

                                         *Attorneys for Plaintiffs*