UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, PACIFIC ENVIRONMENT, and TURTLE ISLAND RESTORATION NETWORK,<br><br>Plaintiffs,<br><br>vs.<br><br>EXPORT-IMPORT BANK OF THE UNITED STATES and FRED P. HOCHBERG, in his official capacity as Chairman and President of the Export-Import Bank of the United States,<br><br>Defendants. | Case No: C 12-06325 SBA<br><br>**ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT** |

Plaintiffs Center for Biological Diversity, Pacific Environment, and Turtle Island Restoration Network (collectively, "Plaintiffs") bring the instant environmental action against the Export-Import Bank of the United States ("Ex-Im Bank" or the "Bank") and Fred P. Hochberg, Chairman and President of the Bank (collectively, "Defendants") for violations of the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 et seq., the National Historic Preservation Act ("NHPA"), 16 U.S.C. § 470 et seq., and the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. Plaintiffs allege that Defendants approved financing for the construction of two natural gas projects in Queensland, Australia, without conducting the requisite environmental analyses. Plaintiffs seek a declaration that the Bank's authorization of financing violated the ESA and the NHPA, as well as an injunction setting aside the loan approvals and ordering the Bank to comply with both statutes before authorizing the distribution of any additional funds.

The parties are presently before the Court on cross-motions for summary judgment. Having read and considered the parties' motions, their memoranda in support thereof and in opposition thereto, and the administrative record, the Court hereby GRANTS summary judgment in favor of Defendants, for the reasons stated below. The Court, in its discretion, finds this matter suitable for resolution without oral argument. See Fed. R. Civ. P. 78(b); N.D. Cal. Civ. L.R. 7-1(b).

## I. BACKGROUND

### A. FACTUAL BACKGROUND

#### 1. Ex-Im Bank

Ex-Im Bank is the official export credit agency ("ECA") of the United States. Second Amended Complaint ("SAC") ¶ 30, Dkt. 64.[1] Acting under the authority of the Export-Import Bank Act of 1945, 12 U.S.C. § 635 et seq., the Bank offers a variety of financial products, including direct loans and loan guarantees, to facilitate the export of U.S. goods and services. Id. ¶¶ 30, 50. In a typical Ex-Im transaction, a foreign buyer seeking to purchase U.S. goods or services will receive financial support from the Bank. El-Mohandes Decl. ¶ 6. The Bank's support ensures that U.S. companies do not forfeit business opportunities to competitors who enjoy support from foreign ECAs. Id. At issue in this action are the Bank's decisions to fund two liquefied natural gas ("LNG") projects-- the Australia Pacific LNG ("APLNG") Project and the Queensland Curtis LNG ("QCLNG") Project (collectively the "Projects")--in Queensland, Australia. Id. ¶ 1.

#### 2. The APLNG Project

The APLNG Project is a joint venture owned and operated by Origin Energy Limited, ConocoPhillips, and the China Petrochemical Corporation ("Sinopec"). SAC ¶ 81. It includes "upstream" and "downstream" components. Id. ¶¶ 82-83. The upstream component encompasses the drilling of up to 10,000 coal-seam gas wells in interior Queensland, and the installation of nearly 300 miles of pipeline to transport the gas to the

---

[1] Approximately 60 ECAs operate worldwide. Decl. of Hala El-Mohandes ISO Defs.' Mot. Summ. J. ("El-Mohandes Decl.") ¶ 4, Dkt. 85.

coast. Id. ¶¶ 2, 82. The downstream component encompasses the construction of an LNG processing facility to condense the gas to liquid and a marine loading jetty to transport the liquefied gas to tankers for shipping. Id. ¶¶ 2, 83. According to Plaintiffs, the APLNG Project also includes shipping of the final product across the high seas. Id. ¶¶ 2, 84.

On May 3, 2012, the Bank authorized a $2.95 billion direct loan for the APLNG Project. SAC, ¶ 109. The funds support procurement of goods and services from U.S. exporters and suppliers, including the primary exporter Bechtel Corporation. Administrative Record ("AR") 000096-101, Dkt. 54. The cost of the APLNG Project is approximately $12 billion for the downstream component and $16 billion for the upstream component. El-Mohandes Decl. ¶ 14. The Bank's funds thus constitute approximately 10.5% of the total project costs. Id.

### 3. The QCLNG Project

The QCLNG Project is owned and operated by BG Energy Holding Limited, a wholly-owned subsidiary of BG Group. SAC ¶ 94.[2] It also includes "upstream" and "downstream" components. Id. ¶¶ 95-96. The upstream component encompasses the drilling of up to 6,000 coal-seam gas wells in interior Queensland, and the installation of over 210 miles of pipeline. Id. ¶¶ 3, 95. The downstream component encompasses the construction of an LNG processing facility and marine loading jetty. Id. ¶¶ 3, 96. According to plaintiffs, the QCLNG Project also includes shipping. Id., ¶¶ 3, 97.

On December 27, 2012, the Bank authorized a $1.8 billion direct loan for the QCLNG Project. SAC ¶ 114. Again, the funds support procurement of goods and services from U.S. exporters and suppliers, including Bechtel Corporation. AR 023411-414. The cost of the QCLNP Project is approximately $9.9 billion for the downstream component and $20 billion for the upstream component. El-Mohandes Decl. ¶ 25. The Bank's funds thus constitute approximately 9% of the total project costs. Id.

---

[2] BG was subsequently acquired by Royal Dutch Shell. El-Mohandes Decl. ¶ 22.

### 4. The Environs of the Projects

Both LNG processing facilities and terminals are located on Curtis Island, partially within the boundaries of the Great Barrier Reef World Heritage Area. SAC ¶¶ 4, 90, 104. The Great Barrier Reef World Heritage Area was added to the World Heritage List in 1981 for, among other things, its ecosystem and biodiversity. Id. ¶ 79; AR 005678-681. The Great Barrier Reef World Heritage Area is nearly 350,000 square kilometers, and encompasses the world's largest coral reef ecosystem, as well as a diverse array of other habitats. SAC ¶¶ 32, 80; AR 046634. These habitats support a tremendous range of biodiversity, including numerous species identified as threatened or endangered under the ESA. SAC ¶ 32. Specifically, the Great Barrier Reef supports the dugong, the green sea turtle, the loggerhead sea turtle, the saltwater crocodile, the humpback whale, and the sperm whale. Id. ¶¶ 64-77. Ships transporting LNG will also pass through high seas habitat for dugongs, sea turtles, and several whale species. Id. ¶ 4.

Construction of the Projects was underway when the Bank authorized financing. See AR 000095 (APLNG); AR 023408-410 (QCLNG); see also AR 046978. By that time, the Australian and Queensland governments had approved both Projects. See AR 000106, 019342-364 (APLNG); AR 023419, 023857-874 (QCLNG). Such approvals included environmental mitigation conditions. See AR 019342-380. In considering the loans for approval, the Bank performed environmental due diligence, which included review of Environmental Impact Statements prepared by the Projects' sponsors. AR 000103-112 (APLNG); AR 023415-429 (QCLNG). Although the Bank has the authority to condition financing on environmental mitigation measures, the Bank found it unnecessary to do so. See AR 000112 (APLNG); AR 023429 (QCLNG).

### 5. The Plaintiffs

Plaintiffs are non-profit organizations dedicated to the protection of wildlife, wildlife habitat, and other environmental causes. SAC ¶¶ 14, 18, 20.[3] Plaintiffs have members with recreational, economic, scientific, and aesthetic interests in the preservation and/or enjoyment of the Great Barrier Reef World Heritage Area, as well as the endangered and threatened species found therein. Id. ¶¶ 15-17, 19, 21-22. According to Plaintiffs, the Projects (and thus the Bank's financing of the Projects) will cause harm to these interests. Id. ¶¶ 24-26. Specifically, Plaintiffs allege that the Projects will harm marine wildlife around Curtis Island and on the high seas by destroying or degrading habitat, diminishing water quality, increasing underwater noise, increasing artificial lighting, and causing vessel strikes. Id. ¶¶ 25, 92, 106. The Projects will also alter the aesthetics and attributes of the Great Barrier Reef World Heritage Area by diminishing water quality, increasing shipping traffic, and reducing the populations of various species. Id. ¶¶ 24-26, 93, 107.

## B. PROCEDURAL HISTORY

Plaintiffs bring the instant declaratory and injunctive relief action to obtain an order setting aside and remanding Ex-Im Banks decisions to fund the Projects. In the operative Second Amended Complaint, filed August 25, 2014, Plaintiffs allege two causes of action: (1) violation of Section 7 of the ESA; and (2) violation of the NHPA.[4]

Section 7 of the ESA provides:

> Each Federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species . . . .

---

[3] Center for Biological Diversity is dedicated to "the protection of threatened, endangered, and rare species and their habitats throughout the United States and abroad." SAC ¶ 14. Pacific Environment is dedicated to protecting "the living environment of the Pacific Rim," including "rare and endangered species." Id. ¶ 18. Turtle Island Restoration Network is dedicated to "the protection and restoration of endangered and threatened species of sea turtles." Id. ¶ 20.

[4] The SAC also includes a third cause of action for violation of the Freedom of Information Act, 5 U.S.C. §§ 500 et seq. Plaintiffs voluntarily dismissed this cause of action in February 2015, however. See Dkt. 76.

- 5 -

16 U.S.C. § 1536(a)(2). For purposes of the ESA, an "action" means "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies in the United States or upon the high seas." 50 C.F.R. § 402.02. Plaintiffs allege that the Bank failed to consult with the appropriate U.S. wildlife agencies, as required by the ESA, before funding either Project. SAC ¶¶ 5, 122-128.[5]

Section 402 of the NHPA provides:

> Prior to the approval of any Federal undertaking outside the United States which may directly and adversely affect a property which is on the World Heritage List or on the applicable country's equivalent of the National Register, the head of a Federal agency having direct or indirect jurisdiction over such undertaking shall take into account the effect of the undertaking on such property for the purposes of avoiding or mitigating any adverse effects.

16 U.S.C. § 470a-2.[6] An "undertaking" is defined as "a project, activity, or program funded in whole or in part under the direct or indirect jurisdiction of a Federal Agency, including . . . those carried out with Federal financial assistance[.]" 16 U.S.C. § 470w(7). Plaintiffs allege that the Bank failed to take into account the effect of the Projects on the Great Barrier Reef World Heritage Area, as required by the NHPA, for purposes of avoiding or mitigating any adverse effects. SAC ¶¶ 7, 129-133.

Now before the Court are cross-motions for summary judgment. Dkt. 83, 84. Plaintiffs argue that the Bank's funding of the Projects constitutes "agency action" upon the high seas that "may affect" listed species, thus triggering the ESA's consultation requirement. Plaintiffs further argue that the Bank's funding constitutes a "Federal undertaking" that may affect the Great Barrier Reef World Heritage Area, thus triggering the NHPA's "take into account" requirement. According to Plaintiffs, the Bank failed to satisfy the demands of either the ESA or the NHPA.

---

[5] Plaintiffs also challenge the legality of the regulations implementing section 7 of the ESA. See SAC ¶¶ 41-44. Specifically, they challenge the regulations limiting the geographic scope of section 7 to agency action occurring in the United States or upon the high seas. See 50 C.F.R. § 402.02. The Court previously dismissed this claim as time-barred. Order Granting Motion to Dismiss, Dkt. 62.

[6] In December 2014, Congress recodified the NHPA. See National Park Service and Related Programs, Pub. L. No. 113-287, § 2, 128 Stat. 3094 (2014). Consequently, former 16 U.S.C. § 470a-2 is now located at 54 U.S.C. § 307101(e).

Defendants contend that this action fails to present a justiciable controversy because: (1) Plaintiffs lack standing; and (2) their claims are prudentially moot. In the event that the Court finds the action justiciable, Defendants argue that consultation under the ESA was not required, and that the Bank satisfied the NHPA's requirements by adequately taking into account the effect of the Projects on the Great Barrier Reef World Heritage Area.

## II. <u>LEGAL STANDARD</u>

"[S]ummary judgment is appropriate where there 'is no genuine issue as to any material fact' and the moving party is 'entitled to a judgment as a matter of law.'" <u>Alabama v. North Carolina</u>, 560 U.S. 330, 344 (2010) (quoting Fed. R. Civ. Proc. 56(c)). When reviewing final agency action, "there are no disputed facts that the district court must resolve." <u>Occidental Eng'g Co. v. INS</u>, 753 F.2d 766, 769 (9th Cir. 1985). Instead, "the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." <u>Id.</u> In other words, the court decides whether the agency's action "passes muster" under the appropriate standard of review. <u>Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't of Agr.</u>, 499 F.3d 1108, 1115 (9th Cir. 2007).

## III. <u>DISCUSSION</u>

In their cross-motions for summary judgment, the parties dispute whether the Bank's decision to partially fund the Projects triggered the ESA's consultation requirement, and whether the Bank satisfied the NHPA's "take into account" requirement. As a threshold matter, however, Defendants dispute Plaintiffs' standing to prosecute this action. "Because the question of whether a particular party has standing to pursue a claim naturally precedes the question of whether that party has successfully stated a claim," the Court addresses the issue of standing first. <u>Moreland v. Las Vegas Metro. Police Dep't</u>, 159 F.3d 365, 369 (9th Cir. 1998) (citing <u>Steel Co. v. Citizens for a Better Env't</u>, 523 U.S. 83, 93 (1998) (standing is a prerequisite to the district court's consideration of the merits of any claim)); see also <u>Righhaven LLC v. Hoehn</u>, 716 F.3d 1166, 1172 (9th Cir. 2013) (same).

Pursuant to Article III of the United States Constitution, standing is a threshold requirement in every civil action filed in federal court. U.S. Const., art. III, § 2, cl. 1; DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 342 ("The 'core component' of the requirement that a litigant have standing to invoke the authority of a federal court 'is an essential and unchanging part of the case-or-controversy requirement of Article III.'"). To satisfy the Article III standing requirement, a plaintiff must show that: (1) it has suffered an "injury in fact"; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 180-181 (2000) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992)).[7] Plaintiffs bear the burden of showing that they have standing for each type of relief sought. Summers v. Earth Island Inst., 555 U.S. 488, 493 (2009). On a motion for summary judgment, Plaintiffs cannot satisfy this burden with mere allegations, "but must 'set forth' by affidavit or other evidence 'specific facts,'" which for the purposes of the motion will be taken as true. Lujan, 504 U.S. at 561.

Plaintiffs seek a declaratory judgment that the Bank violated the procedures of the ESA and the NHPA, and an order setting aside the Bank's decisions to fund the Projects. "[A] plaintiff asserting a procedural injury must show that the procedures in question are designed to protect some threatened concrete interest of his that is the ultimate basis of his standing." Citizens for Better Forestry v. U.S. Dep't of Agric., 341 F.3d 961, 969 (9th Cir. 2003). Plaintiffs allege that they have "recreational, economic, scientific, and aesthetic interests in the species and habitats of the Gladstone area and on the high seas." SAC ¶ 24. A threat to these interests arises out of the "[c]onstruction and operation" of the Projects and the potential impact of the same on local species and habitat. Id. ¶¶ 25-26. Defendants

---

[7] "An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Friends of the Earth, 528 U.S. at 181. Only the first prong of the associational standing test--whether Plaintiffs' members would have standing to sue in their own right--is at issue here.

do not dispute that Plaintiffs' members suffer an injury in fact; Defendants contend, however, that Plaintiffs fail to establish causation and redressability.

Generally, to establish causation, a plaintiff must show "a causal connection between the injury and conduct complained of--the injury has to be 'fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.'" Lujan, 504 U.S. at 560-61 (citation omitted). To establish redressability, "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" Id. (citation omitted). As asserted by Plaintiffs, a showing of procedural injury "lessens" their burden on the causation and redressability prongs of the Article III standing inquiry. Salmon Spawning & Recovery Alliance v. Gutierrez, 545 F.3d 1220, 1226 (9th Cir. 2008) (citing Lujan, 504 U.S. at 572 n.7). A party alleging procedural injury need only show a "reasonable probability" that "the challenged action will threaten their concrete interests." Citizens for Better Forestry, 341 F.3d 969-70; see also Salmon Spawning, 545 F.3d at 1226 (plaintiffs alleging a procedural injury "must show only that they have a procedural right that, if exercised, *could* protect their concrete interests"). Nevertheless, "the redress[a]bility requirement is not toothless in procedural injury cases," Salmon Spawning, 545 F.3d at 1227, and it is this hurdle--establishing a reasonable probability that the relief requested will protect their concrete interests--that Plaintiffs fail to clear.

As stated above, causation and redressability are relaxed when, as here, a procedural injury is alleged. Salmon Spawning, 545 F.3d at 1229 (citing Lujan, 504 U.S. at 572 n.7). Plaintiffs "need to show only that the relief requested--that the agency follow the correct procedures--may influence the agency's ultimate decision of whether to take or refrain from taking a certain action." Salmon Spawning, 545 F.3d at 1226-27; see also Lujan, 504 U.S. at 572 n.7 (noting that if a federal agency issued a license to authorize construction of a dam without first preparing an environmental impact statement, individuals living adjacent to the dam would have standing to bring suit without showing that the agency would have withheld the license if had it prepared such a statement). Consequently, Plaintiffs need not

establish that the Bank would have reached a different decision on the loan applications had it conducted an adequate environmental analysis. Agency action, however, is not the only piece of the redressability puzzle when a plaintiff alleges that agency funding to an independent third party has led that party to injure the plaintiff.

When "a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else* . . . causation and redressability ordinarily hinge on the response of the regulated (or regulable) third party to the government action or inaction--and perhaps on the response of others as well." Lujan, 504 U.S. at 562. "The existence of one or more of the essential elements of standing 'depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict . . . and it becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury." Id. (citations omitted). "Thus, when the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily 'substantially more difficult' to establish." Id. (citations omitted).

In Lujan, the plaintiffs' "claim to injury [was] that the lack of consultation with respect to certain funded activities abroad 'increas[ed] the rate of extinction of endangered and threatened species." 504 U.S. at 562. The Supreme Court plurality held that the plaintiffs failed to demonstrate redressability, in part, because "the agencies generally supply only a fraction of the funding for a foreign project." Id. at 571. For example, the Agency for International Development "provided less than 10% of the funding" for a project at issue in that action, and the plaintiffs "produced nothing to indicate" that the named projects would "either be suspended, or do less harm to listed species, if that fraction [was] eliminated." Id. Accordingly, it was "entirely conjectural whether the nonagency activity that affect[ed]" the plaintiffs, i.e., the foreign projects, would have been "altered or affected by the agency activity they sought to achieve," i.e., the withholding of funds absent consultation. Id.

Similarly, in Village of Bensenville v. FAA, 457 F.3d 52, 68 (D.C. Cir. 2006), the plaintiffs alleged that the Federal Aviation Administration ("FAA") had issued a letter of intent ("LOI") to provide $337 million to the City of Chicago for the expansion of O'Hare International Airport without making essential findings mandated by statute. The LOI funds represented approximately a tenth of the funding for the project. Id. at 70. The appellate court held that, even if the LOI constituted a commitment of funds, the plaintiffs' injury--the O'Hare expansion--was not redressable because the project "would go forward without the LOI funds." Id. at 69. The court reasoned that vacating the LOI was unlikely to scuttle the project given the "relatively minor role of the LOI dollars in funding . . . the O'Hare expansion . . . and the existence of alternative sources of funding." Id. at 70. Later, in St. John's United Church of Christ v. FAA, 520 F.3d 460, 462 (D.C. Cir. 2008), the plaintiffs challenged the FAA's actual commitment of $29.3 million for the O'Hare project. The appellate court again held that redressability was lacking because Chicago was not likely to "scrap the O'Hare project if the court vacated the $29.3 million grant." Id. at 463. The court reasoned that, although the *FAA* might reach a different decision if it followed the proper procedures, the critical inquiry was "what *Chicago* would do." Id.

The situation is similar in the present case. Plaintiffs' challenge the Bank's allegedly unlawful approval of financing for a portion of the Projects, but their concrete harm arises out of the construction and operation of the Projects themselves. The administration of the Projects, however, is beyond either the agency's control or this Court's jurisdiction. Independent third parties, e.g. ConocoPhillips, operate the Projects with the approval of the Australian and Queensland governments, within whose jurisdictions the Projects occur. Consequently, although Plaintiffs need not show that the Bank's observance of proper procedure would cause the Bank to withhold or modify the loan approvals, Plaintiffs must provide some basis for finding that the non-agency activity--construction and operation of the Projects--will be altered or affected.

Critically, Plaintiffs "have produced nothing to indicate that the projects they have named will either be suspended, or do less harm to listed species, if [the] fraction [of the

funding provided by Ex-Im Bank] is eliminated." Lujan, 504 U.S. at 571. Plaintiffs' members have submitted declarations in which they question whether the Projects would proceed without funding from Ex-Im Bank. See, e.g., Decl. of Jane Suzanne Arnold ¶ 20, Dkt. 83-1 ("I believe that, if the Export-Import Bank funding was withdrawn, the Projects may not be able to proceed . . . ."). But "the members' hopes and beliefs that an order rescinding the [loans] would redress their injuries, however genuine, do not constitute 'specific facts' showing redressability." Chesapeake Climate Action Network v. Exp. Imp. Bank, 78 F. Supp. 3d 208, 225-26 (D.D.C. 2015); see generally Lujan, 504 U.S. at 561 (on summary judgment, a plaintiff can no longer rely on mere allegations, but must set forth "specific facts" by affidavit or other evidence). Consequently, "it is entirely conjectural whether the nonagency activity that affects [Plaintiffs] will be altered or affected by the agency activity they seek to achieve." Lujan, 504 U.S. at 571.

In contrast, Defendants provide evidence showing that the Projects very likely will continue unimpeded, even if Plaintiffs obtain the relief sought. Specifically, the developers of the APLNG Project are ConocoPhillips, Origin Energy Limited, and Sinopec. El-Mohandes Decl. ¶ 13. ConocoPhillips is the third largest integrated energy company in the United States, Origin is the leading owner and operator of coal-seam gas development reserves in Australia, and Sinopec is a Chinese state-owned petroleum and petrochemical enterprise. Id. In the 2014 fiscal year, ConocoPhillips alone enjoyed revenue of $55.5 billion, with total market capitalization of $85 billion. Id. The developer of the QCLNG Project is BG Energy Holdings Limited, a wholly owned subsidiary or BG Group, since acquired by Royal Dutch Shell ("Shell"). Id. ¶ 22. Shell is a global group of energy and petrochemical companies, with revenue in 2014 of $421.1 billion. Id. The Project developers thus enjoy substantial financial resources.

Additionally, the developers have demonstrated a substantial commitment to the Projects. With regard to the upstream component of the APLNG Project, the developers made a significant investment of $16 billion to fund initial development costs. AR 000057. Before Ex-Im Bank had approved the loan, 150 wells had been drilled, two gas-processing

facilities were constructed, and two preexisting Origin water-treatment plants were incorporated into the Projects. AR 000095. Similarly, with regard to the upstream component of the QCLNG Project, over 700 wells were drilled and substantial portions of pipeline had been laid. AR 023408. Indeed, in December 2012, at the time Ex-Im Bank authorized the loan for the QCLNG Project, the *downstream* facilities were *already* 46 percent complete. AR 023410. Given the timing of the loans, the Projects also saw substantial progress between the time the Bank authorized financing and the time Plaintiffs filed the instant motion. See El-Mohandes Decl. ¶ 19 (noting that the first production of LNG from APLNG was expected mid-2015), ¶ 28 (noting that the first production of LNG from QCLNG began in December 2014).

As for the significance of the Bank's role, Ex-Im's funding constitutes approximately 10.5 percent and 9 percent of the total costs of the APLNG and QCLNG Projects, respectively. El-Mohandes Decl. ¶¶ 14, 25. The Projects also received funds from equity investors, commercial banks, and China's ECA. Id. Within the energy sector, "the unavailability of [Em-Im Bank] support for U.S. exports would likely shift procurement decisions in favor of goods and/or services from a non-U.S. competitor, but not stop a project from going forward." El-Mohandes Decl. ¶ 8. Thus, as the Bank itself concluded when the loans were still under consideration, "Given the level of competition in the market for engineering services and gas production and liquefaction facility equipment from European, Asian, and Australian companies, financing for the [APLNG and QCLNG] Project[s] could and likely would be provided by other export credit agencies or governmental sources if Ex-Im Bank were to deny the requested loan." AR 000002 (APLNG), 022335 (QCLNG). In fact, a third LNG project located on Curtis Island --the Santos Gladstone LNG Project--proceeded without a loan from Ex-Im Bank, even though the developers initially approached the Bank for financing. El-Mohandes Decl. ¶ 10 (citing AR 000090-91). Ultimately, ECAs from Australia, Canada and Italy provided financing for the Santos Gladstone LNG Project. Id.

Given the financial resources of the developers, their substantial commitment to the Projects, the relatively small fraction of the overall costs financed by Ex-Im Bank, and the availability of other funding sources, the Court finds that there is no reasonable probability the Projects will be halted if further financing by the Bank is impeded. See, e.g., Chesapeake Climate Action, 78 F. Supp. 3d at 223-228 (finding that the plaintiffs lacked standing to challenge Ex-Im Bank's guarantee of a $90 million loan to coal exporters because, given the availability of "alternative funds" and the defendant's "commitment" to its export levels, the plaintiffs failed to establish that redress of their procedural injury could or would reduce the amount of coal exported).

The authorities upon which Plaintiffs rely are distinguishable. Plaintiffs cite NRDC v. Jewell, 749 F.3d 776 (9th Cir. 2014), for the proposition that standing is established because the Bank could have "contracted" to better protect their concrete interests. Pls.' Reply at 2, Dkt. 89 (citing NRDC, 749 F.3d at 783 (the plaintiffs had standing to challenge contracts entered into by a federal agency because the agency "could have contracted" to better protect threatened species)). In NRDC, the plaintiffs alleged that the Bureau of Reclamation unlawfully renewed long-term water service contracts with various water users without engaging in adequate ESA consultation. 749 F.3d at 781. The Bureau directly contracted with those third parties to authorize non-agency action, id. at 780 (the contracts allowed users to draw water from the canal, which threatened the plaintiffs' concrete interests), and the allegedly inadequate consultation "provide[d] [the] basis for renewing the [c]ontracts," id. Because the third parties in NRDC were not free to act absent agency authorization, standing did not hinge on the *independent* decisions of those third parties. Here, in contrast, the Bank did not authorize the Projects, and third parties are free to develop the Projects without regard to the Bank's actions.

Plaintiffs also cite Massachusetts v. EPA, 549 U.S. 497 (2007), for the proposition that standing is established because the Bank could "'slow or reduce' the injury, even if the injury [cannot] be 'reverse[d].'" Pls.' Reply at 3 (citing Massachusetts, 549 U.S. at 525 (Massachusetts had standing to challenge the EPA's refusal to regulate greenhouse gas

- 14 -

emissions from motor vehicles because, even if such regulation would not "by itself *reverse* global warming" the EPA could "take steps to *slow* or *reduce* it")).[8] In Massachusetts, the EPA questioned the plaintiff's standing to sue, not because of a break in the causative chain between the EPA and those who would have been subject to its regulation, but because greenhouse gas emissions from new motor vehicles in the United States contributed "so insignificantly" to global climate change. 549 U.S. at 523. The Supreme Court rejected that view, holding that the agency's ability to curb one "meaningful" source of injurious greenhouse gases was sufficient to confer standing, even if climate change is attributable to a multitude of sources. Id. at 525-26. Here, the Bank is not arguing that Plaintiffs lack standing to sue because the Projects contribute so insignificantly to the degradation of the Curtis Island area in light of *other* development projects; rather, the Bank is arguing that Plaintiffs lack standing because *these Projects* will occur regardless of the Bank's continued involvement.

In addition to the authorities cited above, Plaintiffs rely on Okinawa Dugong v. Gates, 453 F. Supp. 2d 1082 (N.D. Cal. 2008), and Friends of the Earth, Inc. v. Watson, No. C 02-4106, 2005 WL 2035596 (N.D. Cal. Aug. 23, 2005). As a threshold matter, these decisions are not binding. See Camreta v. Greene, 131 S. Ct. 2020, 2033 n.7 ("A decision of a federal district court judge is not binding precedent . . . ."). Moreover, the Court finds neither case helpful to Plaintiffs' cause. In Gates, as in NRDC, a federal agency authorized an allegedly injurious action--i.e., the construction of a military aid station off Okinawa Island in Japan--without the requisite environmental assessment. Thus, unlike the instant

---

[8] As a threshold matter, Massachusetts may not extend to cases brought by private organizations. See Massachusetts, 549 U.S. at 520 ("Given . . . Massachusetts' stake in protecting its quasi-sovereign interests, the Commonwealth is entitled to special solicitude in our standing analysis."); see also Washington Envtl. Council v. Bellon, 732 F.3d 1131, 1145 (9th Cir. 2013) (questioning the application of Massachusetts to actions not involving a sovereign state). In any event, for the reasons discussed above, Massachusetts is inapt.

action, Gates did not address a situation in which a federal agency decided to partially fund a foreign project independently authorized and already underway.[9]

In Watson, the plaintiffs alleged that Ex-Im Bank and the Overseas Private Investment Corporation ("OPIC") provided financial support to numerous projects without satisfying the requirements of the National Environmental Policy Act. 2005 WL 2035596 at *1. Ex-Im Bank and OPIC argued that the plaintiffs lacked standing because the agencies' role in the projects was too limited and attenuated. Id. at *4. Although the agencies argued that most large energy-related projects would proceed without their support, the court found that the plaintiffs had submitted "evidence demonstrating a stronger link between the agencies' assistance and the energy-related projects." Id. For example, the plaintiffs submitted evidence that Ex-Im Bank only "supports export sales that otherwise would not have gone forward." Id. The court concluded that, "in light of the reduced standard or procedural injuries," the defendants had not "submitted any authority" demonstrating that the plaintiffs had not "met their burden regarding causation." Id.[10]

Watson is unpersuasive because the district court in that case appears to have erroneously conflated U.S. export sales with the underlying projects in which they occur. See Watson, 2005 WL 2035596 at *4 (relying on evidence that Ex-Im Bank only "supports *export sales* that otherwise would not have gone forward," to find a strong link between Ex-Im Bank's assistance and "energy-related *projects*"). Plaintiffs make the same error when they assert that Ex-Im Bank has "a statutory directive to fund projects that would not otherwise be funded." Pls.' Mot. Summ J. at 15 n. 11 (citing 12 U.S.C. § 635(b)(1)(B)(ii)).

---

[9] Notably, in a subsequent decision in the Gates action, the district court held that the plaintiffs lacked standing because authorization of the military station had become irrevocable in the form of binding treaty obligations between the United States and Japan. Ctr. for Biological Diversity v. Hagel, 80 F. Supp. 3d 991, 1018 (N.D. Cal. 2015). Because an order requiring the Department of Defense to reconsider the findings underpinning such authorization would not have led the United States to halt construction of the facility, the court found that redress of the procedural injury was not possible. Id. at 1018-19.

[10] Notably, Defendants in the instant action *have provided* such authority. See Defs.' Opp'n and Cross-Mot. Summ J. at 5 (citing Chesapeake Climate Action, 78 F. Supp. 3d 208, and St. John's United Church of Christ, 520 F.3d 460). Those authorities were not available when Watson was decided.

Section 635(b)(1)(B)(ii) imposes no such directive; it provides only that it is the policy of the Bank to "supplement and encourage, and not compete with, private capital." The Bank does compete with foreign ECAs, however. 12 U.S.C. § 635(b)(1)(A).

In fact, the Bank has a statutory directive to support U.S. exports, 12 U.S.C. § 635(a), and a policy to support *export transactions* that might not occur without its assistance. See El-Mohandes Decl. ¶ 5 ("It is the general policy of the Bank that each transaction it supports fosters additional exports."); see also Ex-Im Bank's Application for Long-Term Loan or Guarantee ("Application"), AR 022343 ("Ex-Im Bank will finance the export of U.S. goods and services if it can be demonstrated that Ex-Im Bank support is necessary for the transaction to proceed.") Indeed, the U.S. export transactions at issue in this case might not have occurred without the Bank's support, even if the Projects themselves would have been unaffected. See El-Modandes Decl. ¶ 7 (a lack of Bank funding may mean that U.S. exporters are less likely to be utilized, but not that a "project itself w[ill] not proceed"); see also Application (wherein the QCLNG applicants state that the Bank's support was necessary because "foreign companies manufacture comparable goods and services that are sold in the buyer's market with export credit agency support available"). In view of the foregoing, reliance on Watson is misplaced.

Overall, Plaintiffs' standing arguments simply miss the mark. Plaintiffs argue, "If the Court remands the [Bank's] decision and directs Ex-Im Bank to comply with proper procedures, there is certainly 'some possibility that' Ex-Im Bank will 'reconsider the decision that allegedly harmed the litigant.'" Pls.' Reply at 5 (quoting Massachusetts, 549 U.S. at 518). Plaintiffs fail to address the next, more significant, piece of the redressability puzzle, however--whether it is reasonably likely that the Project developers will cease their harmful actions in response to an order setting aside the Bank's funding authorizations.

Tellingly, despite all their arguments to the contrary, Plaintiffs appear to concede that redressability is an obstacle. Although Plaintiffs request that the Court grant their motion for summary judgment, they state the following with regard to a remedy:

> Given that [two years passed between the filing of Plaintiffs' complaint and the filing of their motion for summary judgment], and that intervening events have affected the Great Barrier Reef World Heritage Area and its endangered species in the interim, in the event that Plaintiffs prevail, we request the Court order the parties to confer in an attempt to reach a resolution as to appropriate remedies, or if no such resolution is possible, to provide a joint proposal for briefing regarding an appropriate remedy.

Pls.' Mot. Summ. J. at 25, n.17. The existence of an "appropriate remedy" is a core component of Article III standing, however, and a prerequisite to this Court's jurisdiction. The Court cannot reserve the issue of redressability for another day, and the time for Plaintiffs to identify an appropriate remedy is now. Plaintiffs fail in that regard, and therefore, lack standing.[11]

## IV. CONCLUSION

For the reasons stated above,

IT IS HEREBY ORDERED THAT:

1. Plaintiffs' Motion for Summary Judgment, Dkt. 83, is DENIED.

2. Defendants' Cross-Motion for Summary Judgment, Dkt. 84, is GRANTED.

3. The Clerk of the Court shall CLOSE this case.

IT IS SO ORDERED.

Dated: 3/31/16

SAUNDRA BROWN ARMSTRONG
Senior United States District Judge

---

[11] Given the Court's finding on the issue of standing, the Court does not reach the issues of prudential mootness, the Bank's compliance (or lack thereof) with the ESA, or the Bank's compliance (or lack thereof) with the NHPA.